```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/19/11
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
IN RE SEPTEMBER 11 LITIGATION                     :
------------------------------------------------------------ :
CANTOR FITZGERALD & CO. et. al.,                  :   **ORDER AND OPINION GRANTING**
                                                  :   **PARTIAL SUMMARY JUDGMENT**
                              Plaintiffs,          :   **TO LIMIT PLAINTIFFS' DAMAGES**
                                                  :
        -against-                                 :   21 MC 101 (AKH)
                                                  :
                                                  :   04 Civ. 7318
AMERICAN AIRLINES, INC. and AMR CORP.,            :
                                                  :
                              Defendants.          :
------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Defendants American Airlines, Inc., and AMR Corporation (collectively

"American") move under Federal Rule of Civil Procedure 56 for partial summary judgment to

limit the scope of damages that Plaintiffs associated with Cantor Fitzgerald & Company

(collectively "Cantor Fitzgerald") may recover should Cantor Fitzgerald prove American was

negligent on September 11, 2001, by failing to prevent terrorists from entering and hijacking

American Airlines flight 11 and crashing it into Tower One of the World Trade Center.

American contends that portions of the damages Cantor Fitzgerald claims are excessive and in

contravention of New York law, because they are claim as damages the revenues that could have

been produced if Cantor Fitzgerald's employees had not been killed.  For the reasons that follow,

I grant American's motion and limit the damages that Cantor Fitzgerald may claim.

        Cantor Fitzgerald, a financial services firm, had its main offices in the top five

floors of Tower One.  On the morning of September 11, 2001, terrorists hijacked American

Airlines flight 11 after it departed from Logan International Airport in Boston and crashed the

fuel-laden 767 jumbo jet into Tower One, practically severing the building between the 90th and

100th floors.  The crash caused intense fires within the building, and its collapse later that

morning.  Cantor Fitzgerald lost its principal office and 658 of the approximately 1,000 officers

and employees who worked there.

Cantor Fitzgerald sued American and other defendants,[1] alleging negligence and

other wrongs in failing to detect and screen the hijackers and permitting them to board and

capture the airplane.  Cantor Fitzgerald alleged several categories of injuries: (i) harm to its

brand identity as a leading financial services firm, (ii) destruction of its office, (iii) destruction of

its corporate property, such as furniture and artwork, (iv) destruction of its technological

infrastructure, (v) destruction of its business records and transactions, and (vi) business

interruption losses.  Cantor Fitzgerald's complaint did not specify the amount of damages it

sought.

In October 2009, all twenty-one plaintiffs alleging property damage arising from

the events of September 11, and the defendants whom they sued, took part in comprehensive

formal mediation efforts before retired United States District Judge John S. Martin.  The

mediation efforts were based on the twenty-one plaintiffs' estimates of the damages they had

incurred, as reflected in their pre-trial disclosures.  Cantor Fitzgerald's own initial estimate was

approximately $100 million.

Immediately prior to the mediation, Cantor Fitzgerald amended its damage

estimate to increase it ten-fold, to nearly $1 billion.  The increase caused a breakdown in

mediation efforts before they had even begun.  Of the twenty other plaintiffs, eighteen succeeded

in mediation by compromising at a figure approximating 72 percent of their overall claimed

---

[1] Except for American Airlines and AMR Corporation, all Defendants whom Cantor Fitzgerald originally sued have
been dismissed from the case.  Order Denying Motion In Limine to Exclude Expert Report, Cantor Fitzgerald v.
American Airlines, 04 Civ. 7138 (21 MC 101), Doc. No. 81 (S.D.N.Y. Oct. 13, 2010).

damages amount. The only two other plaintiffs who did not mediate successfully were Cedar &
Washington Associates, LLC ("Cedar and Washington") and a collective group of plaintiffs
associated with the developer Larry Silverstein—the "WTCP Plaintiffs."[2] I discuss the
resolutions of these claims later in this opinion.

American now moves for partial summary judgment to define and limit Cantor
Fitzgerald's damage claims.

### I.  Background

### a.  The ATSSSA

This lawsuit arises under the Air Transportation Safety and System Stabilization
Act, 49 U.S.C. § 40101 et seq.  Immediately following the events of September 11, Congress
passed the ATSSSA to protect the aviation industry against the prospect of ruinous liability from
exposure to lawsuits; to regulate and concentrate anticipated lawsuits; and to provide a fair,
efficient and economical administrative procedure to compensate the victims and their families.
See 147 Cong. Rec. S9589-01, S9594 (Statement of Sen. McCain).

Accordingly, the ATSSA provides that "any air carrier, aircraft manufacturer, [or]
airport sponsor" may face liability only up to the limit of the individual aviation defendant's
insurance coverage for claims "arising from the terrorist-related aircraft crashes of September 11,
2001."  ATSSSA §§ 408(a)(1), (a)(2).  All lawsuits "arising from or relating to the terrorist-
related aircraft crashes of September 11, 2001" are to be brought only in the United States
District Court for the Southern District of New York, which is directed to apply "the law,

---

[2] The particular entities comprising the WTCP Plaintiffs have been identified in several of my previous orders.  See,
e.g., Order Clarifying Order and Op. Approving Settlement and Granting Intervenor Status, In re Sept. 11 Litig., 21
MC 101, Doc. No. 1206 (S.D.N.Y. July 23, 2010).

including the choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by federal law." Id. §§ 408(b)(2), (b)(3).

The ATSSSA also established a Victim Compensation Fund ("VCF"), administered by a Special Master appointed by the Department of Justice. The Special Master developed regulations to provide recoveries from federal funds to surviving victims and to the families of deceased victims without the need to prove fault or face the complications arising from litigation. See id. §§ 401-407. Claimants eligible for the VCF were given a choice of opting into the fund or pursuing litigation. Id. § 405(c)(3)(B). Claimants for property damage were not eligible for the VCF.

### b. The Wrongful Death and Personal Injury Lawsuits

The ATSSSA gave wrongful death and personal injury claimants a choice either to enter the VCF and seek speedy and certain recovery from the Special Master appointed to administer the VCF or to pursue traditional tort remedies in court. Ninety-five such suits were filed in connection with the crashes of the four hijacked airplanes, American Airlines flights 11 and 77 and United Airlines flights 93 and 175, and against numerous other Aviation Defendants.[3]

Ninety-four of the ninety-five cases have settled. The history of the cases and the settlement proceedings is described in several of my decisions. See, e.g., In re Sept. 11 Litig., 600 F. Supp. 2d 549 (S.D.N.Y. 2009). The one remaining case, Bavis v. United Airlines, 02 Civ. 7154, is scheduled for trial beginning June 2011. See Order Regulating Proceedings, Bavis v. United Airlines, 02 Civ. 7154 (21 MC 101), Doc. No. 1320 (S.D.N.Y. Oct. 22, 2010).

---

[3] The "Aviation Defendants" are: American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Globe Airport Security Services, Inc.; Argenbright Security, Inc.; Burns International Services Corp.; Burns International Security Services Corp.; Pinkerton's Inc.; Metropolitan Washington Airport Authority; the Port Authority of New York and New Jersey; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; and the Massachusetts Port Authority.

### c.   The Property Damage Lawsuits

Twenty-one Plaintiffs sued the Aviation Defendants for damage to property from the terrorist attacks.  These lawsuits were brought by subrogated insurers after having paid loss claims, and by uninsured businesses (collectively "Property Damage Plaintiffs").

Discovery proceeded in these cases in coordination with the wrongful death actions, and through specially-designed procedures to streamline and economize disclosure of damages.  See Stipulation and Order Regarding Settlements, In re Sept. 11 Litig., Doc. No. 747, 21 MC 97 (S.D.N.Y. Apr. 11, 2006).  The discovery built on specially devised Damages Disclosure Forms ("DDFs"), in which each Property Damage Plaintiff had been directed to itemize its claimed damages.  Order Requiring Disclosure of Property Damage Information, In re Sept. 11 Litig., 21 MC 101, Doc. No. 6. (S.D.N.Y. Apr. 12, 2005).  The DDFs required the Property Damage Plaintiffs to itemize damages in stipulated categories—for example, damage to real property, movables and other personal property, furnishings and equipment, and the like. Claims for business interruption also were to be detailed.  And recoveries and payments of insurance also were to be set out in itemized categories.  Id.

In May 2008, after two years of discovery and as the prospect of trials approached, the parties were directed to enter into a damages protocol, a process intended to streamline remaining damages discovery and narrow the issues for trial.  Stipulated Order, In re Sept. 11 Litig., 21 MC 101, Doc. No. 478 (S.D.N.Y. May 22, 2008).  The parties proceeded in the protocol process before the mediator they selected, Judge Martin, from May 2008 to September 2009. In re September 11 Litig., 723 F. Supp. 2d 534, 540 (S.D.N.Y. 2010).  While participating in the damages protocol, the parties also continued conducting formal liability discovery.  The parties took approximately one hundred and eighty depositions and, after screening by the

Transportation Security Authority ("TSA") for Sensitive Security Information, inspected approximately one million pages of documents. Id.

Notwithstanding the parties' efforts to conduct the damages protocol process and the formal liability discovery, it soon became clear that they remained far apart on issues of settlement and the proper scope of trial. Despite repeated status conferences and case management orders, the cases—both the wrongful death and the property damage cases— remained difficult to govern. In particular, a status conference of September 24, 2008 gave me the impression that the pretrial proceedings had taken on lives of their own, subject to ever-growing requests for information, ever-increasingly complex disputes, and ever-increasing concerns by the TSA and the Department of Justice that discovery would compromise Sensitive Security Information. A proposed case management plan tendered by the parties reinforced my concerns. I rejected the plan, ordered motions to define the disputed issues and, by my Order and Opinion of July 16, 2009, resolved the discovery disputes and laid a clear path towards trial, first of any remaining wrongful death claims, and then of property damage claims. See In re Sept. 11 Litig., 621 F. Supp. 2d 131 (S.D.N.Y. 2009). Following my order, I directed the Property Damage Plaintiffs and Aviation Defendants to conduct formal mediation before Judge Martin. In re September 11 Litig., 723 F. Supp. 2d at 540. The mediation began in October 2009.

Judge Martin produced results. He had the parties set forth their competing views, listened to arguments of the merits and of damages, and conducted extensive negotiations. After two weeks of formal mediation, Judge Martin made a proposal for settlements of the claims of eighteen of the twenty-one Property Damage Plaintiffs, requiring the Aviation Defendants to pay these claimants an aggregate of $1.2 billion. The proposed amount

6

represented a 72 percent discount from these eighteen Property Damage Plaintiffs' aggregate claim of $4.4 billion. Id. The settling parties agreed and, on February 25, 2010, filed a motion to approve the settlement. The WTCP Plaintiffs objected, and submitted opposition papers. After holding oral argument, I overruled the WTCP Plaintiffs' objections and approved the settlement on July 1, 2010. Id. at 546.

Two other Property Damage Plaintiffs also did not settle: Cedar & Washington and Cantor Fitzgerald. Cedar & Washington brought a claim under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., for injuries to a property they owned at 130 Cedar Street, a few blocks from the World Trade Center. After briefing and oral argument, I granted the Aviation Defendants' motion to dismiss Cedar & Washington's complaint. Summary Order Granting Defendants' Motion to Dismiss, In re Sept. 11 Litig., 21 MC 101, Doc. No. 1296 (S.D.N.Y. Sept. 22, 2010).

As for the WTCP Plaintiffs, their claims under the ATSSSA for damages to their leasehold interests in the World Trade Center have been the subject of a number of motions, hearings and orders and opinions. I held, in resolving those motions, that the damage claims of the WTCP Plaintiffs were to be limited to the market value of their leasehold interests as of September 11, 2001, less their insurance recoveries. As to that market value, since the WTCP Plaintiffs had purchased their interests from the Port Authority of New York and New Jersey, Inc., only a short while before September 11, 2001, and in the absence of proofs of any change of value, I held that the price they paid was the equivalent of the market value that was destroyed. See Order Granting in Part and Denying in Part Motion for Summary Judgment Regarding Damages, In re Sept. 11 Litig., 21 MC 101, Doc. No. 677 (S.D.N.Y. Dec. 10, 2008); Order

7

Reclassifying and Denying World Trade Center Properties Plaintiffs' Motion for Reconsideration, In re Sept. 11 Litig., 21 MC 101, Doc. No. 793 (S.D.N.Y. April 29, 2009).[4]

The claims of Cantor Fitzgerald are the only property damage claims not yet resolved. My task in this opinion and order is to understand their nature and scope, and the law that applies to the largest component of them, the claim for business interruption damages resulting from American's alleged negligence.

### i.   Cantor Fitzgerald's Claims for Damages

Its initial DDF, submitted in June 2005, Cantor Fitzgerald claimed total damages of $223,500,000, of which $127,500,000 represented its claim for business interruption. After subtracting insurance recoveries of $121,045,000, Cantor Fitzgerald presented a net claim of $102,455,000.

On September 29, 2009, just before Judge Martin's mediation proceedings were to begin, Cantor Fitzgerald amended its DDF to state a much larger damages claim, after insurance recoveries, of $1,093,404,153. To reach this amount, Cantor Fitzgerald enlarged its claim for business interruption damages to $879, 819,953; shrunk its property damages claims to $7,190,000; added a new category of "Extra Expenses," such as relocating to temporary facilities and renting furniture, for $20,189,212; and computed interest on the total claim at a rate of 9 percent, in the amount of $354,075,075.[5] In May 2010, Cantor Fitzgerald amended its claim for damages again. Cantor Fitzgerald again enlarged the business interruption damages claim from

---

[4] One relatively small issue remains to be tried, the extent that the WTCP Plaintiffs' potential tort damages exceed the insurance recoveries already received. See, e.g., Order Denying Motion for Certification of Interlocutory Appeals under 28 U.S.C. § 1292(b), In re Sept. 11 Litig., 21 MC 101, Doc. No. 1322 (S.D.N.Y. Oct. 26, 2010). The WTCP plaintiffs have not yet sought to match the components of their insurance recoveries against the components of their potential tort damage recovery.

[5] Around the same time, Cantor Fitzgerald attempted also to add additional defendants, which I denied as untimely. Order and Op. Granting Motion to Drop Parties and Denying Motion to Add Parties, Cantor Fitzgerald v. American Airlines, 04 Civ. 7318 (21 MC 101), Doc. No. 57 (S.D.N.Y. Oct. 28, 2009).

$879, 819,953 to $963,357,344, and shrunk the insurance payments deduction from $166, 507, 543, to $45,462,543.  Cantor Fitzgerald did not include the interest expense, and did not substantially modify its Extra Expenses claim.  Accordingly, the net claim, as of May 2010, was $945,389,568.  Cantor Fitzgerald reserved its right to amend again, if "new information was brought to [its expert's] attention."  Declaration of John Stoviak ("Stoviak Decl."), Ex. E.  The table below traces the growth in Cantor Fitzgerald's damages claim:

| Damages Category | Initial Submission (June 2005) | Amended Submission (Sept. 2009) | Amended Submission (May 2010) |
|---|---|---|---|
| **Business Interruption** | $127,500,000 | $879,819,953 | $963,357,344 |
| **Property Damage** | $96,000,000 | $7,190,000 | $7,190,000 |
| **Imputed Interest** | X | $354,075,075 | X |
| **Extra Expenses** | X | $20,189,212 | $20,304,767 |
| **(Insurance Payments)** | ($121,045,000) | ($166,507,543) | ($45,462,543) |
| **Net Damages Claim** | **$102,455,000** | **$1,093,404,153** | **$945,389,568** |

Cantor Fitzgerald relies for its damage claim on the "holistic" evaluation of its expert, Gregory S. Thaler.[6]  As Thaler explained his approach, he "quantified the damages associated with everything, all the damage that occurred to Cantor Fitzgerald that day."  Stoviak Decl., Ex. F at *33.  He elaborated, "I haven't tried to parse out damage related to one factor or another [because] there were so many components."  Id. at *39.  Additionally, he explained, "[w]hen the airplane crashed into the building it destroyed—killed people, it destroyed office space, it destroyed the books of business, it destroyed the relationships.  I quantified the damages related to all of that."  Id. at *34.  Thaler found the market share that Cantor Fitzgerald had

---

[6] I described Thaler's experience and expertise in my earlier order denying American's motion *in limine* to exclude the report.  See Order Denying Motion In Limine to Exclude Expert Report, 04 Civ. 7318 (21 MC 101), Doc. No. 81 (S.D.N.Y. Oct. 13, 2010).

enjoyed in each of its four lines of business, discussed below, based on lost income from Cantor Fitzgerald's decreased market share in each line of business, carried forward to June 30, 2009. In this analysis, which contemplated "the totality of what happened that day" to Cantor Fitzgerald, Thaler did not parse out discrete elements of his business-interruption damages calculations, such as the losses associated with employee deaths. Id. at 40, 41-42. Thaler commented that this approach was "generally accepted" in insurance and "widely accepted" for other purposes.[7] Stoviak Decl., Ex. E.

Thaler broke down his analysis to Cantor Fitzgerald's four principal lines of business: (i) interdealer brokerage services, (ii) electronic interdealer brokerage services, (iii) third-market equities services, and (iv) matched book/MMI services.

The interdealer brokerage line of services were Cantor Fitzgerald's traditional trading services, depending on individual brokers to foster client relationships and grow books of business. Thaler reasoned that Cantor Fitzgerald's brokers were exceptionally talented and liberally compensated, so that their deaths severely impacted the dominance enjoyed by the firm. Thaler considered that Cantor Fitzgerald was unable to replace its brokers and their books of business and personal relationships until it purchased the business of a competitor, Euro Brokers, in May 2005. Thaler put Cantor Fitzgerald's market share, as of September 11, 2001, at 13.5 percent, and its business-interruption damages for lost market share at $264,457,883.

The electronic interdealer brokerage line of services, operated by Cantor Fitzgerald's subsidiary, eSpeed Inc. ("eSpeed"), provided a highly automatic service that used the internet, and highly sophisticated programs and equipment, to link buyers and sellers of

---

[7] At his deposition, Thaler was asked repeatedly whether his damages estimates excluded damages resulting from the deaths of Cantor Fitzgerald's employees on September 11. In response, Thaler first insisted that his estimates, while accounting for "the total damage to Cantor Fitzgerald as a company," did not include damages due to the deaths of employees. See Stoviak Decl. Ex. F, at *38-42. However, Thaler acknowledged also that his calculations did note remove damages associated with employee deaths. Id. at 41-42.

securities.  Thaler considered that Cantor Fitzgerald became unable to provide this service when its offices were destroyed and its personnel killed on September 11.  However, Cantor Fitzgerald was able quickly to restore eSpeed using the firm's backup location in Rochelle, New Jersey, and its offices in London.  When the New York market reopened on September 13, 2001, eSpeed was online.  Thaler computes Cantor Fitzgerald's damages at $366,475,240, projecting from a market share of 83 percent.

The third-market equities line of services acted as a clearinghouse for equities, securities, and hybrid securities traded directly by institutions.  Success in this business line also depended in large part on brokers' abilities to form client relationships and grow books of business.  Thaler considered that Cantor Fitzgerald's market share of this line of business amounted to 50 percent, and that a projection based on Cantor Fitzgerald's lost market share resulted in $224,955.921 in damages.

In its matched book/MMI line of services, Cantor Fitzgerald functioned as a dealer and secondary market maker for United States Treasury bills and notes, buying and selling "repos" and "reverse repos" of large blocks of Treasury bills and notes, and seeking profits in spreads of interest rates between the purchases and sales.  Cantor claims $18,052,690 in business interruption damages from this line of business.  Because Cantor Fitzgerald did not function as a market competitor in this line of business, Thaler did not employ the same approach to calculate business interruption damages as he used in the previous three lines of business.  Instead, Thaler projected the average annual revenue earned and projected it over the same period, September 11, 2001, to June 30, 2009.

American Airlines filed this motion for partial summary judgment to limit and define Cantor Fitzgerald's amended damages claim, contending the business-interruption claims

11

were based on shifting and legally untenable bases. American also moved to strike Thaler's report, contending that it was speculative and not based on expertise or legally relevant components of damage. I denied American's latter motion, ruling that I would be examining the competence and relevance of Cantor Fitzgerald's expert's report in the context of this motion. I now consider American's motion for partial summary judgment.

## II. Discussion

### a. Standard of Review

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(2). The district court is obligated to construe the evidence in the light most favorable to the nonmoving party, and to draw all reasonable inferences in its favor. In re Agent Orange Prod. Liability Litig., 517 F.3d 76, 87 (2d Cir. 2008). These standards apply with equal force to motions for partial summary judgment. See Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 143 (2d Cir. 2010). A defendant may seek partial summary judgment on an element of the plaintiff's claim, and thus may seek judgment limiting the scope of the plaintiff's damages as a matter of law. See AT&T Corp. v. Microsoft Corp., 290 F. Supp. 2d 409, 410 (S.D.N.Y. 2003) (granting motion for partial summary judgment to limit the scope of damages); State v. Almy Bros., Inc., 90 Civ. 818, 1998 WL 57666, at *15 (N.D.N.Y. Feb. 4, 1998) (same).

### b. Whether Cantor Fitzgerald Has Sought Impermissible Damages

American contends that Cantor Fitzgerald's claims of business interruption damage are based substantially on the consequences of the deaths of its employees, in contravention of New York law. Cantor Fitzgerald concedes that New York law does not permit

12

an employer to recover damages for the loss of its employees, but contends it has not sought such damages. Rather, Cantor Fitzgerald argues that it has suffered a predicate harm to its physical property and has sought consequential damages flowing naturally and probably from the harm to its business property. I hold that Cantor Fitzgerald's damage claim is substantially inflated by the losses caused by the deaths of its employees, and must be restated to eliminate damages thus caused.

New York common law provides a cause of action for harm done to an ongoing business. The rule goes back at least to <u>Snow v. Pulitzer</u>, 36 N.E. 1059 (N.Y. 1894). In that case, the defendant negligently razed a building, causing structural damage to the neighboring building, which had to be condemned. The plaintiff had owned and operated a confectionary business in the now-condemned building; the confectionary was destroyed when the building was razed. The New York Court of Appeals allowed the plaintiff to recover the profits that the confectionary would have generated had the defendant not been negligent. <u>Id.</u> at 1060. Subsequent cases have confirmed the principle that if an individual's business is harmed, the individual may sue for damages to compensate for lost profits. <u>See</u> <u>Syracuse Cablesystems v. Niagara Mohawk Power</u>, 578 N.Y.S.2d 770 (4th Dept. 1991) (physical damage to business premises was sufficient to trigger cause of action for lost profits); <u>Dunlop Tire & Rubber Corp. v. FMC Corp.</u>, 385 N.Y.S.2d 971 (4th Dept. 1976) (same); <u>see also</u> <u>Black v. George Weston Bakeries, Inc.</u>, 07 Civ. 853S, 2008 WL 4911791, at *2-3 (W.D.N.Y. Nov. 13, 2008) (same).

The cause of action for lost profits must arise from physical damage to property; it cannot be maintained if a plaintiff alleges only economic damages. In <u>532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.</u>, 96 N.Y.2d 280 (N.Y. 2001), the defendant's building partially collapsed, causing bricks and mortar to crumble away from the south wall and

13

crash into Madison Avenue.  To prevent injury to persons and property, the City closed Madison Avenue from 42d to 57th streets.  The plaintiff owned a delicatessen along that stretch of Madison Avenue, and sued the defendant for lost sales and profits from the closure.  The New York Court of Appeals, affirming the dismissal of the complaint, held that the plaintiff had failed to state a cause of action, for the defendant did not owe a duty to the plaintiff to prevent purely economic harm.  Id. at 286; see also Roundabout Theater Co., Inc. v. Tishman Realty & Constr. Co., 756 N.Y.S.2d 12, 12 (1st Dept. 2003) (applying 532 Madison to reject theater owner's claim that street closure, due to collapse of defendant's construction elevator tower on neighboring building, caused damages in the form of cancelled performances); Beck v. FMC Corp., 385 N.Y.S.2d 956 (4th Dept. 1976) (declining to provide cause of action where plaintiff alleged only economic damages).

The destruction of Tower One of the World Trade Center destroyed Cantor Fitzgerald's leasehold to the top floors of the Tower and its property within that leasehold. Cantor Fitzgerald is entitled to claim damages naturally and probably resulting from the damage it suffered.  These damages can include injuries to property, and to lost profits naturally and probably flowing from the injury to its property.  But Cantor Fitzgerald cannot bootstrap this entitlement into a wholesale claim of business interruption damages not matching the corresponding duty of the alleged tortfeasor.  See Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232 (N.Y. 2001) ("The threshold question in any negligence action is: does defendant owe a legally recognized duty of care to plaintiff?").  As the following cases show, the duty of the alleged tortfeasor, American, does not permit Cantor Fitzgerald to claim profits arising from the deaths of its officers and employees.

14

In <u>Ferguson v. Green Island Construction Corp.</u>, 355 N.Y.S.2d 196 (3d Dept. 1974), the defendant owned an airplane that crashed while transporting an employee critical to the plaintiff's business. The employee was critically injured, and the plaintiff sued the defendant for business interruption damages, on the theory that by harming the employee, the defendant had interrupted the plaintiff's business operation. Affirming the dismissal of the complaint, the Appellate Division ruled that New York law does not recognize a tort duty to avoid interfering with an employer's contractual interest in its employee's services. 355 N.Y.S.2d at 198. The Court of Appeals affirmed, holding that "[a]n employer has no right to recover damages sustained when one of its employees is injured in consequence of the negligence of a third party." 36 N.Y.2d 742, 743 (N.Y. 1975) (per curiam); <u>see also</u> <u>Alvord & Swift v. Stewart M. Muller Const. Co., Inc.</u>, 46 N.Y.2d 276, 281 (N.Y. 1978) (rejecting existence of a cause of action for negligent interference with contract). This rule has been broadly accepted. <u>See</u> <u>Behrens v. Metropolitan Opera Ass'n, Inc.</u>, 794 N.Y.S.2d 301, 305 (1st Dept. 2005) (corporation could not recover for losing the services of its principal employee, an opera singer, because of injuries caused by defendant's negligence); <u>Champion Well Service, Inc. v. NL Indus.</u>, 769 P.2d 382, 383 (Wyo. 1989) (citing multiple jurisdictions holding similarly to <u>Ferguson</u>); <u>Lauria v. Mandalay Corp.</u>, 07 Civ. 817, 2008 WL 3887608, at *2 (D.N.J. Aug. 18, 2008) ("Generally, courts to have recently considered the issue have denied employers recovery of economic damages relating to an employee's injury inflicted through negligence.") (collecting cases).

The rationale underlying the view set forth in <u>Ferguson</u> is that employers cannot rely on master/servant liability to assert an interest in their employees. Master/servant liability, which has been roundly rejected, posits that an employer has a proprietary interest in his employee's services. <u>See, e.g.</u>, <u>Woodward v. Washburn</u>, 3 Denio. 369 (N.Y. 1846). Modern

15

caselaw views the doctrine as asserting a proprietary interest in an employee himself, which is regarded as an unacceptable premise. See Barry & Sons, Inc. v. Instinct Prods. LLC, 788 N.Y.S.2d 71, 76 (1st Dept. 2005) ("Courts almost universally reject the antiquated proprietary view of the master/servant relationship."). Because employers cannot claim such an interest in an employee, they cannot sue a third party in negligence for acts that interfere with the employer's ability to enjoy the employee's services. Put differently, a third party has no duty to an employer to avoid harming an employee. It was on this rationale that the Court of Appeals affirmed in Ferguson, and in which it sharply questioned the continuing vitality of Woodward. 36 N.Y.2d at 743.

In Ferguson, the employee was injured but lived; here, Cantor Fitzgerald's employees died. The distinction is not legally significant, however, for the death of an employee, from an employer's economic perspective, is no different from a lesser interruption of an employee's services. It is difficult to imagine that New York courts would allow an employer to sue a third party for business-interruption losses arising from the lost services of an employee who was killed, but would not allow the same suit for business interruption losses incurred during the period that a surviving employee had to convalesce. It follows that the Ferguson rule applies with full force in this case.

New York law provides another reason why Cantor Fitzgerald's business interruption damages claim is flawed. Under New York law, claims for damages associated with the death of an individual are considered wrongful-death causes of action. An employer like Cantor Fitzgerald is not entitled to bring such a cause of action. Thus, regardless of how artfully it pleads, Cantor Fitzgerald's attempt to recover for what are, substantively, damages flowing from the deaths of its employees is not permissible.

16

The power to sue for injuries incurred from the death of an individual has no basis in New York common law.  Liff v. Schildkrout, 49 N.Y.2d 622, 631-32 (N.Y. 1980).  The cause of action arises only from statute, the New York Estates Powers & Trusts Law § 5-4.1(1) (McKinney 1999 and Supp. 2009).  The statute provides in relevant part:

> The personal representative, duly appointed in this state or any other jurisdiction, of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued.

N.Y. Est. Powers & Trusts L. § 5-4.1(1).  The Court of Appeals has instructed, repeatedly, that this statute must be construed "strictly."  See Gonzalez v. N.Y. City Housing Auth., 77 N.Y.2d 663, 667-68 (N.Y. 1991); Liff, 49 N.Y.2d at 631-32; see also Langan v. St. Vincent's Hosp. of New York, 802 N.Y.S.2d 476, 477 (2d Dept. 2005) (narrowly defining "personal representative" under EPTL § 5-4.1(1)); W.E. Shipley, Modern Status of Rule Denying a Common-Law Recovery for Wrongful Death, 61 A.L.R.3d 906, § 3 (2010) ("The American courts have almost universally accepted the rule that a civil action for wrongful death was not recognized at common law, and that no such cause of action may be maintained except under the terms and authority of a statute.") (collecting cases).

To assert a claim under section 5.4-1(1), a plaintiff must be the duly appointed "personal representative" of the decedent.  George v. Mt. Sinai Hosp., 47 N.Y.2d 170, 177 (N.Y. 1979); see also Carrick v. Cent. Gen. Hosp., 51 N.Y.2d 242, 249 n.2 (N.Y. 1980).  Moreover, the personal representative may bring the claim only on behalf of the decedent's distributees. Hernandez, 78 N.Y.2d at 693; Hamilton v. Erie R. Co., 219 N.Y. 343, 350 (N.Y. 1916).  These limitations accord with the general principle, recently reaffirmed by the Court of Appeals, that "[t]o grant the right conferred by [the statute] to a different party plaintiff, representing in part

17

different interests, would require the placing of a construction upon the section plainly beyond its intent and purpose. Reliance Ins. Co. v. PolyVision Corp., 9 N.Y.3d 52, 57 (N.Y. 2007) (quoting Streeter v. Graham & Norton Co., 263 N.Y. 39, 44 (N.Y. 1933)).

New York courts have affirmed this principle in rejecting the efforts of employers to bring causes of actions against third parties who negligently caused the death of employees.[8] In Barry & Sons, the plaintiff sued the defendant when the defendant's airplane crashed, killing plaintiff's singularly important employee. The plaintiff urged that its suit was not a wrongful death action, but rather a claim that the defendant failed to use reasonable care in performing its contractual obligation to the plaintiff. The First Department, directing dismissal of the complaint, noted that "[t]he facile complaint allegation that [the employee] was [plaintiff's] primary asset does nothing to dispel the obvious—that [plaintiff's] claims assert nothing more than a wrongful death action." 788 N.Y.S.2d at 74. Because the plaintiff's claim properly belonged only to the personal representative, the claim was dismissed.

Barry & Sons also noted the important reasons New York courts have limited section 5.4-1(1) in this way. First, damages from a tortfeasor who causes death must be protected for the benefit of those who relied on the decedent for support. Id. at 75 (citing Harris Corp., Data Commc'ns Div. v. Comair, Inc., 510 F. Supp. 1168, 1172 (E.D.Ky. 1981)). Second, to allow an employer to assert such a cause of action would—as in Ferguson—revive master/servant liability. Barry & Sons, 788 N.Y.S.2d at 75. For these reasons, Barry & Sons instructs courts to consider the substance of a plaintiff employer's claim to decide if it is a wrongful death case. Id.; see also Arrow Elecs., Inc. v. Stouffer Corp., 458 N.Y.S.2d 461, 463

---

[8] Contrary to Cantor Fitzgerald's contention, it is irrelevant that the families of the deceased employees and officers have already recovered damages that would substantively be wrongful-death damages by participating in the VCF. Cantor Fitzgerald cannot recover such damages as a matter of law. The recoveries of other individuals does not bear upon the question.

(N.Y. Sup. 1982) (holding that a complaint brought by an employer, "no matter how ingeniously disguised," must be dismissed if it is in truth a wrongful-death claim).

Other cases reinforce the principle provided by Barry & Sons. In Taj Mahal Assocs. v. Construzioni Aeronautiche Giovanni Agusta, S.p.A., 761 F. Supp. 1143 (D.N.J. 1991), a helicopter crashed, killing three executives critical to an Atlantic City, New Jersey gambling enterprise. The plaintiff, employer of the deceased employees, sued the defendant helicopter manufacturer for damages arising from the loss of the employees' services. The United States District Court, applying similar New Jersey law,[9] held that the plaintiff could not seek such damages. Id. at 1161-62. And in a case arising under New York law, Shell v. United States, 530 F. Supp. 1271 (E.D.N.Y. 1982), the owner and principal of a bar, while at work, was killed when the neighboring perimeter wall of the Brooklyn Naval Yard collapsed and crushed the bar. The corporation and the principal's next of kin both sued, and each recovered for discrete harms: the corporation recovered $20,000 for destruction of property and loss of revenues the bar could no longer generate because the premises had been destroyed; the decedent's next of kin recovered $400,000 in damages for "pecuniary loss sustained . . . due to decedent's death." Id. at 1275-76.

In the case before me, it is clear that Cantor Fitzgerald claims damages arising from the death of its employees. As Cantor Fitzgerald's damages expert, Thaler, testified, "[w]hen the airplane crashed into the building it destroyed—killed people, it destroyed office space, it destroyed the books of business, it destroyed the relationships. I quantified the damages related to all of that." Stoviak Decl., Ex. F at *34. Thaler's report fails to distinguish, and

---

[9] The New Jersey wrongful-death statute reads, "The amount recovered in proceedings under this chapter shall be for the exclusive benefit of the persons entitled to take any intestate personal property of the decedent, and in the proportions in which they are entitled to take the same." N.J. Stat. Ann. § 2A:31-4 (West 2008). The statute is the only source of a cause of action arising from the death of another. See Trump Taj Mahal, 761 F. Supp. at 1160.

eliminate, the economic loss resulting from the loss of Cantor Fitzgerald's employees, and from the loss of the interpersonal client relationships nurtured by its highly talented brokers. New York law is clear that Cantor Fitzgerald may not a claim a legal injury from such a loss, for Cantor Fitzgerald cannot assert a duty owed by American, nor a statutory claim for wrongful death under section 5-4.1(1) of the New York Estates Powers & Trusts Law.

Cantor Fitzgerald is not the first business to try to plead around this rule by contending that it is suing for a business loss, and not for the wrongfully caused deaths of its employees. See Barry & Sons, 788 N.Y.S.2d at 75; Taj Mahal, 761 F. Supp. at 1161-62. But as in those cases, it is clear that the major part of Cantor Fitzgerald's loss resulted from having lost the services of its deceased employees. This is evident in Thaler's report. New York law does not permit his holistic approach. [10]

### III.   Conclusion

No one can deny the emotional and financial hurt suffered by Cantor Fitzgerald, and the families of its officers and employees. But as a matter of law, Cantor Fitzgerald's claim for damages, however theorized, may not include claims for lost profits resulting from the deaths of, and injuries to, its officers and employees on September 11.

Cantor Fitzgerald must eliminate the impermissible aspect of its damages claim. It has leave to file amended claims by February 28, 2011. I will meet with the parties on March 7, 2011, at 2:30pm, to discuss the status of any remaining pretrial issues, and to set a trial date.

---

[10] This holding is consistent with the rule in tort law that a plaintiff may recover damages only flowing naturally and probably from the alleged injury. See Palka v. Servicemaster Mgmt Servs. Corp., 83 N.Y.2d 579, 586 (N.Y. 1994) ("Courts traditionally and as a part of the common-law process fix the duty point by balancing factors, including the reasonable expectations of the parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."). Such concerns are particularly appropriate here, in light of the congressional intent, expressed in the ATSSSA, to limit damages and allow a fair distribution of recoveries by the thousands of injured plaintiffs. See In re Sept. 11 Litig., 567 F. Supp. 2d 611, 620 (S.D.N.Y. 2008) ("Under the ATSSSA, this district court, discharging its task to administer all the cases before it, must consider . . . the context of all other settlements and remaining claims.").

In the meantime, if the parties wish to return to mediation before Judge Martin after Cantor Fitzgerald restates its claim, they shall so advise me by joint letter, and ask for the cancellation of the status conference.

The Clerk shall terminate the motion (Doc. No. 1234).

SO ORDERED.

Dated:    January 19 2011
          New York, New York

ALVIN K. HELLERSTEIN
United States District Judge