UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                     :
IN RE SEPTEMBER 11 LITIGATION          :  21 MC 101 (AKH)
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                     :
CANTOR FITZGERALD & CO., et al.,           :
                                                     :
                      Plaintiffs,          :   04-CV-7318 (AKH)
                                                     :
             v.                                      :
AMERICAN AIRLINES, INC., and AMR        :
CORP.,                                               :
                      Defendants.          :
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR A DETERMINATION OF
## APPLICABLE LAW REGARDING THE STANDARD OF CARE

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, NY 10036
Telephone:  (212) 490-9100
Fax:  (212) 370-4453
dbarry@condonlaw.com
             -and-
DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, NY 10022
Telephone:  (212) 909-6000
Fax:  (212) 909-6836
mkmonagh@debevoise.com
repodesta@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ....................................................................................................... 2

I.  Federal Law Exclusively Governs Aviation Security and Preempts
    State Law Standards of Care ................................................................... 2

II. The Federal Aviation Regulations, Air Carrier Standard Security
    Program and Security Directives Comprised the Federal Standard of Care
    Applicable to American on 9/11 .............................................................. 6

    A.  The FARs Prescribed the Security Measures Air Carriers Were
        Required to Implement on 9/11 ........................................................ 7

    B.  The FAA-Approved Air Carrier Standard Security Program
        Prescribed the Specific Security Procedures in Place on 9/11 .................... 8

    C.  The FAA-Issued Security Directives Advised Air Carriers of Specific
        Security Threats and Prescribed Permissible Countermeasures ................ 11

III. The FARs, ACSSP and Security Directives Prescribed the Detailed Security
     Responsibilities of Air Carriers on 9/11 ................................................ 13

    A.  The FARs Did Not Require an Affirmative or Absolute Obligation to
        Secure the Sterile Area of all Potential Weapons ................................ 13

    B.  American's FAA-Approved ACSSP Not Did Include Small-Bladed
        Knives and Box Cutters in the Prohibited Category of "Deadly and
        Dangerous" Weapons on 9/11 ........................................................ 17

        1.  The FAA Considered and Rejected a Prohibition on
            Knives with Blades Shorter Than Four Inches ............................ 19

        2.  The Four-Inch Knife Rule is Consistent With FAA Pre-Board
            Screening and Sterile Area Polices ...................................... 21

        3.  Plaintiffs Advocate a Broader Definition of "Deadly and
            Dangerous Weapons" Than Is Required by FAA
            Regulations .............................................................. 23

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

C.    The FAA Limited Air Carriers' Ability to Screen Passengers and Other
      Individuals Seeking to Enter the Sterile Area on 9/11 .............................. 27

      1.    Heightened Scrutiny of Muslims, Middle Easterners, and
            Arabs Was Prohibited by Federal Law ........................................... 27

      2.    Passenger Pre-Screening Was Limited by FAA Regulations ........ 28

            (a)    Computer-Assisted Passenger Pre-Screening Was
                   Designed to Address Checked Baggage Security
                   Concerns .......................................................................... 28

            (b)    FAA-Prescribed Baggage Control Questions During
                   Check-In Were Designed to Detect Terrorist Dupes ........ 32

            (c)    The International Security Program Did Not Apply to
                   Domestic Flights ............................................................... 33

      3.    The FAA-Approved Equipment for Checkpoint Screening of
            Passengers Was Not Capable of Detecting Small-Bladed
            Knives or Box Cutters ................................................................. 36

            (a)    The Calibration and Testing of Metal Detectors Was
                   Intended to Identify Guns ................................................. 37

            (b)    The FAA Did Not Require Additional Screening or
                   Pat-Down Procedures of All Passengers ........................... 40

D.    The FAA Did Not Require Hand Searches of All Carry-On Items at
      Checkpoint Screening ............................................................................ 43

E.    The Qualification Standards and Training of Screening Personnel
      Were Prescribed by the FAA ................................................................. 45

      1.    The FAA-Approved ACSSP Provided the Standards for
            Screener Qualifications and Training ........................................... 45

      2.    The FAA Required Air Carriers to Appoint Ground Security
            Coordinators and Inflight Security Coordinators to Monitor
            Compliance with the Required Security Procedures ..................... 47

ii

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

F.      The FAA's "Common Strategy" Instructed Flight Crews to
        Cooperate With Hijackers ....................................................................... 48

G.      The FAA's Aviation Security Contingency Plan Alerted Air Carriers
        of the Likelihood of Potential Security Threats......................................... 51

IV.     The Checkpoint Operations Guide Was Not a Federal Regulation,
        and Did Not Impose Any Legally Binding Obligations on Air Carriers.............. 52

V.      American Only Needs to Show Substantial Compliance With
        The Federal Standard of Care .............................................................................. 59

CONCLUSION ............................................................................................................. 60

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdullah v. Am. Airlines, Inc.*,
　181 F.3d 363 (3d Cir. 1999) ........................................................................................... 4

*Abraham v. Port Auth. of N.Y. & N.J.*,
　815 N.Y.S.2d 38 (1st Dep't 2006) ................................................................................ 58

*Air Transp. Ass'n of Am., Inc. v. Cuomo*,
　520 F.3d 218 (2d Cir. 2008) ........................................................................................... 4

*Asantewaa v. City of N.Y.*,
　935 N.Y.S.2d 18 (1st Dep't 2011) ................................................................................ 58

*Bavis v. United Airlines Inc.*,
　811 F. Supp. 2d 883 (S.D.N.Y. 2011) ................................................................... 1, 3, 4

*Crosland v. N.Y.C. Tr. Auth.*,
　68 N.Y.2d 165 (1986) ................................................................................................... 59

*French v. Pan Am. Express, Inc.*,
　869 F.2d 1 (1st Cir. 1989) ............................................................................................... 4

*Gilson v. Metro. Opera*,
　5 N.Y.3d 574 (2005) ..................................................................................................... 58

*Goodspeed Airport LLC v. E. Haddam Inland Westlands & Watercourses Comm'n*,
　634 F.3d 206 (2d Cir. 2011) ........................................................................................... 4

*Gordon v. Softech Int'l, Inc.*,
　726 F.3d 42 (2d Cir. 2013) ........................................................................................... 17

*Greene v. B.F. Goodrich Avionics Sys., Inc.*,
　409 F.3d 784 (6th Cir. 2005) .......................................................................................... 4

*In re Air Crash Near Clarence Center, N.Y., on Feb. 12, 2009*,
　798 F. Supp. 2d 481 (W.D.N.Y. 2011) ........................................................................... 4

*In re Sept. 11 Litig.*,
　621 F. Supp. 2d 131 (S.D.N.Y. 2009) .......................................................................... 60

*Longacre v. Yonkers R.R. Co.*,
　236 N.Y. 119 (1923) ..................................................................................................... 59

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW', AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) ..................................................................................4

*Rahimi v. Manhattan & Bronx Surface Transit Operating Auth.*,
    843 N.Y.S.2d 557 (1st Dep't 2007) .........................................................................58

*Rivera v. N.Y.C. Tr. Auth.*,
    77 N.Y.2d 322 (1991) .............................................................................................59

*Sherman v. Robinson*,
    80 N.Y.2d 483 (1992) .............................................................................................58

*U.S. Airways, Inc. v. O'Donnell*,
    627 F.3d 1318 (10th Cir. 2010) ...............................................................................4

*Wanderer v. Allstate Ins. Co.*,
    355 N.Y.S.2d 80 (1974) ..........................................................................................15

*WNET, Thirteen v. Aereo, Inc.*,
    712 F.3d 676 (2d Cir. 2013) ....................................................................................17

## STATUTES, TREATIES AND RULES

14 C.F.R. Part 108 ........................................................................................*passim*

14 C.F.R. Part 121 .................................................................................................50

49 U.S.C. § 40101 ...................................................................................................2

49 U.S.C. § 44701 ...................................................................................................5

66 Fed. Reg. No. 137 ..................................................................................10, 15, 16

~~SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)~~
~~SENSITIVE SECURITY INFORMATION WARNING–THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED~~
~~UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR~~
~~PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.~~
~~UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION~~

## PRELIMINARY STATEMENT

Defendants American Airlines, Inc. and AMR Corporation (collectively "Defendants" or "American") submit this Memorandum of Law together with the accompanying Declaration of Desmond T. Barry, Jr. ("Barry Decl.") and attached exhibits for an Order determining the law applicable to the standard of care to be applied to their conduct on 9/11. In particular, Defendants seek an Order that the body of federal laws concerning aviation security procedures provides the exclusive standard of care against which the conduct of Defendants and their agents on 9/11 is to be measured.

In *Bavis v. United Airlines Inc.*, 811 F. Supp. 2d 883 (S.D.N.Y. 2011), after extensive briefing and argument, the Court held that federal law preempted any state law standard of care regarding aviation security and set the standard of care applicable to the conduct of United Airlines and its security contractor on 9/11. The Court further held that the federal scheme for aviation security sets out a uniform system of duties and requirements, not minimum standards for the airlines and their agents. The *Bavis* ruling is in full accord with Second Circuit precedent and federal case law generally. For the reasons discussed below, American submits that the same federal law that applied in *Bavis* also establishes the standard of care in this action, and that the Court should determine here that federal law preempts any state law standard of care applicable to aviation security.

This Motion further addresses the substantive content of the federal aviation security regulatory scheme in effect on 9/11, which was comprised of the Federal Aviation Regulations ("FARs"), the Air Carrier Standard Security Program ("ACSSP"), and Federal Aviation Administration ("FAA") Security Directives in force on 9/11. The purpose of this Motion is to

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21-MC-101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

define the standard of care applicable to American's actions on 9/11 and to specifically indicate which provisions of federal law controlled on 9/11 and what they provide.

The substantive content of the FAA's aviation security regulatory scheme—the FARs, the ACSSP, and Security Directives, and their implementation, have been the subject of extensive discovery within this litigation. As explained *infra*, the FARs are part of the Code of Federal Regulations; thus, the FARs and their administrative history are publicly available. The ACSSP and Security Directives were produced to Plaintiffs over seven years ago. Throughout the course of this litigation, nine FAA officials have been deposed regarding various aspects of the aviation security regulatory scheme, and 25 depositions of American personnel from various levels—from employees at the airport at Logan Airport in Boston through the Corporate Security department and senior management at American—have been taken by Plaintiffs. Plaintiffs have also taken the depositions of more than 30 screeners and management personnel from American's security company at Logan Airport, Globe Aviation Services Corporation ("Globe"). In addition, there have been 12 expert depositions in this case alone, and more than 100 other depositions, including depositions of United Airlines, the Massachusetts Port Authority, Huntleigh USA Corporation, The Boeing Company, Colgan Air, Inc., U.S. Airways, Inc., and their screening companies. At this point, the substantive content of these federal regulations are as well known to Plaintiffs as they are known to American.

## ARGUMENT

**I.   Federal Law Exclusively Governs Aviation Security and Preempts State Law Standards of Care.**

The Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 *note* ("ATSSSA") created a federal cause of action (under which both the *Bavis* plaintiffs' and Cantor's

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

claims arise) that supersedes state law claims for damages arising out of the hijacking and subsequent crashes of American Airlines Flight 11 and United Airlines Flight 175. The ATSSSA further provides that the substantive law for decision in any suit arising out of 9/11 "shall be derived from the law, including choice of law principles, of the State in which the crash occurred *unless such law is inconsistent with or preempted by Federal law.*" ATSSSA § 408(b)(2) (emphasis added).

Since its inception in 1973, aviation security, including checkpoint screening of passengers and baggage, has been exclusively the subject of federal regulation. In *Bavis v. United Airlines Inc.*, 811 F. Supp. 2d 883 (S.D.N.Y. 2011), this Court correctly ruled that the federal law aviation security scheme preempts state law relating to aviation security procedures and, thus, federal law provided the standard of care applicable to the actions of United Airlines and its security contractor on 9/11. 811 F. Supp. 2d at 891 (holding that the "federal statutes, and the regulations promulgated thereunder, make clear that there is no room for such state law. The statutory mandate for uniformity is inconsistent with Plaintiff's argument that state law should be considered along with federal regulations, for air carriers then would be subjected to an untenable mixture of 50 different state legal regimes, and not to a uniform federal legal regime" (citations omitted)). The Court also held that the federal aviation security scheme sets out a uniform system of duties and requirements, not minimum standards for the airlines and their agents. *Id.* at 893 ("Congress created a comprehensive federal scheme to provide for aviation security specifically designed to protect persons and property of passengers against violence and terrorism. The detailed, comprehensive regulatory security regime sets out a uniform system of duties and requirements, not minimum standards to be interpreted in different ways, in different cases."). The Court further observed that "even if the 'minimum standards' approach were to

3

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

apply, that would be a direction to the FAA Administrator, not an open door to litigants and courts to second-guess the Administrator." *Id.* at 892. Thus, the Court concluded that state tort law cannot impose damages liability on a defendant for failing to exceed federal standards where, as here, federal law occupies the entire field and the governing statute expressly displaces inconsistent state law. *Id.*

The Court's ruling is fully consistent with Second Circuit case law on this issue. *See Goodspeed Airport LLC v. E. Haddam Inland Westlands & Watercourses Comm'n*, 634 F.3d 206, 210–11 (2d Cir. 2011) ("Congress intended to occupy the field of air safety," and if "state regulation sufficiently interferes with federal regulation . . . it should be deemed preempted"); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 224 (2d Cir. 2008) ("The FAA was enacted to create a 'uniform and exclusive system' of federal regulation in the field of air safety" (citation omitted)). This is also the conclusion reached by other federal appellate courts to address the issue.[1] Indeed, the Circuit courts, including the Second Circuit, have reached the

---

[1] *See Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007) (holding that the Federal Aviation Act "preempts the entire field of aviation safety from state and territorial regulation," and dismissing plaintiffs' failure to warn claim because there were no applicable federal regulations requiring warning); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005) ("federal law establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation"); *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367–68 (3d Cir. 1999) ("federal law establishes the applicable standards of care in the field of air safety generally, thus preempting the entire field from state and territorial regulation"); *French v. Pan Am. Express, Inc.*, 869 F.2d 1, 5 (1st Cir. 1989) (holding state drug-testing law preempted because federal "statutory and regulatory mosaic" occupied the field of air safety in regulating pilot qualifications); *see also U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010) (concluding that New Mexico liquor laws as applied to U.S. Airways were preempted by federal law when "applying New Mexico's regulatory scheme to U.S. Airways implicates the field of aviation safety that Congress intended federal law to regulate exclusively"); *In re Air Crash Near Clarence Center, N.Y., on Feb. 12, 2009*, 798 F. Supp. 2d 481, 486 (W.D.N.Y. 2011) ("this Court finds that the Aviation Act and its accompanying federal regulations preempt state regulation of the air safety field, including state standards of care").

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

conclusion that federal aviation standards preempt substantive state tort standards even in the context of aviation safety, for which the applicable statute states that the federal regulations set forth by the FAA shall constitute "minimum standards." *See* 49 U.S.C. § 44701(a)(5) ("The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing— . . . (5) regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.").   When federal regulations set the "minimum standards" in an area exclusively occupied by federal regulation, those federal regulations are the law, and they comprise the applicable standard of care. Air carriers regulated by such minimum standards may be permitted in certain circumstances to exceed those standards, if they wish, but cannot be liable for tort damages under state law for not exceeding federal standards.

Attached as Appendix A to this brief is the memorandum of law concerning the applicable standard of care that American filed in *Bavis*, which sets forth these arguments in greater detail.  As explained in that brief, the "preempted by" and "inconsistent with" language of ATSSSA mandates an exclusively federal standard of care whenever state law varies from or is different from the standards set by federal law. *See* App'x A at 5–13.  The federal regulations that governed United's conduct in *Bavis* are essentially identical to the regulations governing American's conduct in this action, and the reasoning underlying the Court's ruling in *Bavis* applies with equal force to American Airlines Flight 11 as it applied to United Airlines Flight 175.  There is no distinction whatsoever between the two flights in terms of the standard of care or applicable requirements of federal law.   The ATSSSA dictates that the same federal substantive law applies to Flights 11 and 175, and thus, federal aviation security law defines the standards applicable to American's conduct on 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

II.     **The Federal Aviation Regulations, Air Carrier Standard Security Program and Security Directives Comprised the Federal Standard of Care Applicable to American on 9/11.**

The federal standard of care for air carriers concerning aviation security as of 9/11 was embodied in: (1) the Federal Aviation Regulations, or FARs; (2) the Air Carrier Standard Security Program, or ACSSP, applicable to each air carrier; and (3) the FAA Security Directives then in effect. The security requirements contained in the FARs, the ACSSP, and Security Directives were formulated and approved by the FAA and represented the end product of a series of policy judgments and trade-offs between competing systemic objectives including security, passenger convenience, the maintenance of an efficient and on-time air transportation system, and the protection of passenger privacy and civil liberties. *See* Barry Decl. Ex. A, ACSSP at App'x III[2] (AALTSA007417–645, AALTSA007592); Barry Decl. Ex. B, Excerpts from Robert Cammaroto[3] Dep. Vol. I 100:14–20, 141:11–142:4, 143:14–25, Feb. 11, 2008 ("Cammaroto Dep. Vol. I"); Barry Decl. Ex. C, FAA Information Circular ("IC") 99-13 (Dec. 23, 1999) (AAL011915–16). Each source of federal aviation security law is described below.

Plaintiffs may argue that the federal standard of care in effect on 9/11 included the Checkpoint Operations Guide ("COG"), a practical working guide to the operation of the ACSSP that served as a reference manual for checkpoint screeners regarding security regulations and procedures. But, as explained in Section IV, *infra*, this argument fails as a matter of law. As both FAA witnesses and Plaintiffs' own experts have confirmed, the COG was not a federal

---

[2] All citations to the ACSSP are to American's ACSSP in effect on 9/11.

[3] Mr. Cammaroto was designated by the FAA as its Rule 30(b)(6) representative on a variety of aviation security issues, including the Selectee Screening and No Fly Lists, Prohibited and Restricted Items, and Security Directives and Information Circulars. He gave 14 hours of testimony on these subjects on February 11 and 12, 2008. Mr. Cammaroto was the FAA's Chief of Commercial Airports Policy on 9/11.

6

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

regulation – it was not issued by the FAA and did not impose any legally binding obligations on

air carriers.[4]   Instead, the COG was a reference that air carriers were free to use if they chose to

do so.  However, as Plaintiffs' own experts have admitted, as long as an air carrier complied with

its obligations under the FARs, ACSSP, and applicable Security Directives, it would not be

subject to any fines, penalties, or other legal sanctions for non-compliance with the COG.[5]

### A.   The FARs Prescribed the Security Measures Air Carriers Were Required to Implement on 9/11.

The Federal Aviation Regulations, or FARs, are rules prescribed by the FAA governing

all aviation activities in the United States.  The FARs are part of Title 14 of the Code of Federal

Regulations.  Title 14, Part 108 addresses Airline Operator security.  As of 9/11, the FARs

required that each air carrier "shall adopt and carry out a security program that meets the

---

[4] *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 271:13–25 ("Q.  Does the COG or provisions of the COG have the binding force of a federal regulation? . . . A.  No, sir, it does not."); Barry Decl. Ex. D, Excerpts from Quinten Johnson Dep. 40:9-15, Oct. 4, 2013 ("Johnson Dep.") (the FAA "could not take enforcement action on the COG").  Quentin Johnson is Plaintiffs' expert witness regarding aviation security and a former FAA official.  As of 9/11, Mr. Johnson was the Deputy Director of the FAA's Office of Civil Aviation Security Policy and Planning.

*See also* Barry Decl., Ex. E, Excerpts from Robert Cammaroto Dep. Vol. II, 615:24–616:9, Feb. 12, 2008 ("Cammaroto Dep. Vol. II"); Barry Decl. Ex. F, Excerpts from Janet Riffe Dep. 212:8–20, May 17, 2012 ("Riffe Dep.").  Janet Riffe was the FAA's Principal Security Inspector ("PSI") for American on 9/11.  Ms. Riffe's responsibilities as PSI are discussed *infra*.

[5] *See* Barry Decl. Ex. D, Johnson Dep. 40:16-24 ("Q.  So, if an airline followed the provisions of its ACSSP, but failed to follow a provision of the COG, were there any consequences in the form of fines or other reprimand or penalties to the airline that the FAA would issue?  A.  The answer is no."); Barry Decl. Ex. G, Excerpts from Glen E. Winn Dep. 53:6–10, Oct. 2, 2013 ("Winn Dep.") ("Q.  So as long as it has met its obligations under the ACSSP, could an airline be fined or penalized by the FAA for non-compliance with a provision of the COG?  A.  No.");  *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 271:13–25 (FAA did not impose fines or penalties on air carriers for failure to comply with the provisions of the COG).

Glen E. Winn is Plaintiffs' expert witness regarding the state of aviation security on and before 9/11.  He served in the security department of United Airlines from 1990–2005.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING. THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

requirements of § 108.7," and § 108.7 listed the requisite elements of that security program, including "[p]rovid[ing] for the safety of persons and property traveling in air transportation and intrastate air transportation against acts of criminal violence and air piracy." 14 C.F.R. §§ 108.5, 108.7 (2001). The FARs further provided general regulations regarding, among other things, the screening of passengers and property (§ 108.9); the prevention and management of hijackings and sabotage attempts (§ 108.10); the prohibition on the carriage of weapons aboard an airplane (§ 108.11); the use of and standards for x-ray systems for screening (§ 108.17); proper compliance with Security Directives and Information Circulars (§ 108.18); the management of security threats and proper procedures following receipt of a threat (§ 108.19); the use of approved explosive detection systems (§ 108.20); and the training of screeners and other employees (§ 108.23). The FARs are more general than the ACSSP or individual Security Directives (for obvious reasons, the government did not wish to make the details of required aviation security procedures public information for possible misuse by wrongdoers). *See* Barry Decl. Ex. H, Excerpts from Frances Lozito[6] Dep. 23:16–17, Jan. 27, 2011 ("Lozito Dep.") (describing the FARs as "high level and public documents"). A complete copy of Part 108 of the FARs in effect on 9/11 is attached to the Barry Declaration as Exhibit OO.

**B.     The FAA-Approved Air Carrier Standard Security Program Prescribed the Specific Security Procedures in Place on 9/11.**

The FARs required each airplane operator to adopt an ACSSP, a program that was a standard compilation of security responsibilities that the FAA imposed on air carriers. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 35:8–17. The FARs delineated the required components of that program, which each carrier was then legally bound to follow. *See* 14 C.F.R. § 108.5

---

[6] Ms. Lozito was the Manager of the Air Carrier Operations Branch of the FAA as of 9/11.

8

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

(2001); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 35:8–36:16.   Each air carrier's
ACSSP was approved by the FAA. *See* Barry Decl. Ex. E, Cammaroto Dep. Vol. II 616:14–617
(confirming that "in approving the ACSSP, the FAA gave the [Standard Security Program] the
binding force of a Federal regulation"); *see also* Barry Decl. Ex. D, Johnson Dep. 17:19-18:5
(the ACSSP "provide[d] the basic guidelines that air carriers must adhere to in order to run their
federally mandated security program.").   Once approved, the ACSSP had the force of law and
was the equivalent of an FAA regulation. *See* Barry Decl. Ex. A, ACSSP I.A (AALTSA007425)
("This program [American's ACSSP] is required by Title 14 Code of Federal Regulations (14
CFR) part 108"); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 35:23–36:11 (noting that
ACSSP requirements had the force of federal regulations and an airline could be fined for failure
to comply with the requirements of the ACSSP); Barry Decl. Ex. I, Excerpts from Stephen
Jenkins[7] Dep. 49:9–13, Jan. 28, 2011 ("Jenkins Dep.")  ("Q. When you were acting as the PSI
for United Airlines was it your understanding that the ACSSP had the legal force of a Federal
regulation?   A. Yes.").   The FAA retained the authority to amend the ACSSP to add any
requirement that the FAA thought necessary to promote aviation security. *See* Barry Decl. Ex.
D, Johnson Dep. 51:6-9 ("The FAA had the authority within its oversight to adjust [the ACSSP]
any time we felt necessary, the government felt necessary."); Barry Decl. Ex. I, Jenkins Dep.
78:14–17 ("Q.   So while you were the PSI for United, the FAA had the authority to amend the
ACSSP? A. That is correct.").

Each air carrier's ACSSP had to contain a number of specified elements, including
"procedures for screening of passengers, carry-on baggage, checked baggage, and cargo; using

---

[7] Stephen Jenkins was the FAA's Principal Security Inspector ("PSI") for United Airlines on
9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

screening devices (such as X-ray systems and metal detectors); controlling access to aircraft and aircraft operator facilities; reporting and responding to bomb threats, hijackings, and weapons discovered during screening; reporting and protecting bomb threat information; identifying special procedures required at airports with special security needs; and training and testing standards for crewmembers and security personnel." Aircraft Operator Security, 66 Fed. Reg. 37330 (Jul. 17, 2001); *see also* Barry Decl. Ex. A, ACSSP VII.A–F (AALTSA007475–88) (establishing procedures for checking-in passengers on domestic flights), II (AALTSA007431–51), App'x III (AALTSA007592–95) (detailing screening procedures for passengers and carry-on items).

The ACSSP's standards and procedures for screening persons and carry-on baggage were "designed to effect uniform application, optimum safety, and the courteous and efficient treatment of all persons subject to preboard screening." *See* Barry Decl. Ex. A, ACSSP, App'x III (AALTSA007592); Barry Decl. Ex. B, Cammaroto Dep. Vol. I. 143:14–25. As the FAA's Rule 30(b)(6) representative confirmed, in promulgating the ACSSP and issuing Security Directives, the FAA sought to adopt security measures that were as effective as possible in meeting perceived threats. Barry Decl. Ex. B, Cammaroto Dep. Vol. I 195:5–196:10.

No air carrier could substitute its own judgment for that of the federal government and implement a procedure inconsistent with the FAA's requirements; thus, any change to the ACSSP had to be approved by the FAA, and only a few non-uniform changes had been granted to particular air carriers since the program's implementation. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 39:12–41:2; Barry Decl. Ex. D, Johnson Dep. 18:6-19:12; Barry Decl. Ex. F, Riffe Dep. 21:11–19; Barry Decl. Ex. I, Jenkins Dep. 295:16–21; Barry Decl. Ex. J, Excerpts from

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

Michael Morse[8] Dep. 35:18–36:2, Jan. 8, 2009 ("Morse Dep.") ("The ACSSP was designed to be as standardized as possible."); 14 C.F.R. § 108.256 (2001); *see also* Barry Decl. Ex. A, ACSSP App'x III at 1 (AALTSA007592) ("Section 316 of the Federal Aviation Act provides in part that, to the maximum extent practicable, the FAA Administrator shall require uniform procedures for the inspection, detention, and search of persons and property in air transportation to assure their safety and to assure that they receive courteous and efficient treatment by air carrier representatives and law enforcement personnel engaged in carrying out any air transportation security program."). As a result, the ACSSP was virtually identical for all air carriers on 9/11. A complete copy of American's ACSSP is included as Exhibit A to the Barry Declaration.

### C.   The FAA-Issued Security Directives Advised Air Carriers of Specific Security Threats and Prescribed Permissible Countermeasures.

The third piece of the aviation security regulatory framework in effect on 9/11 was the Security Directives issued by the FAA. Security Directives identified particular threats and directed the use of appropriate security procedures or techniques to counter those threats. *See* Barry Decl. Ex. A, ACSSP XII.A (AALTSA007525). The ACSSP described Security Directives as follows:

> Security Directives: The air carrier must be able to respond immediately to both threat assessments and specific threats against civil aviation. When the FAA determines that immediate additional security measures are necessary to respond to such threats, the FAA will issue a security directive. The FAA security directive will contain specific, mandatory actions that the air carrier shall implement.

---

[8] Mr. Morse was a Special Assistant reporting to the Director of Civil Aviation Security Operations of the FAA on 9/11. Mr. Morse was offered as the FAA's designated witness regarding the Common Strategy. *See* Section III.F, *infra*.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER; *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING. THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

*See* Barry Decl. Ex. A, ACSSP XII.A (AALTSA007525).  Security Directives had the force of law, and air carriers were required to comply with all Security Directives, just like any provision of the ACSSP or the FARs.  As the FAA's Rule 30(b)(6) representative explained, "A Security Directive is an, effectively an emergency rule [that] carries the full weight of regulation and law that directs a regulated party to institute certain measures that are intended to counter threat based on some intelligence that has been developed."  Barry Decl. Ex. B, Cammaroto Dep. Vol. I 17:8–21.  A complete list of the Security Directives in force as of 9/11 is attached as Barry Declaration Exhibit PP.[9]

* * * *

The FARs, ACSSP, and Security Directives set forth the legal requirements applicable to air carriers on 9/11.  The FAA, through the FARs, ACSSP, and Security Directives, regulated all aspects of aviation security and provided for fines and other penalties if air carriers violated these federal regulations.  *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 17:8–15, 35:3–36:11; Barry Decl. Ex. K, Excerpts from Claudio Manno[10] Dep. Vol. I 277:14–278:3, June 9, 2009 ("Manno Dep. Vol. I").  Accordingly, the FARs, ACSSP, and any applicable Security Directives set the standard of care to which an air carrier like American could be held as of 9/11.

---

[9] In addition to Security Directives, the FAA's Civil Aviation Security Office sent memoranda known as Information Circulars to the air carriers.  Information Circulars contained information concerning potential threats synthesized from intelligence and public sources about recent events, near-term possibilities, and long-term concerns.  *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 105:7–16.  Unlike Security Directives, Information Circulars did not impose any mandatory requirements on air carriers.  *See id.* (noting that Information Circulars provided air carriers with information that the FAA thought would be "helpful to them as they conducted their security duties, but where the nature of the information we had was not completely actionable in such a way we could develop a counter measure that we would impose through a Security Directive").

[10] On 9/11, Mr. Manno was the Office of Civil Aviation Intelligence Director for the FAA.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

III.   **The FARs, ACSSP and Security Directives Prescribed the Detailed Security Responsibilities of Air Carriers on 9/11.**

A.   **The FARs Did Not Require an Affirmative or Absolute Obligation to Secure the Sterile Area of all Potential Weapons.**

The two provisions of the FARs most pertinent to air carriers' responsibilities concerning

the most critical issue in this litigation, the potential entry of deadly and dangerous weapons into

the sterile area,[11] are 14 C.F.R. § 108.9 and § 108.11.  As of 9/11, § 108.9(a) provided:

> (a) Each certificate holder required to conduct screening under a security program shall use the procedures included, and the facilities and equipment described, in its approved security program to prevent or deter the carriage aboard airplanes of any explosive, incendiary, or a deadly or dangerous weapon on or about each individual's person or accessible property, and the carriage of any explosive or incendiary in checked baggage.

14 C.F.R. § 108.9(a) (2001).  On 9/11, § 108.11(a) provided:

> (a) No certificate holder required to conduct screening under a security program may permit any person to have, nor may any person have, on or about his or her person or property, a deadly or dangerous weapon, either concealed or unconcealed, accessible to him or her while aboard an airplane for which screening is required
> . . .

14 C.F.R. § 108.11(a) (2001).  As demonstrated below, neither regulation imposes on an air

carrier an affirmative or absolute obligation to detect each and every concealed deadly and

dangerous weapon that potential wrongdoers might seek to sneak into the sterile area.  Indeed,

§ 108.9(a) only imposed on air carriers the obligation to follow certain procedures designed to

deter or prevent the entry of deadly and dangerous weapons to the sterile area, and § 108.11(a)

provided only that air carriers may not *permit* entry of deadly and dangerous weapons to the

---

[11] The "sterile area" was considered the area past the checkpoint where passenger and carry-on screening occurred, including, but not limited to, the concourse area, gates, and inside the aircraft's cabin and cockpit.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

sterile area.[12]  This interpretation has been confirmed by Plaintiffs' own expert witness.  *See* Barry Decl. Ex. G, Winn Dep. 101:10–19 ("Q. Is there any provision of the Federal Aviation Regulations Part 108 or the ACSSP that you interpret to impose an affirmative obligation on an air carrier to detect a deadly and dangerous weapon that is carried through the walk-through metal detector, where the walk-through metal detector, properly calibrated to FAA standards, does not alarm?  A. I'm not aware of any, no.").[13]

As noted earlier, FAR § 108.9(a) imposed the basic obligation upon each air carrier to use the procedures, facilities and equipment set forth in its ACSSP "to prevent or deter the carriage aboard airplanes of any explosive, incendiary, or a deadly or dangerous weapon on or about each individual's person or accessible property, and the carriage of any explosive or incendiary in checked baggage."  14 C.F.R. § 108(9)(a); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 199:19 200:8.  A few points are worth noting about this regulation.

The "prevent or deter" language of § 108.9(a) does not impose an affirmative obligation on air carriers to prevent or deter all deadly and dangerous weapons from entering the sterile area, but rather states the purpose for which the prescribed security procedures, facilities and equipment are to be used.  This is demonstrated by the plain language of that section, which

---

[12]  Both sections leave the definition of a deadly and dangerous weapon (except for explosives and incendiaries) to the ACSSP.  *See* 14 C.F.R. §§ 108.9(a), 108.11(a) (2001).

[13]  Similarly, in conducting tests of checkpoint screeners, the FAA considered it a violation if a screener failed to detect an FAA test object that caused the metal detector to alarm.  However, if the test object did not cause a properly calibrated walk-through metal detector to alarm, there was no violation.  *See* Barry Decl. Ex. A, ACSSP XIII.G(2)(a)(2) (AALTSA007543); Barry Decl. Ex. H, Lozito Dep. 51:8–17.

Plaintiffs' expert similarly acknowledged that there would not be any obligation to detect weapons in carry-on baggage if the x-ray monitor did not indicate the presence of a suspicious item.  *See* Barry Decl. Ex. G, Winn Dep. 101:20 – 103:11.

14

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

required air carriers to conduct screening under a security program using the procedures of their ACSSP, as approved by the FAA. If an air carrier followed the procedures laid out in the FARs, ACSSP, and any operative Security Directives, the carrier met the federal standard of care, even if the air carrier did not achieve perfect detection of carefully concealed weapons.[14]

This history of 14 C.F.R. § 108.9(a) is also illuminating. Notably, the regulation provided that air carriers shall "prevent or deter" the carriage of certain categories of weapons aboard airplanes—not detect and prevent such weapons. In fact, an obligation to *detect* all deadly and dangerous weapons was rejected by the FAA. Only a few months before 9/11, the FAA considered and rejected a proposed amendment to § 108.9(a) that would have imposed such an affirmative obligation on air carriers. *See* 66 Fed. Reg. No. 137 at 37340–41. The Notice of Proposed Rulemaking regarding this proposed regulation recommended that each aircraft operator be required to conduct "screening, use the facilities, equipment, and procedures described in its security program to 'prevent or detect' the carriage of any deadly or dangerous weapon, explosive, incendiary, or other destructive substance, on or about each person or the person's accessible property before boarding an aircraft or entering a sterile area." *Id.* at 37341.

---

[14] In addition, the words "prevent" and "deter" have different meanings, and any obligation imposed on an air carrier under § 108.9(a) was to prevent or deter deadly and dangerous weapons from entering the sterile area. To "prevent" means "to keep from happening" or "to keep from doing something; impede." Webster's New World College Dictionary 1139 (4th ed. 2010). To "deter" is defined as "to keep or discourage from doing something by instilling fear, anxiety, doubt, etc." *Id.* at 393. The disjunctive phrase "prevent or deter" indicates an alternative—*i.e.*, that an air carrier fulfills its obligation to use the procedures, facilities, and equipment described to either prevent (impede) or deter (discourage), the carriage aboard airplanes of any explosive, incendiary, or deadly or dangerous weapon on or about an individual's person or accessible property. *See, e.g.*, *Wanderer v. Allstate Ins. Co.*, 355 N.Y.S.2d 80, 82 (1974) (rejecting the interpretation of a contract that ignored the phrase after a disjunctive "or" because, "[p]resumably, [those] words were inserted for a purpose").

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.) SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

The Federal Register indicates the FAA's consideration and rejection of this potential change to the rule's language, stating:

> The current requirement in §108.9(a) is to 'prevent or deter.' The FAA has decided to accept the commenters' suggestion so the language in §108.201(a) remains 'prevent or deter.' Both phrases adequately reflect the overall intent that *aircraft operators must use the measures in their security programs* to keep deadly or dangerous weapons, explosives, or incendiaries off the aircraft and out of the sterile area. Further, the phrase 'other destructive substances' has been removed from the list of prohibited items.

*Id.* (emphasis added). The language of the FARs, and the history of the relevant rules thus make clear that American's obligation on 9/11 was to comply with all federal aviation security regulations in order to prevent or deter dangerous and deadly weapons from entering the sterile area; provided that American complied with what federal law required, it would not be subject to liability.

Section 108.11(a) similarly set forth a general standard, refined in the ACSSP and Security Directives, regarding air carriers' responsibilities with respect to the entry of a deadly and dangerous weapon into the sterile area. As noted above, § 108.11(a) provided that no air carrier "may permit any person to have, nor may any person have, on or about his or her person or property, a deadly or dangerous weapon, either concealed or unconcealed, accessible to him or her while aboard an airplane for which screening is required." 14 C.F.R. § 108.11(a). Notably, the regulation described the air carrier's obligations in terms of not "permitting" deadly or dangerous weapons in the sterile area (as opposed to, *e.g.*, "preventing" deadly or dangerous weapons in the sterile area).

Like § 108.9, § 108.11 did not impose on air carriers an affirmative obligation to detect every prohibited item. The verb "permit" as used in § 108.11(a) requires more than an air

16

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

carrier's mere failure to detect a deadly and dangerous weapon that was either carefully concealed by a criminal or not detectable using FAA-approved and properly calibrated screening equipment and procedures. Undefined terms in a statute should be given their plain and ordinary meanings. *See, e.g., Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 48 (2d Cir. 2013); *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 697 (2d Cir. 2013). To "permit" is defined as "to allow; consent to; tolerate" or "to give permission to; authorize." Webster's New World College Dictionary 1072 (4th ed. 2010). Aviation security is an extremely difficult task involving the screening of millions of passengers on thousands of flights per day across hundreds of airports throughout the country. If the properly calibrated, properly operated metal detectors and x-ray machines used by an air carrier for screening failed to detect a deadly or dangerous weapon, but the air carrier had substantially complied with the FARs, ACSSP, and Security Directives, the air carrier has not "permitted" a person to have a deadly or dangerous weapon aboard an airplane. Thus, this section of the C.F.R. also makes clear that American's obligation on 9/11 was to abide by the standards and guidelines discussed below; provided that American followed these standards, it cannot be subjected to damages liability under state tort law.

**B.     American's FAA-Approved ACSSP Not Did Include Small-Bladed Knives and Box Cutters in the Prohibited Category of "Deadly and Dangerous" Weapons on 9/11.**

Appendix I of the ACSSP provides a detailed list of the Deadly and Dangerous Weapons whose entry into the sterile area was prohibited on 9/11. Specifically, Appendix I states:

The following guidelines are furnished to assist in making a reasonable determination of what property in the possession of a person should be considered a deadly or dangerous weapon. They are only guidelines, however, and common sense should always prevail.

- **Firearms**: Any weapon from which a shot may be fired by the force of an explosion including starter pistols, compressed air or BB guns, and flare pistols.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520 EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

- **Knives**: Including sabers, swords, hunting knives, souvenir knives, martial arts devices, and such other knives with blades 4 inches long or longer and/or knives considered illegal by local law.

- **Disabling or Incapacitating Items**: All tear gas, mace, and similar chemicals and gases whether in pistol, canister, or other container, and other disabling devices such as electronic stunning/shocking devices.

- **Other Articles**: Such items as ice picks, straight razors, and elongated scissors, even though not commonly thought of as a deadly or dangerous weapon, but could be used as a weapon, including toy or 'dummy' weapons or grenades.

Barry Decl. Ex. A, ACSSP, App'x I (AALTSA007588).

As of 9/11, FAA regulations only prohibited knives with blades four inches long or longer and knives illegal under local law[15] from entry into the sterile area. *See* Barry Decl. Ex. L, Knives and Sharp Objects (Sept. 16, 2001) (TSA11526–27); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 204:15–21, 205:15–20 ("Q. As of 9/11 under the ACSSP and the FAA's deadly or dangerous weapon guidelines, did the FAA prohibit knives with blades less than four inches long and that were legal under local law from entering the sterile area? A. We did not."). Indeed, the FAA publicly so stated in its website advisory to the traveling public. *See* Barry Decl. Ex. M, Archived Web Page, FAA Passenger Information, Travel and Safety Tips (June 2001). As Plaintiffs' experts acknowledge, the practical effect of this rule was that knives with blades less than four inches long were generally permitted into the sterile area. *See* Barry Decl. Ex. D, Johnson Dep. 88:21-89:7 (agreeing that the FAA did not prohibit knives with blades less than four inches from being brought into the sterile area assuming that the passenger was not behaving in a suspicious manner); Barry Decl. Ex. G, Winn Dep. 41:16-42:12 (ACSSP did not

---

[15] The prohibition of knives illegal under local law has no bearing upon this litigation. The 9/11 hijackers boarded Flight 11 at Logan International Airport in Massachusetts, and Massachusetts law did not prohibit possession or carriage of knives with blades under four inches long as of 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER; *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

prohibit boxcutters or similar cutting implements on passenger flights before 9/11, 46:13–47:15 (only express provision in ACSSP regarding knives prohibited knives 4 inches long or longer or illegal under local law), 53:16–54:8, 55:4–15 (not aware of FAA ever commencing a civil penalty against, or seeking to impose fines upon, an airline for failure to prevent a box cutter or knife with a blade less than 4 inches long from passing through the security checkpoint into the sterile area).

### 1. The FAA Considered and Rejected a Prohibition on Knives with Blades Shorter Than Four Inches.

The four-inch knife rule represented a considered policy decision by the FAA based upon a determination that there would be little to no security gain from banning knives under four inches. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 219:24–220:11, 228:5–20 (explaining that in 1993 the FAA considered modifying the standard and shortening the length of permitted knife blades, but decided to maintain the four-inch rule because "there was no security gain to be had by shortening the length"), 228:21–229:7 (one consideration was that weapons "could be fashioned by items either on board the plane or used for items that were already on the plane, for instance, metal cutlery in first class that was in common use at that time, broken chards of glass"), 230:13–20 ("And that when we looked historically at the record, while certainly knives and some short knives had been used in hijacking situations in the past, none of those were what could be characterized as terrorist situations . . ."); *see also* Barry Decl. Ex. N, Excerpt of Nat'l Comm'n on Terrorist Attacks, *The 9/11 Commission Report*, 84 (July 24, 2004) ("*9/11 Commission Report*").

Before 9/11, the FAA regarded bombs and explosives as the principal threat to aviation security and did not consider knives with blades less than four inches long as high-priority threat

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

items. *See* Barry Decl. Ex. K, Manno Dep. Vol. I 34:12–55:11; *see also* Barry Decl. Ex. O, Excerpts from Claudio Manno Dep. Vol. II, 589:18–599:12, June 10, 2009 ("Manno Dep. Vol. II); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 218:15-231:5; Barry Decl. Ex. N, *9/11 Commission Report* at 84. In addition, the FAA determined that small knives should not be banned because of a concern that doing so would increase innocent alarms and cause congestion at the checkpoints. *See* Barry Decl. Ex. N, *9/11 Commission Report* at 84; *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 204:15–213:8, 246:4–19.

The FAA adopted the four-inch knife rule in 1976 and reaffirmed this decision in 1993 in response to a proposal to change the rule to prohibit knives with shorter blades. *See* Barry Decl. Ex. L, Knives and Sharp Objects (Sept. 16, 2001) (TSA11526–27); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 218:15–220:11. Among the factors influencing the FAA's decision to adopt and reaffirm the four-inch knife rule were that: (1) many passengers carried these items for legitimate reasons; (2) relatively few hijackings had occurred in which the hijacker's principal weapon had been a short-bladed knife and in those hijackings the planes had landed safely without serious injuries to passengers or crew; (3) would-be hijackers could obtain or improvise equally dangerous items once inside the sterile area; (4) it was difficult to detect short-bladed knives at the checkpoint; and (5) the FAA desired to focus screener attention and resources on higher-priority threat items such as explosive devices and firearms. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 218:15–239:13, 247:2–250:12, 229:8–230:12 (a further reason was "diversion of scarce resources. . . .We knew that distracting the screeners to look for the smaller easily concealed items that this references, we would sap a lot of those resources, would distract the screeners from looking for more definitive items, especially in light of the fact that short bladed knives, what I have heard characterized as Swiss Army knives and such were very, very

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

common items at the checkpoint . . ."); *see also* Barry Decl. Ex. O, Manno Dep. Vol. II 589:18–599:12; Barry Decl. Ex. N, *9/11 Commission Report* at 84.[16]

### 2. The Four-Inch Knife Rule is Consistent With FAA Pre-Board Screening and Sterile Area Polices.

Four extrinsic considerations corroborate American's interpretation of the ACSSP standard regarding knives with blades under four inches. First, as explained in more detail in section III.C.3(a), *infra*, prior to 9/11, the FAA required walk-through metal detectors to be calibrated to a sensitivity level capable of detecting the smallest handgun then in use in North America. *See, e.g.*, Barry Decl. Ex. A, ACSSP IV.C(3) (AALTSA007459–61); Barry Decl. Ex. Q, Calibration of Walk Through Metal Detectors (WTMD) at Checkpoints Used by the September 11th Hijackers (June 13, 2002) (TSA7847–49); Barry Decl. Ex. N, *9/11 Commission Report* at 2. The FAA recognized that, in promulgating the standard, this calibration level would not detect many small knives and box cutters, but did not change the standard and never conducted testing prior to 9/11 to determine the percentage of times that metal detectors set to this sensitivity level did detect small knives and box cutters. *See* Barry Decl. Ex. R, Walk-Through Metal Detectors Calibration and Self-Certification Standards (TSA 24366); Barry Decl. Ex. S, Excerpts from Lyle Malotky Dep. 55:16-56:3, 65:19–67:15, Jan. 7, 2011 ("Malotky Dep.").[17] In addition to this initial calibration, calibration was verified on a daily basis using the

---

[16] The four-inch knife rule was also reinforced by the provisions of the COG. Part V of the COG which, although not a federal regulation, was in some respects more stringent than FAA regulations and rules, expressly permitted the carriage of knives with blades under four inches, including Swiss Army knives, pocket utility knives, Boy Scout knives, scissors, letter openers, and trade tools into the sterile area. *See* Barry Decl. Ex. P, Checkpoint Operations Guide (AAL014298–412), at pp. 5-7 (AAL014338), pp. 5-11 (AAL014342).

[17] Mr. Malotky served as a scientific advisor to the FAA and was a member of the FAA's Technical Support Working Group as of 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

Operational Test Piece (OTP), an imitation weapon intended to simulate a handgun: it was fabricated from a type of stainless steel and composed of a barrel, a midsection, and a handle. *See* Barry Decl. Ex. A, ACSSP App'x VI.A.7 (AALTSA007602); Barry Decl. Ex. S, Malotky Dep. 78:21–80:17; Barry Decl. Ex. H, Lozito Dep. 68:2–69:8 (describing OTP).

Second, in Appendix VI of the ACSSP, the FAA set forth specific requirements regarding the types of objects to be used to test walk-through metal detectors and the screeners operating them. These objects included various models of actual inoperable and encapsulated handguns, as well as the OTP. *See* Barry Decl. Ex. A, ACSSP App'x VI (AALTSA007603); Barry Decl. Ex. S, Malotky Dep. 54:18–55:15. The FAA test objects did not include knives with blades under four inches. Barry Decl. Ex. B, Cammarato Dep. Vol. 1 258:17–259:21; *see also* Barry Decl. Ex. A, ACSSP App'x VI (AALTSA007603). ACSSP Appendix VI identified the specific items used to test x-ray screeners' performance of their duties. *See* Barry Decl. Ex. A, ACSSP App'x VI (AALTSA007603). These items included three-stick simulated dynamite time bombs, simulated pipe bombs, hand grenades, pistols, and revolvers. *See id.* Notably, the FAA x-ray screening test objects did not include knives with blades under four inches. *See id.*

Third, before 9/11, the FAA did not impose restrictions on the sale of Swiss Army knives or other short-bladed knives or cutlery at stores inside the sterile area; or on the ability of restaurants in the sterile area to make metal knives available to their customers; or on the ability of employees in the sterile area to use box cutters or other cutting implements in their daily work. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 231:23–232:22; Barry Decl. Ex. G, Winn Dep. 58:17–60:6. In addition, prior to 9/11, passengers were permitted to bring glass bottles, which could be broken and turned into a weapon, into the sterile area. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 234:9–239:13.

~~SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)~~

~~WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.~~

Finally, the FAA developed and used a Threat Image Projection System ("TIPS") to train and test screeners and improve screener performance.[18] *See* Barry Decl. Ex. T, Threat Image Projection, at p. 3 (Nov. 1, 2001) (TSA24293–301, TSA24295). The TIPS system would project onto a screener's x-ray image screen an image of a fictitious bag with a weapon or an image of a weapon superimposed onto the image of the actual bag that was being x-rayed. *See id.* at 1. If the screener saw the image, he or she would press a button on the x-ray machine and would be notified that a fictitious image had been successfully identified. *See id.* at 2. The TIPS image library did not contain any images of any box cutters or knives with blades under four inches. *See id.* ("The knives in the initial FAA developed TIP library were all made of metal with blade lengths between 5-9 inches."). Consistent with the FAA's threat assessment as of 9/11, a substantial majority of the images in the TIPS library were of explosives or guns. *See id.* at 3.

Clearly, if the FAA intended to require air carriers to confiscate knives with blades under four inches long, it would have adopted different calibration standards for metal detectors, used knives with blades under four inches as testing objects for metal detector and x-ray screeners, restricted access to knives with blades under four inches in the sterile area, and utilized images of knives with blades under four inches in the TIPS image library.

### 3.   Plaintiffs Advocate a Broader Definition of "Deadly and Dangerous Weapons" Than Is Required by FAA Regulations.

Despite this clear evidence of the FAA's consideration and decision regarding the four-inch knife rule, Plaintiffs appear to argue that knives with blades under four inches were prohibited entry into the sterile area before 9/11. In support of this argument, they point to the

---

[18] TIPS was in place at Logan Airport as of 9/11. *See* Barry Decl. Ex. U, Excerpts from Christopher Bidwell Dep. 42:14–43:22, June 7, 2012 ("Bidwell Dep."). Mr. Bidwell was the Manager of Corporate Security at American as of 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

"common sense" language in the ACSSP and argue that screeners should have exercised judgment as to each item during screening so as to ban any knives capable of being used to harm or kill. *See, e.g.*, Barry Decl. Ex. V, Expert Report of Glen E. Winn, ¶¶ 67, 70–71 (June 13, 2013) ("Winn Report"). But Plaintiffs misconstrue the purpose of the "common sense" provision.

Because the variety of deadly and dangerous weapons is limited only by human imagination, the ACSSP cautions that the list is not comprehensive and that common sense should always prevail. *See* Barry Decl. Ex. A, ACSSP App'x I (AALTSA007588); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 203:15–204:2 ("Q. Would it have been possible as a practical matter for the FAA to have prepared an all inclusive list of every deadly or dangerous weapon somebody might conceivably try to take into the sterile area? A. I don't think that would have been practical. Q. Is that one of the reasons that the FAA included the common sense instruction in the guidelines? . . . A. Yes, sir."), 203:3–14 ("Q. What was the purpose of including the common sense language in the FAA's deadly or dangerous weapons guidelines? . . . A. That was a reinforcement of a long-standing principle and understanding in the business that obviously Appendix I could not anticipate each and every single deadly or dangerous item that there would be some that would go beyond what is listed here on the page."). For example, as the FAA's Rule 30(b)(6) witness testified, neither bazookas nor battle axes are specifically listed as deadly or dangerous items in the FAA guidelines, but a screener would be expected to use his common sense to prevent a passenger from carrying a bazooka or battle ax into the sterile area. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 204:3–13. In contrast, knives were not an unanticipated item. The FAA was well aware that passengers would frequently seek to take knives into the sterile area, and as explained above, the FAA established and later reaffirmed a

24

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

clear standard for prohibited knives based on blade length (four inches or longer) and legality under local law.

Moreover, FAA policy did not require screeners to ban any knives capable of being used to harm or kill. As a practical matter, almost any knife could hypothetically be used to harm or kill, but under explicit federal law, screeners were not required to prevent a knife with a blade less than four inches in length from entering the sterile area. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 228:5–20 ("[T]here was no security gain to be had by shortening the length that three inches was still deadly or dangerous object that two inches was deadly or dangerous in some context or another."). Even Plaintiffs' experts have acknowledged that air carriers did not have to categorically prohibit the entry of knives with blades under four inches or knives capable of being used to harm or kill into the sterile area. Mr. Johnson conceded that the FAA would have permitted a Swiss Army knife into the sterile area, assuming the passenger was not behaving in a suspicious manner, even though such a knife could be used to kill. Barry Decl. Ex. D, Johnson Dep. 89:10–91:16. Similarly, Mr. Winn admitted that the FARs and the ACSSP did not prohibit Leatherman and or other knives with blades under four inches, including boxcutters, in the sterile area. *See* Barry Decl. Ex. G, Winn Dep. 338:20–24.

Plaintiffs' argument is also inconsistent with the considered policy decision that the FAA made when it reconsidered the four-inch knife rule in 1993. Of course, when the FAA both adopted and reconsidered the four-inch knife rule, the FAA was well aware that knives under four inches could be used to harm or kill. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I at 217:20–218:2. Nonetheless, the FAA chose to retain the four-inch knife rule for the reasons discussed above. *See* Section III.B.1, *infra*.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.) SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

To be sure, there were some circumstances under which screeners might exercise discretion to prohibit a particular knife from entering the sterile area.  For example, if a knife with a three-inch blade were concealed in a passenger's shoe or underwear, this might suggest a criminal intent and warrant seizure of the knife.  Similarly, a knife of a character such that the knife's only practical use was to cause harm (such as a switchblade) might warrant seizure if detected during the screening process.  But the FAA's common sense provision is not a mechanism for imposing liability on American if any ordinary knife (*e.g.*, Swiss Army knife, Boy Scout knife, Leatherman, box cutter, pocket utility knife, *etc.*) that was permitted into the sterile area was ultimately used for a criminal purpose.  If such liability were permitted, the federal four-inch knife rule, which only prohibited carrying knives with blades four inches or longer into the sterile area, would be potentially misleading to regulated parties.

\* \* \* \*

Accordingly, the federal standard did not require the seizure of all short-bladed knives or those knives that appeared capable of causing physical harm.  The air carriers were only obligated to comply with federal law regarding aviation security.  To the extent that Plaintiffs may argue that American's screeners were legally obligated to seize any box-cutters or knives with blades under four-inches carried by hijackers on the morning of 9/11, that argument is foreclosed by federal law, which did not require such knives' detection, did not set standards that would result in their detection, and did not require their seizure if discovered during the screening process.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21-MC-101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

**C.**     **The FAA Limited Air Carriers' Ability to Screen Passengers and Other Individuals Seeking to Enter the Sterile Area on 9/11.**

>    **1.**     **Heightened Scrutiny of Muslims, Middle Easterners, and Arabs Was Prohibited by Federal Law.**

Before 9/11, the FAA did not permit airlines or checkpoint screening companies to select passengers for more intensive screening procedures based on their race, religion, or national or ethnic origin in any aspect of passenger or baggage screening. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 102:23–103:25 (prior to 9/11, the FAA would neither permit the carry-on luggage of Muslims to be singled out for special hand searches nor hand-held metal detector searches or pat downs of all young Arab males); Barry Decl. Ex. G, Winn Dep. 138:8–139:2. Thus, as acknowledged by Plaintiffs' expert, Mr. Winn, neither check-in agents nor checkpoint screeners could single out individuals for additional scrutiny because of their race, religion, or national or ethnic origin. *See* Barry Decl. Ex. G, Winn Dep. 138:8–139:2; 313:9–18 ("Never can use race. color or creed"). This was a fundamental limitation on pre-9/11 passenger screening. *See also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 103:17–104:7, 108:19–109:4 (subjecting young Arab appearing males to additional screening "would have been against policy" and agreeing that the FAA cautioned airlines to use non-discriminatory screening practices).

Before 9/11, a White House Commission on aviation security (the Gore Commission) had expressly warned against the imposition of screening criteria based on ethnicity or religion, and the FAA issued statements both before and after 9/11 that warned air carriers that federal law barred discriminatory screening, notwithstanding the fact that radical Islamic terrorists were known to pose a threat to aviation security. *See* Barry Decl. Ex. W, White House Commission on Aviation Safety and Security (Gore Commission), Final Report to President Clinton, Recommendation 3.19 & App'x A (1997) ("No profile should contain or be based on material of

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

a constitutionally suspect nature – *e.g.*, race, religion, national origin of U.S. citizens" and "Factors to be considered for elements of the profile should be based on measurable, verifiable data indicating that the factors chosen are reasonable predictors of risk, not stereotypes or generalizations."). Even when issuing Information Circulars such as IC 99-13 regarding Islamic terrorism concerning the Millennium Bomb Plot, the FAA still cautioned air carriers that they must treat all passengers equally. *See* Barry Decl. Ex. X, IC 99-13 (Dec. 23, 1999) (AAL019915–16) ("It is essential that screeners treat all passengers – regardless of race, color, ethnicity, religion, or gender – equally, both in terms of their being potential threats and of their deserving courteous, professional treatment during the conduct of security procedures.").

### 2.   Passenger Pre-Screening Was Limited by FAA Regulations.

The first step in the passenger screening process occurred at passenger check-in. Passengers were subject to selection for additional scrutiny by the FAA's screening program, asked to present identification, and asked to respond to certain security questions designed to ensure that they had maintained control of their baggage.

### (a)   Computer-Assisted Passenger Pre-Screening Was Designed to Address Checked Baggage Security Concerns.

Before 9/11, the Computer-Assisted Passenger Pre-Screening program ("CAPPS"), developed by the FAA, was used to identify passengers about whom the FAA possessed insufficient information to conclude that they were not threats. *See* Barry Decl. Ex. A, ACSSP VII.B (AALTSA007480–81). The CAPPS program was primarily designed to address security concerns regarding those individuals' checked baggage. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 21:19–22:8 (noting that the CAPPS program "was primarily designed to address explosives secreted in checked baggage").

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.) SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

The CAPPS program automatically scored each passenger's security risk according to an algorithm of factors and weights. *See* Barry Decl. Ex. B, Cammarato Dep. Vol. I 31:14–23 ("CAPPS, as the acronym implies, is an automated system. It is computer based system there is an algorithm that was developed over several years, piloted in cooperation with Northwest Airlines, in particular. And that algorithm is run based on the information that is provided in the [personal name reservation system of an air carrier]."); Barry Decl. Ex. Y, Security Directive ("SD") 97-01, at 3–4 (Oct. 27, 1997); *see also* Barry Decl. Ex. Z, Aviation Monograph at 70 (Aug. 26, 2004). The CAPPS algorithm was deliberately structured so as to not take into account factors such as race, religion, or ethnic origin. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 87:4–6, 83:9–90:20.[19] It would have been impermissible for an air carrier to modify the CAPPS algorithm to give special scrutiny to Arabs, Muslims, or persons of Middle Eastern appearance. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 62:8–12, 89:21–96:11.

The CAPPS program also assigned selectee status to a random sampling of passengers on each flight in order to address concerns about discrimination and to keep terrorists from gaming the system by learning how to avoid CAPPS selection. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 121:24–122:22 ("The random selection process was intended to ensure that everyone had an even chance to be selected and also so that if the system were being surveilled by a group with inimical intent, there would be an unknown quantity that would cause them concern."); Barry Decl. Ex. Z, Aviation Monograph at 70.

---

[19] As discussed above, air carriers were prohibited under federal law from profiling passengers based upon their race or religion. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 101:25–103:11 (overt or covert discrimination was prohibited and airlines were not permitted to select individuals for additional screening based on race, religion or ethnic origin).

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION,* 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

As of 9/11, the only consequences of CAPPS selection pertained to the selectee's checked baggage. If an individual was designated as a CAPPS selectee, checked baggage belonging to that individual was not permitted to board the plane before the selectee boarded, unless it was subjected to an explosives search.[20] *See* Barry Decl. Ex. A, ACSSP VII.B–VII.F; *see also* Barry Decl. Ex. Y, SD 97-01, at 3, 6–7 (AAL011598, AAL011604–05). Thus, the carrier could hold the checked bags off the flight until it was confirmed that the selectee had boarded, a procedure known as "bag matching." *See* Barry Decl. Ex. A, ACSSP VII.E(4) (AALTSA007486); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 47:16–22. As of 9/11, at airports such as Logan, where CTX (Computer Tomography X-ray) machines[21] were in operation, the checked baggage would be subject to CTX screening before the passenger boarded the plane.[22] *See* Barry Decl. Ex. U, Bidwell Dep. 45:6-17; Barry Decl. Ex. AA, Excerpts from Carter Bibbey[23] Dep. 167:3-11, Sept. 12, 2006 ("Bibbey Dep."); Barry Decl. Ex. G, Winn Dep. 148:19-24 (noting that airports such as Logan checked baggage screened for explosives by CTX machine). In smaller airports such as Portland, Maine, where Mohamed Atta boarded his initial

---

[20] If an individual was not a CAPPS selectee, federal law did not provide for any search of his checked baggage as of 9/11.

[21] A CTX machine is an explosives detection device used to screen checked baggage for explosives. *See* Barry Decl. Ex. N, *9/11 Commission Report* at 2.

[22] Three Flight 11 hijackers (Satam al-Suqami, Wail al Shehri, and Waleed al Shehri) were CAPPS selectees at Logan. *See* Barry Decl. Ex. N, *9/11 Commission Report* at 2. Their checked baggage was sent through a CTX machine. *Id.* Their selection only affected the handling of their checked bags, not their screening at the security checkpoint. *Id.*

[23] Mr. Bibbey was the Globe Duty Manager at Logan Airport Terminal B on 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

flight to Logan, the selectee's baggage would be held until the selectee boarded his flight.[24]  *See*

Barry Decl. Ex. G, Winn Dep. 148:25-149:18.

CAPPS selectees were not required to undergo any additional screening of their persons

or carry-on luggage at the checkpoint beyond those procedures applied to all other passengers.

*See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 62:23–63:24 (agreeing that "the only

consequence of CAPPS selection was that the selectee's checked baggage underwent special

procedures."), 64:18–24 ("There were no additional measures ascribed to CAPPS selectees at the

checkpoint."). 64:25–65:8 (explaining that CAPPS selectees were not treated differently from

other passengers at screening checkpoints); Barry Decl. Ex. G, Winn Dep. 141:14-142:16,

148:13-24 (noting that as far as FAA regulations were concerned, the only consequence of

CAPPS selection related to screening of selectee's checked baggage).

\* \* \* \*

Before 9/11, the FAA had proposed a rule to make CAPPS mandatory for all major

airlines on flights with more than 60 passengers.[25]  *See* 64 F.R. 19220; Barry Decl. Ex. BB,

Security of Checked Baggage on Flights Within the United States (Apr. 19, 1999) (TSA 10358–

409); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 47:23–48:19.  The proposed rule

required that baggage of individuals selected by CAPPS could not be transported unless the

checked baggage was screened by explosive detection equipment, or the passenger had boarded

---

[24] This is why the FBI was able to recover Atta's baggage after 9/11.  Atta's baggage was held
off his plane in Portland until he boarded Colgan flight 5930 to Logan, but his baggage missed
the Colgan flight, making its arrival at Logan too late to be loaded onto American Flight 11 to
Los Angeles.

[25] Under the federal regulatory scheme in effect on 9/11, CAPPS was the FAA's preferred
system of passenger pre-screening.  *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 62:8–12,
89:21–96:11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING. THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

the flight. *See* Barry Decl. Ex. CC, Proposed 14 C.F.R. § 108.12 (TSA 10406–7). The rule did not provide for additional measures to be applied to selectees at the checkpoint. Moreover, the proposed regulation required that the CAPPS system implemented by the airlines, and any proposed modifications, would have to be approved by the FAA, in order to ensure that "no impermissible factors [were] used to select passengers for additional screening" and that "members of specific ethnic groups were not being unfairly targeted." *Id.* (TSA 10375). The proposed rule had been cleared at all levels and was ready for release as of 9/11. *See* Barry Decl. Ex. DD, Security of Checked Baggage on Flights Within the United States (Checked Baggage Rule) (TSA 10410); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. 1 50:23–51:16.

### (b)     FAA-Prescribed Baggage Control Questions During Check-In Were Designed to Detect Terrorist Dupes.

During initial check-in, a passenger was also requested to present identification. If the passenger did not produce the requested identification or the identification did not match the name on the passenger's travel authorization, the passenger was designated as a selectee. Similar to a CAPPS selectee, these passengers' *checked* baggage was subject to additional screening with explosive detection equipment or through bag matching. Barry Decl. Ex. A, ACSSP VII.C(4) (AALTSA007482).

Passengers were also asked certain security questions during check-in that were designed not to detect terrorists, but terrorist dupes.[26] At the time that a passenger checked in, the air carrier was required to ask the passenger the following questions:

---

[26] These questions were based on the Hindawi affair, the attempted bombing of an El Al Airlines flight from London to Tel Aviv in 1986. On April 17, 1986, Israeli security guards working for El Al at Heathrow Airport found 1.5 kilograms of explosives in the bag of Anne-Marie Murphy, a passenger boarding an El Al flight to Tel Aviv. Murphy claimed to be unaware of the explosives, and reported that she had been given the bag by her fiancé, Nezar Hindawi.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

- **Question 1**: Has anyone unknown to you asked you to carry an item on this flight?

- **Question 2**: Have any of the items you are traveling with been out of your immediate control since the time you packed them?

*See* Barry Decl. Ex. A, ACSSP VII.C, VII.D (AALTSA007481–86). If a passenger answered "yes" to either of these questions, any baggage identified in response to questions 1 or 2 would also be subject to additional screening using an Explosive Trace Detection ("ETD") device.[27] *See* Barry Decl. Ex. A, ACSSP VII.D (AALTSA007483); *id.* at VII.F (AALTSA007488). Air carriers were only required to conduct additional screening of those bags identified in response to the questions—not all baggage belonging to that passenger.

### (c) The International Security Program Did Not Apply to Domestic Flights.

The Plaintiffs appear to argue that American should have implemented the pre-screening interview program applied as part of its International Security Program ("ISP") to domestic flights. *See* Barry Decl. Ex. V, Winn Report, ¶¶ 38–39; 129 (suggesting that the ISP should have been implemented domestically). However, federal law did not require the application of the ISP to American's domestic flights and actually prohibited implementation of aspects of the ISP domestically.

---

Hindawi was subsequently arrested and found guilty of duping Murphy to carry the bag on board in order to blow up the jet. *See* Israel Security Agency, Anne-Marie Murphy Case (1986), available at http://www.shabak.gov.il/english/history/affairs/pages/anne-mariemurphy case.aspx; *see also* Barry Decl. Ex. D, Johnson Dep. 82:21-25 ("Q. Weren't [the two questions] primarily designed so that the ticket agent could detect whether a passenger may have been duped into carrying an explosive device onboard the aircraft? A. That's . . . correct.").

[27] An ETD device is "a device which has been assessed as effective by the FAA, for use in detecting explosive particles on objects intended to be transported aboard an airplane." Barry Decl. Ex. A, ACSSP I.D(9) (AALTSA007427).

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR
PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

The ISP was a profiling and interrogation security system implemented by American for international flights starting in the 1980s, under which all passengers boarding international flights were briefly interviewed by American employees who employed profiling techniques to assess the possible risk of a terrorist boarding a flight. *See* Barry Decl. Ex. EE, Excerpts from Homer Boynton[28] Dep. 54:4–15, June 13, 2012 ("Boynton Dep.") (describing initial contact American employees had with passengers), 163:18–165:12 (agreeing that the basic tenets of the El Al security program that were employed in the ISP included interviewing each passenger, reviewing his documentation, and determining what type of security treatment the passenger will receive); *see also* Barry Decl. Ex. FF, Excerpts from Larry Wansley[29] Dep. Vol. I 227:1–3, 227:21–25, 228:4–13, Apr. 3, 2007 ("Wansley Dep. Vol. I"). American developed the ISP for use at foreign airports where the terrorism threat was the highest, and received approval from the FAA to use the ISP at foreign airports. *See* Barry Decl. Ex. FF, Wansley Dep. Vol. I 228:22–229:15; *see also* Barry Decl. Ex. EE, Boynton Dep. 112:23–113:2 (agreeing that profiling was done internationally because the threat was considered greater).

There was no requirement in the FARs, the ACSSP, or any Security Directives that any U.S. air carrier conduct security interviews of domestic passengers. Barry Decl. Ex. B, Cammaroto Dep. Vol. I 73:11–20 ("There was no requirement for an actual interview, no, sir, not domestically."), 77:4–12 ("Q. As of 9/11 did the FAA require interview prescreening by U.S. carriers departing from certain foreign locations under extraordinary security? A. Yes, sir, we did. Q. Did the FAA impose any similar intensive interview prescreening requirements as of

---

[28] Mr. Boynton was Managing Director of Worldwide Security at American Airlines from 1981 to 1993 and was deposed regarding his involvement with the implementation of the ISP.

[29] Mr. Wansley was the Managing Director of Corporate Security for American Airlines on 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

9/11 for any purely domestic flights?   A.   No, sir."). This fact was admitted by Plaintiffs' own expert witnesses, who acknowledged that the FAA did not require the intensive ISP-type interviews for domestic flights. Barry Decl. Ex G, Winn Dep. 157:20–158:11; *see also* Barry Decl. Ex. D, Johnson Dep. 50:6–14.

Moreover, it is doubtful that the ISP could have been used for domestic flights because of its ethnic profiling feature—the ISP involved profiling passengers based on "certain indicators such as area background, born in a Muslim country, traveling to a Muslim country." Barry Decl. Ex. EE, Boynton Dep. 36:4–9, 184:15-19; *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I. 89:21–90:10. Indeed, the "essential" suspicious sign or indicator under the ISP was "[b]eing an Arab." Barry Decl. Ex. EE, Boynton Dep. 132:23–133:10. Even Plaintiffs' experts have acknowledged that the ISP could not have been applied domestically. *See* Barry Decl. Ex. D, Johnson Dep. 51:10–52:11 (assuming the ISP profiled based upon country of origin, ethnicity or religion, if an airline requested permission to use it domestically, the FAA would have been required to consult the Department of Justice Civil Rights Division); Barry Decl. Ex. G, Winn Dep. 159:14–160:6 (ISP program that used Middle Eastern or Arabic origin as selection criteria would not have been allowed on domestic flights).[30] The ISP was thus developed by American for use on international flights only.

---

[30] Of course, in addition to not being legally required, it would also have been impractical for American to employ the ISP for purely domestic flights. *See* Barry Decl. Ex. EE, Boynton Dep. 184:15–19 ("Q. Could the domestic – could the international security program passenger profiling system practically been applied to all domestic flights in the United States?   A. No."); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 76:13–77:3 (agreeing that "volume of traffic in U.S. made it impossible to apply the type of intensive interview prescreening" used at foreign locations); Barry Decl. Ex. FF, Wansley Dep. Vol. I 227:23–229:6; *see also* Barry Decl. Ex. EE, Boynton Dep. 64:23–65:10 ("Q. Other than cost, was there any reason why American Airlines could not implement this profile system in this international security program at its domestic operations?   . . . A. Yes.   Other than cost, it's the volume of

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

For these reasons, the interview procedures involved in the ISP were not part of the standard of care applicable to American's conduct on 9/11, and Plaintiffs are precluded from arguing that American should have implemented the ISP's interview program to purely domestic flights like Flight 11.

### 3. The FAA-Approved Equipment for Checkpoint Screening of Passengers Was Not Capable of Detecting Small-Bladed Knives or Box Cutters.

Under the federal aviation security scheme, all individuals seeking to pass beyond the screening point or board an airplane were required to undergo screening of their persons. This screening was typically accomplished through the use of metal detectors; initially, passengers and other individuals seeking entry to the sterile area would pass through a walk-through metal detector. *See* Barry Decl. Ex. A, ACSSP II.F (AALTSA007438); *id.* at IV.C(1) (AALTSA007459). Walk-through metal detector screening was approved by the FAA and was used as the primary method of screening of the persons of passengers at all major airports by all major air carriers on 9/11. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 147:2-148:4 (noting that walk-through metal detectors were the "most commonly used" method for screening passengers and that "the vast majority of passengers were processed with walk-throughs"). As described below, hand-held metal detectors were used to locate metal on an individual's person if she alarmed the walk-through metal detector. *See* Barry Decl. Ex. A, ACSSP IV.C(2) (AALTSA007459).

---

passengers, the number of flights, the design of the system in the United States. Not only would it have been impractical, it would have been impossible.").

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

### (a)   The Calibration and Testing of Metal Detectors Was Intended to Identify Guns.

Under the ACSSP, the walk-through metal detectors used to screen the persons of individuals seeking to enter the sterile area were calibrated by the FAA, according to FAA settings, and tested by air carrier personnel on a daily basis using an FAA-approved test piece. Thus, to comply with federal law, air carriers were required to operate the walk-through metal detectors according to FAA standards and were not required to set the detectors to higher sensitivity levels in order to detect items that would not alarm under the required FAA settings.

The walk-through metal detectors used for passenger screening were calibrated by the FAA prior to their initial use. For each walk-through metal detector used by an air carrier, the FAA conducted an initial test "to establish the minimum setting at which that device shall be operated." Barry Decl. Ex. A, ACSSP IV.C (AALTSA007459). The FAA did so using the "three gun test" standard, which calibrated the detectors to at least the sensitivity required to detect three guns, one of which was the smallest handgun in use in North America, a .22-caliber handgun. *See* Barry Decl. Ex. A, ACSSP IV.C (AALTSA007461); Barry Decl. Ex. Q, Calibration of Walk-Through Metal Detectors (WTMD) at Checkpoints Used by the September 11th Hijackers (June 13, 2002) (TSA7847) (describing the protocol for the "three gun test"); Barry Decl. Ex. N, *9/11 Commission Report* at 2. The FAA's three-gun test was the only approved test standard used for airport walk-through metal detectors in airports on 9/11. *See* Barry Decl. Ex. S, Malotky Dep. 41:8–42:20 (discussing the three-gun test as the standard for calibrating and using metal detectors on 9/11); Barry Decl. Ex. G, Winn Dep. 121:17-124:18 (same); *see also* Barry Decl. Ex. Q, Calibration of Walk-Through Metal Detectors (WTMD) at Checkpoints Used by the September 11th Hijackers (June 13, 2002) (TSA7847). Under federal

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

regulations, air carriers were not required to calibrate the walk-through detectors to detect all metal—only metal detected by the walk-through metal detectors when set to the FAA's required calibration level. *See* Barry Decl. Ex. S, Malotky Dep. 191:4–9 (noting that FAA did not require airlines to set their walk-through metal detectors at a level more sensitive than the FAA calibration setting established by the three-gun test); Barry Decl. Ex. G, Winn Dep. 125:3-23 (after conducting the three-gun test, FAA would note the sensitivity setting on the machine itself or in a logbook, and the air carrier was authorized thereafter to use the machine at that setting so long as it passed the daily OTP test).

To ensure proper functioning on a daily basis, each walk-through metal detector was tested each morning. Federal regulations required that the person testing the walk-through metal detector carry an OTP though the walk-through metal detector three times using a specified protocol. *See* Barry Decl. Ex. A, ACSSP IV.C(3) (AALTSA007459–60), ACSSP App'x VI.A.7; Barry Decl. Ex. S, Malotky Dep. 78:21–80:17 (describing FAA calibration of walk-through metal detectors using three guns and airlines' daily testing of walk-through metal detectors using OTP). If the alarm sounded during each of the three OTP walks through, the walk-through metal detector was authorized for use that day, and the air carrier satisfied FAA requirements. *See* Barry Decl. Ex. A, Malotky Dep. 80:25–81:21; Barry Decl. Ex. GG, Excerpts from Denise Roussin[31] Dep. 49:10–18, Jan. 27, 2009 ("Roussin Dep."); Barry Decl. Ex. D, Johnson Dep. 123:16–125:15 (if a walk-through metal detector passed the OTP test, it was fit for use according to FAA regulations; *see also* Barry Decl. Ex. G, Winn Dep. 130:4–10. The FAA also conducted

---

[31] Ms. Roussin served as a Civil Aviation Security Specialist and Special Agent with the FAA as of 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN *RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

periodic tests of all walk-through metal detectors, in addition to the daily tests conducted by air carriers. *See* Barry Decl. Ex. G, Winn Dep. 129:2–130:3.

Walk-through metal detectors calibrated to the required FAA standard frequently would not detect small knives or so-called box cutters. *See* Barry Decl. Ex. HH, Prohibited Items in Sterile Access, (Nov. 1, 2001) (TSA 11522–23); Barry Decl. Ex. II, Expert Report of Scott Dennison at p. 26 (Aug. 5, 2013) ("the findings of tests conducted after 9/11 [ ] demonstrated that the metal detectors in use as of 9/11 were not calibrated by the FAA to detect a variety of blades less than four inches long"); Barry Decl. Ex. S, Malotky Dep. 55:18–56:14. The metal detector calibration standard in effect on 9/11 was geared to detect objects that had the metal content of certain handguns; thus, many small knives would not have alarmed walk-through metal detectors at screening checkpoints. *See* Barry Decl. Ex. R, Walk-Through Metal Detectors Calibration and Self-Certification Standards (Sept. 16, 2001) (TSA 24366) ("The sensitivity of WTMD's is adjustable. FAA enforces the standard for detection based upon the device, detecting fixed amounts of metal in the form of standardized test objects which must be detected when passed through the WTMD in the prescribed fashion. WTMDs calibrated using the present standard would likely NOT have detected the knives allegedly used in September 11 hijacking." (emphasis in original)); Barry Decl. Ex. S, Malotky Dep. 55:16–56:3 ("Q. And to detect a razor blade, what would the – did the FAA study the level of calibration needed to detect the razor blade? A. No. Q. Why is that? . . . A. We did not consider a razor blade to be a threat."), 65:19–66:15, 67:6–15. If the FAA had required walk-through metal detectors to detect knives with blades under four inches, it would have established a standard calibration that would have alarmed in the presence of such items; however, it did not do so. This reflected the FAA's

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING. THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

determination that it did not consider knives with blades under four inches to be a threat as of

9/11. *See* Barry Decl. Ex. S, Malotky Dep. 55:16–56:3.

The requisite testing procedures for hand-held metal detectors under the ACSSP required

that hand-held metal detectors be tested at least once a day by activating the device and placing it

two to four inches from metal. *See* Barry Decl. Ex. A, ACSSP IV.C(4) (AALTSA007461). A

properly operating device would alarm as it neared the metal test object. *Id.*

### (b)     The FAA Did Not Require Additional Screening or Pat-Down Procedures of All Passengers.

Once each air carrier ensured that its metal detectors were properly calibrated, ACSSP

Appendix III provided for the following steps in the screening process of individuals seeking to

enter the sterile area:

- Each individual was required to walk through a walk-through metal detector to enter the sterile area. If the metal detector did not alarm, the individual was cleared to go beyond the screening point and enter the sterile area. *See also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 152:16–20, 153:8–10.

- If an individual alarmed the walk-through metal detector, the individual was required to walk through the metal detector again or go through a secondary walk-through metal detector (as was the practice at the main checkpoint at Logan Airport). The individual was requested to divest himself of metal prior to doing so. If the metal detector did not alarm during the second walk through, the individual was cleared to enter the sterile area. *See also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 156:13–24.

- If the individual alarmed on both passes through a walk-through metal detector, the individual was subject to screening with a hand-held metal detector. The individual was again requested to divest himself of any metal prior to doing so. If the individual did not alarm after properly conducted hand-held metal detector screening, he was cleared to enter the sterile area.[32] *See also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 159:22–160:19.

---

[32] Screening by hand-held metal detector was also an option after an individual alarmed the walk-through metal detector on his initial pass through. *See* Barry Decl. Ex. A, ACSSP App'x III, pt. II(B) (AALTSA007592–23).

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

- If an individual was cleared to enter the sterile area at any point in the procedures described above, that individual's person was not subject to any additional screening by metal detector, pat-down search, or any other method, even on a random basis.

*See* Barry Decl. Ex. A, ACSSP App'x III, pt. II (AALTSA007592–94).

Plaintiffs appear to argue that those individuals who otherwise cleared the screening process (because they had not alarmed the walk-through metal detector on their first or second pass-through or failed to alarm during a properly conducted hand-held metal detector search), should still have been subject to additional hand-held metal detector or pat-down screening. But the ACSSP provided explicit steps for passenger screening, including the specific circumstances under which an individual could be subjected to a hand-held metal detector search or a pat-down. Under federal regulations, if an individual did not alarm the walk-through metal detector, he was cleared to proceed beyond the screening point. *See* Barry Decl. Ex. A, ACSSP App'x III, pt. II.A (AALTSA007592); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 163: 6–12 ("Q. As of 9/11 was there any provision of the ACSSP or FAA screening guidelines that required airlines or checkpoint screening companies to conduct pat-down searches of individuals who did not set off any metal detector alarms? A. No, sir."). As noted above, even if a passenger initially alarmed the walk-through metal detector, if he did not alarm the walk-through metal detector on his second pass through, he was cleared to enter the sterile area. *See* Barry Decl. Ex. A, ACSSP App'x III, pt. II (AALTSA007592–94); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 156:13–17. And again, even if he alarmed the walk-through metal detector twice, if he did not alarm the hand-held metal detector, he was free to proceed to the sterile area. *See* Barry Decl. Ex. A, ACSSP App'x III, pt. II (AALTSA007592-94); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 159:22–160:19.

~~SAHSI [*] [SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)~~

~~SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PARTS 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION~~

Security agents only conducted pat-downs of passengers during screening (i) by request
of a passenger, or (ii) if the hand-held metal detector continued to alarm but the cause of the
alarming detector could not be determined by the agents.   Pat-down searches could only be
conducted with the passenger's consent.   *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 162:11–
16 ("Q. As of 9/11 under the ACSSP and FAA screening guidelines did a pat-down search
require the consent of the passenger up to the point when an obvious threat had been identified?
A. Yes, it was a consent search.   Q. So if an individual on whom an obvious threat had not yet
been identified refused to consent to a pat-down search, the screeners could not conduct a pat-
down search of that person?   A. That's correct.").[33]   As of 9/11, there was no provision of the
ACSSP or FAA screening guidelines that required air carriers or checkpoint screening
companies to conduct pat-down searches of individuals who did not set off any metal detector
alarms.   *See* Barry Decl. Ex. A, ACSSP II.F (AALTSA007438–39); Barry Decl. Ex. B,
Cammaroto Dep. Vol. I 163:6–12.[34]

To meet the standard of care, American was only required to comply with the provisions
of the FARs, ACSSP, and Security Directives.   Those federal regulations and rules instructed air
carriers to conduct initial screening of individuals' persons using walk-through metal detectors,
and hand-held metal detector or pat-down searches only when individuals caused or continued to

---

[33] If an individual did not consent to a pat-down, he could not enter the sterile area.   Barry Decl.
Ex. B, Cammaroto Dep. Vol. I 162:17–163:5 (noting that if an individual refused to consent to
a pat down, "the result would be if [the screeners] felt they needed it that he or she would not
be permitted into the sterile area").

[34] As with the FAA rules regarding knives, the procedures laid out in the ACSSP reflected the
FAA's policy decisions regarding appropriate screening procedures.   For example, as the
FAA's Rule 30(b)(6) representative pointed out, there would be significant inefficiencies
associated with conducting large numbers of pat-downs.   *See* Barry Decl. Ex. B, Cammaroto
Dep. Vol. I 161:21–162:10.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

cause the walk-through metal detector to alarm. Furthermore, federal regulations did not provide for random pat-downs, and only permitted pat-downs under limited circumstances, with passenger consent.[35]   Accordingly, any argument that American was required to subject more passengers to hand-held metal detector or pat-down searches must fail.

### D.  The FAA Did Not Require Hand Searches of All Carry-On Items at Checkpoint Screening.

Federal law required all carry-on items passing through the checkpoint to be screened using FAA-approved inspection methods. Thus, if any person refused to permit inspection of any carry-on item, that item was not permitted into the sterile area or inside the airplane cabin, and the air carrier was instructed that it must "not knowingly transport that item as checked baggage or cargo." *See* Barry Decl. Ex. A, ACSSP II.G(1) (AALTSA007439). As of 9/11, all major airlines at all major airports used x-ray screening systems as the primary method of inspecting carry-on items. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 172:13–21. This method of carry-on inspection was approved by the FAA. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 172:13–174:5.[36]

---

[35] Of course, different rules regarding pat-downs applied once an individual was found to be carrying a threat item or weapon.

[36] FAA approval was required prior to the installation and use of an x-ray system, and such systems had to meet certain federal x-ray system requirements. *See* Barry Decl. Ex. A, ACSSP IV.C(5) (AALTSA007461). The ACSSP required that all x-ray systems meet specific imaging capabilities and be operated "at a level to ensure maximum effectiveness in detecting weapons, explosives, and other dangerous objects." *See id.*; Barry Decl. Ex. A, ACSSP App'x XIX, § 2 (AALTSA007656–57). In addition, air carriers were instructed to conduct daily tests of each system using a Test Step Wedge to test the x-ray machine. *See* Barry Decl. Ex. A, ACSSP IV.C(5) (AALTSA007462–63); *see also* Barry Decl. Ex. JJ, Excerpts from Rosarito Rivera Dep. 119:20–120:4, Sept. 13, 2006 ("Rivera Dep."). Ms. Rivera was a checkpoint security supervisor for Globe on 9/11.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

Part II to the ACSSP (which was supplemented by additional guidance in Appendix III of the ACSSP), contained detailed requirements for the screening of all carry-on items:

- Carry-on item inspection was conducted by a screener using an x-ray device or physically inspecting the item. If an item was clearly identifiable as "being other than an explosive, incendiary, or deadly or dangerous weapon," the item was cleared for entry to the sterile area. *See* Barry Decl. Ex. A, ACSSP II.G (AALTSA007439); *id.* at App'x III, p. III.A (AALTSA007594).

- If the x-ray monitor displayed an image ▓▓▓▓▓▓▓▓ an explosive, incendiary, or deadly or dangerous weapon in a carry-on item, the ACSSP required that the carry-on item be subjected to additional screening. *See* Barry Decl. Ex. A, ACSSP II.G(2) (AALTSA007439).

- If a bag was flagged for additional screening by the x-ray operator, the screener was required to conduct a physical inspection of a carry-on item, or, if an explosive was suspected, examine the carry-on item using an ETD device. *See* Barry Decl. Ex. A, ACSSP II.G(2) (AALTSA007439). If no explosive, incendiary, or deadly or dangerous weapon was discovered, the carry-on item was permitted to pass beyond the screening point; if an explosive, incendiary, or deadly or dangerous weapon was discovered, screeners were required to notify the law enforcement officer on duty immediately. *See* Barry Decl. Ex. A, ACSSP, App'x III, pt. III (AALTSA007594–95).

- In practice, for questionable items that were not explosives, incendiaries, or deadly or dangerous weapons, screeners would contact the Checkpoint Security Supervisor ("CSS") and Ground Security Coordinator ("GSC").[37]

- If the screener and/or law enforcement officer determined that such item was not inimical to the flight's safety, the item was permitted to pass into the sterile area. *Id.* If an explosive, incendiary, or deadly or dangerous weapon was discovered, the law enforcement officer was instructed to take steps to verify the discovery of the item, take custody of the item, and initiate appropriate law enforcement action. *See* Barry Decl. Ex. A, ACSSP, App'x III, pt. III (AALTSA007594–96).

- Once a carry-on item was cleared for entry to the sterile area, it was not subject to any additional screening or searches.

In addition to the above-listed screening procedures, at large airports such as Logan,[38] besides any items specifically flagged for additional screening by the x-ray operator, the FAA

---

[37] The role of GSCs is described in Section III.E.2, *infra*.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

required the air carriers to conduct continual and random secondary searches of carry-on baggage. *See* Barry Decl. Ex. A, ACSSP II.G (AALTSA007439–40); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 182:18–183:2 (continual search mandate of ACSSP required random searches), 185:5–13 ("Q. As of 9/11 what was the air carrier required to do under the ACSSP to meet the continual search requirements where the number of bags selected for inspection, because of possible threat items was insufficient to ensure continual flow of bags for inspection? A. There would need to be additional bags identified randomly to staff out that continual requirement.").[39]   At Logan and other airports where ETD devices were available for use, the random and continual search requirement was satisfied by an ETD check of any bag selected for a search under this process. *See* Barry Decl. Ex. A, ACSSP II.G(3) (AALTSA 007439); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 185:20–186:7.  There was no requirement that these bags be searched by hand; indeed, where an ETD device was available, the ACSSP required screeners to use the ETD device to inspect any carry-on items that could not be cleared by the x-ray operator. *See* Barry Decl. Ex. A, ACSSP II.G(3)(a) (AALTSA007439); Barry Decl. Ex. B, Cammaroto Dep. Vol. I 186:8–15 ("Q. In the circumstances we just been discussing where the ETD device was available and meeting all operational requirements you just described would a physical hand search of the randomly selected bag alone be sufficient to meet the continual search

---

[18]   The FAA classifies airports based on volume of passenger traffic. "Category X" airports are the United States' largest and busiest airports as measured by volume of passenger traffic. As of 9/11, Logan was considered a Category X airport. *See* Barry Decl. Ex. A, ACSSP App'x VII.B (AALTSA007607).

[39]   The concept behind continual random searches was that if the x-ray operator was not identifying a continual number of bags for secondary screening, the screeners were to randomly select additional baggage for search.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

requirements?  A. Not if there was an operational ETD available."); *see also* Barry Decl. Ex. G,

Winn Dep. 108:4–23.

### E.    The Qualification Standards and Training of Screening Personnel Were Prescribed by the FAA.

#### 1.    The FAA-Approved ACSSP Provided the Standards for Screener Qualifications and Training.

The ACSSP required that "[p]ersons who perform screening shall be trained in

accordance with this program." Barry Decl. Ex. A, ACSSP II.A (AALTSA007431). Air carriers

were required to hire, train, test, and supervise all persons used to perform and supervise

screening functions and security coordinator functions to perform their duties effectively.  *See*

Barry Decl. Ex. A, ACSSP XIII.A (AALTSA007528).  The ACSSP further provided that each

air carrier shall test and evaluate each screener's ability to perform screening functions, and

listed the specific functions required for screeners.  *See* Barry Decl. Ex. A, ACSSP XIII.B(1)

(AALTSA007528–29).

In addition to ensuring that their screeners met the requisite qualifications, air carriers

were required to train screeners in proper screening techniques, physical inspection, use of metal

detectors and, if appropriate, use of x-ray systems.  *See* Barry Decl. Ex. A, ACSSP XIII.C(1)

(AALTSA007530).  Training requirements for screeners were laid out in Appendix XI of the

ACSSP.  The FAA also regularly tested and audited the effectiveness of screening personnel,

without providing prior notice of the testing.   *See* Barry Decl. Ex. A, ACSSP XIII.F

(AALTSA007539), *id.* at XIII.G (AALTSA007543) ("To ensure that adequate protection is

being provided to the traveling public, the FAA conducts tests of screeners.").  For example:

- The FAA routinely tested the performance of x-ray screeners using a variety of objects, including a simulated pipe bomb, a simulated dynamite time bomb, a practice hand

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21-MC-101 (AKH) (S.D.N.Y.) SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

grenade, pistols, or revolvers. *See* Barry Decl. Ex. A, ACSSP App'x VI (AALTSA007601–03).[40]

- The FAA routinely tested the proficiency of screeners' hand searches by using toy firearms and simulated explosive devices in carry-on items. *See* Barry Decl. Ex. A, ACSSP IV.C(5) (AALTSA007464).[41]

### 2. The FAA Required Air Carriers to Appoint Ground Security Coordinators and Inflight Security Coordinators to Monitor Compliance with the Required Security Procedures.

The ACSSP provided, per 14 C.F.R. § 108.10, that the air carrier shall provide and use a GSC for each departing domestic flight. The GSC's role was to ensure that all the security requirements of each flight were monitored prior to departure, including:

- Screening passengers and their personal property for the flight;

- Controlling access to the airplane;

- Airplane servicing;

- Ground support for in-flight emergency response;

- The security of the air operations area;

- The security of baggage and cargo acceptance and loading;

- The monitoring of any extraordinary ground security procedures where they are in effect; and

- Communicating to the Inflight Security Coordinator before the flight departs, all information that could affect the security of that flight.

---

[40] Small knives or box cutters were not used to test the performance of x-ray screeners. *See* Barry Decl. Ex. A, ACSSP App'x VI (AALTSA007601–03).

[41] Small knives or box cutters were not used to test the proficiency of screeners' hand searches. *See* Barry Decl. Ex. A, ACSSP IV.C(6) (AALTSA007464).

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

*See* Barry Decl. Ex. A, ACSSP XIII.H (AALTSA07545–45). The GSC training requirements were listed in Appendix XII to the ACSSP, and GSC performance standards were laid out in Appendix XIV.

The ACSSP also provided for the appointment of an Inflight Security Coordinator ("ISC") for each domestic and international flight. *See* Barry Decl. Ex. A, ACSSP XIII.I (AALTSA07546). The ISC was the pilot of the plane, making the pilot responsible for the safety of the passengers and crew on the airplane. *See* Barry Decl. Ex. H, Lozito Dep. 278:18–279:3.

### F.    The FAA's "Common Strategy" Instructed Flight Crews to Cooperate With Hijackers.

Each air carrier was responsible for training its crewmembers serving on all domestic flights in security and anti-hijack subjects. *See* Barry Decl. Ex. A, ACSSP XIII.J (AALTSA07547). This included training all crewmembers in the Common Strategy. *See* Barry Decl. Ex. A, ACSSP, App'x XIII § 1(c) (AALTSA007628). The Common Strategy referred to "a training module that the aircrews went through in terms of how to deal with an on board security incident," primarily a hijacking situation. *See* Barry Decl. Ex. J, Morse Dep. 18:17–19:7 (describing the Common Strategy as "the mandatory training requirements for aircrews with respect to procedures that the FAA instructed crewmembers to follow in an event of a hijacking"), 20:2–13.[42] The objective of the Common Strategy was to "properly handle a hijacking in the most secure and safe way possible," and effectively coordinate the roles and responsibilities of law enforcement, the FAA, air traffic control, air carriers, and crewmembers in the event of a hijacking. Barry Decl. Ex. J, Morse Dep. 19:20–22, 36:23–37:16.

---

[42] The term was also used more broadly to refer to "the underlying doctrine relevant to how the government and industry would cooperate to manage a hijacking incident." Barry Decl. Ex. J, Morse Dep. 18:17–19:7.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

The elements of the Common Strategy were set forth in detail in Appendix XIII to the
ACSSP. The Common Strategy instructed flight crews that the best way to deal with hijackers
was to "accommodate their demands, get the plane to land safely, and then let law enforcement
or the military handle the situation." Barry Decl. Ex. N, *9/11 Commission Report* at 85; *see*
Barry Decl. Ex. A, ACSSP App'x XIII (AALTSA007632–33). Thus, in the event of a hijacking,
the Common Strategy instructed crewmembers to stay calm and establish a rapport with the
hijackers; the crewmembers were explicitly instructed not to negotiate with or try to overpower
the hijackers. *See* Barry Decl. Ex. A, ACSSP App'x XIII (AALTSA007632); *see also* Barry
Decl. Ex. J, Morse Dep. 29:3–24 (noting that the key elements of the Common Strategy include
the emphasis on "calmness, on quieting down the situation, on not exacerbating it, with lots of
little tips on how to do that, like not serving alcohol to the hijackers and so forth. You know,
establishing rapport with them if you could. Trying to keep them in the back end of the aircraft.
Try to assure them that someone was listening . . ."). The Common Strategy operated on the
fundamental assumption that hijackers issue negotiable demands and "provided no guidance for
flight crews should violence occur." Barry Decl. Ex. N, *9/11 Commission Report* at 85; *see also*
Barry Decl. Ex. J, Morse Dep. 298:9–14 ("Q. Was it your opinion on, or was it your belief on
September 11, 2001 that the common strategy operated on the fundamental assumption that
hijackers issue negotiable demands? A. Yes.").

The Common Strategy also affected crews' approach to whether a hijacker might gain
access to the cockpit during flight. Before 9/11, the FAA required that cockpit doors generally
remain closed and locked for the duration of the flight, unless they were in active, permissible

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

use. *See* 14 C.F.R. § 121.587 (2001).[43]  Of course, there were legitimate purposes for opening the cockpit door during flight, *e.g.*, for the pilot's bathroom visits, for the flight crew to bring meals to the pilots, or for the pilot to enter the cabin if necessary to inspect any issues in the main cabin; the opening of cockpit doors was also permitted in the event of an emergency. *See* Barry Decl. Ex. KK, Excerpts from Robert P. Kudwa[44] Dep. 373:12–374:22, Sept. 9, 2009 ("Kudwa Dep."); *see also* Barry Decl. Ex. N, *9/11 Commission Report* at 85; Barry Decl. Ex. Z, Aviation Monograph at 81.  In addition to the cockpit crew (*e.g.*, pilot, co-pilot) being able to open the cockpit door, FAA regulations required that the cockpit door be capable of being opened from inside the flight cabin and required that the flight attendants have access to keys to the cockpit. *See* 14 C.F.R. § 121.313 ("No person may conduct any operation unless the following equipment is installed in the airplane: (g) A key for each door that separates a passenger compartment from another compartment that has emergency exit provisions.  The key must be readily available for each crewmember.").[45]

---

[43] 14 C.F.R. § 121.587 (2001) provided in full:

   (a) Except as provided in paragraph (b) of this section, a pilot in command of an airplane that has a lockable flight crew compartment door in accordance with § 121.313 and that is carrying passengers shall ensure that the door separating the flight crew compartment from the passenger compartment is closed and locked during flight.

   (b) The provisions of paragraph (a) of this section do not apply— (1) During takeoff and landing if the crew compartment door is the means of access to a required passenger emergency exit or a floor level exit; or (2) At any time that it is necessary to provide access to the flight crew or passenger compartment, to a crewmember in the performance of his duties or for a person authorized admission to the flight crew compartment under § 121.547.

[44] Mr. Kudwa was Vice President, Director of Operations for American as of 9/11.  Mr. Kudwa was previously a pilot for American.

[45] The regulation regarding flight attendants having keys to the cockpit would have undermined the purpose of any attempt to fortify the cockpit doors. *See* Barry Decl. Ex. KK, Kudwa Dep. 275:4–8, 275:19–25 ("Q. And so wouldn't hardening a cockpit door help deter a passenger

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

The Common Strategy contemplated allowing the hijackers to access the cockpit in order to avoid confrontation. *See, e.g.*, Barry Decl. Ex. J, Morse Dep. 48:4–9 ("Q. Before 9/11, were the cockpit crew instructed to use force to prevent hijackers from entering the cockpit? . . . A. No."), 51:9–52:5, 52:17–19 ("it was clearly recognized that there were cases in which a hijacker would end up in the cockpit"); Barry Decl. Ex. KK, Kudwa Dep. 368:18–369:3 ("Q. In your experience, based on your training, would it have been consistent with the Common Strategy for a flight attendant to use her cockpit key to access the cockpit door if threatened by a hijacker who wanted to get into the cockpit? . . . . A. That would be consistent with the Common Strategy, yes.  Q. Did the Common Strategy require a flight attendant to submit to stabbing or death in order to deny a hijacker access to the use of her cockpit key to enter the cockpit? A. No, it did not.  Q. Was a flight attendant expected to suffer martyrdom under the Common Strategy in order to deny the hijackers access to a cockpit key? . . . . A. No, she was not.").

### G. The FAA's Aviation Security Contingency Plan Alerted Air Carriers of the Likelihood of Potential Security Threats.

The FAA developed the Aviation Security Contingency ("AVSEC") Plan to ensure that the FAA, airport operators, and air carriers were able to respond on short notice to all civil aviation threats. Barry Decl. Ex. A, ACSSP App'x XV (AALTSA007640); Barry Decl. Ex. B, Cammaroto Dep. Vol. 1 128:4–8. The FAA created four alert levels corresponding to various levels of threat to security based upon the FAA's overall assessment of the threat. The AVSEC Plan set forth a "menu" of particular countermeasures that the FAA could select to enact for each

---

who didn't have a key from gaining entry to a locked cockpit? A. Flight attendants have keys. . . Q. A hardened door is harder to kick in, is it not? That's the point of hardening a door, is that your understanding? A. Okay. I can't see if there are keys out, I can't see why that would make any difference at all.").

SUBJECT TO SENSITIVE SECURITY PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

AVSEC Alert Level. Barry Decl. Ex. A, ACSSP App'x XV (AALTSA007640); Barry Decl. Ex.

B, Cammaroto Dep. Vol. I 133:5–135:10 (discussing the menu of options the FAA could choose

from in response to the AVSEC Alert level).   To be clear, the countermeasures listed in

Appendix XV of the ACSSP only provided a list of options for the FAA; the countermeasures

did not come into effect automatically upon a declaration of the AVSEC Alert Level, but rather

they required FAA regulatory action (*i.e.*, a Security Directive), in order to activate them. *See*

Barry Decl. Ex. A, ACSSP App'x XV (AALTSA007640–42); Barry Decl. Ex. B, Cammaroto

Dep. Vol. I 127:9–22 (AVSEC "was intended to give both parties, the air carriers and airports

insights into what measures the opposite party could potentially be called on by FAA to

implement at various alert levels so they can be prepared to cooperate."), 133:12–19 ("Q. Does

the mere listing of a possible counter measure under a particular alert level in Appendix XV

necessarily meaning [sic] that that particular counter measure was automatically in effect

whenever and wherever the alert level was adopted?  A. No, sir, that was not the implication.").

As of 9/11, the AVSEC Alert Level was set at Level III; the Alert Level had remained at Level

III for several years prior to 9/11. *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 124:19–126:21

(noting that the Alert Level had remained at Level III since the "the so-called Bojinka plot in

1995" and that Level III "had become the environment in which we were operating for a

prolonged period").

**IV.    The Checkpoint Operations Guide Was Not a Federal Regulation, and Did Not Impose Any Legally Binding Obligations on Air Carriers.**

The Checkpoint Operations Guide, or COG, was a practical working guide to the

operation of the ACSSP that was developed by the Air Transport Association and the Regional

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21-MC-101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING  THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PARTS 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

Airways Association, for the purpose of providing an easier-to-understand working guide to the ACSSP.

The COG was not an FAA regulation – it imposed no legally binding obligations on air carriers. *See, e.g.*, Barry Decl. Ex. E, Cammaroto Dep. Vol. II 615:24–616:9 ("Q. Did the FAA pre 9/11 consider the COG to be a document with which the airlines were required to comply as a matter of Federal law? . . . . A. No, sir."); Barry Decl. Ex. D, Johnson Dep. 40:9-15 ("Q. And the ACSSP had the force of law, but the Checkpoint Operations Guide did not; correct? A. Correct. We could not take enforcement action on the COG."); Barry Decl. Ex. H, Lozito Dep. 115:9–16 ("Q. Okay. But it was the security program, not the Checkpoint Operations Guide that the air carriers were supposed to implement? A. That's correct."). The FAA reviewed the COG to ensure that it did not contain any provisions inconsistent with the requirements of the ACSSP or other FAA regulations, but the FAA did not otherwise play a role in the COG's creation. *See, e.g.*, Barry Decl. Ex. B, Cammaroto Dep. Vol. I 272:2–273:23.

Air carriers were not subject to fines or other penalties for failure to comply with the terms of the COG. This was testified to by the FAA's Rule 30(b)(6) representative, *see* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 271:13–25 ("Q. Did the FAA ever impose fines or penalties on air carriers for failure to comply with the provisions of the COG as distinguished from failure to comply with the provisions of their ACSSP? A. No, sir, the FAA did not."); and one of the principal draftsmen of the COG, *see* Barry Decl. Ex. LL, Excerpts from James D. Helliwell Dep.[46] 43:5–43:20, Nov. 30, 2007 ("Helliwell Dep.") ("Q. In your experience, sir, could the airlines be fined or penalized by the FAA if they failed to comply with the COG? . . . A. That's

---

[46] Mr. Helliwell was one of the authors of the COG.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING. THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

no.  Q.   Can you recall any instance in which an airline was fined or penalized by the FAA for

violating a provision of the COG, as distinguished from a provision of the ACSSP? . . . A. No.").

Plaintiffs' experts have also admitted that air carriers did not face fines or other federal law

penalties for failure to comply with the COG:

> Q. [I]f an airline followed the provisions of its ACSSP, but failed
> to follow a provision of the COG, were there any consequences in
> the forms of fines or other reprimand or penalties to the airlines
> that the FAA would issue.
>
> A. The answer is no.

Barry Decl. Ex. D, Johnson Dep. 40:16–24.    Similarly, Cantor's expert, Mr. Winn,

acknowledged:

> Q. So long as it has met its obligations under the ACSSP, could an
> airline be fined or penalized by the FAA for non-compliance with
> a provision of the COG.
>
> A. No.

Barry Decl. Ex. G, Winn Dep. 53:6–10.

Whereas air carriers had a binding legal obligation to comply with the FARs, ACSSP,

and Security Directives, they were free to depart from the COG. *See* Barry Decl. Ex. B,

Cammaroto Dep. Vol. I 271:13–25 ("Q. Was the COG issued by the FAA? A. No, sir. Q. Does

the COG or provisions of the COG have the binding force of a federal regulation? . . . A. No, sir,

it does not.").   Indeed, Janet Riffe, the FAA's PSI[47] for American Airlines as of 9/11, testified

---

[47]  The responsibilities of a PSI included overseeing an air carrier's security program, reviewing
and approving any amendments to the air carrier's security program, disseminating Security
Directives and Information Circulars to the air carrier, performing trend analyses on violations
throughout the security system, answering questions from the air carrier's corporate office,
offering interpretations of Security Directives and regulations, approving training programs
for GSCs, ISCs and crew members, and participating in and observing training from time to
time. *See* Barry Decl. Ex. F, Riffe Dep. 20:21–21:6.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED
UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR
PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

that she was responsible, as PSI, to monitor American's compliance with the ACSSP; she had no responsibility to monitor American's compliance with the COG. *See* Barry Decl. Ex. F, Riffe Dep. 212:8–20; *see also* Barry Decl. Ex. H, Lozito Dep. 177:2–9 ("Q. We had talked a little bit before the break about the Checkpoint Operation Guide, the COG. Did you have any communications, aside from working with it yourself, you already talked about that. But did you have any communications with United Airlines concerning the COG? A. Not that I can recall."). Thus, federal law did not require compliance with the COG, and the COG was not part of the standard of care applicable to American's conduct on 9/11.

Plaintiffs argue that certain provisions in the COG were more stringent than those in the ACSSP and security directives, and that compliance with these more stringent COG provisions was required in order to meet the standard of care. Most prominently, Plaintiffs appear to argue that the COG's designation of box cutters as a prohibited item imposed a legal obligation on air carriers to detect and seize box cutters. *See, e.g.,* Barry Decl. Ex. V, Winn Report ¶¶ 35–37, 69–70. However, this is simply incorrect as a matter of law. The FAA has explicitly stated that it did not prohibit box cutters as of 9/11. *See* Barry Decl. Ex. MM, FAA Position on Box Cutters (TSA 11524) ("Prior to September 11, the FAA security program for air carriers did not prohibit carrying box cutters or similar cutting instruments on passenger flights."); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. 1 247:2–249:12 (same); Barry Decl. Ex. F, Riffe Dep. 80:6–14 ("Was a box cutter a deadly or dangerous weapon on 9/11, to the best of your knowledge? . . . A. Based on the definition in the ACSSP, a box cutter was not a prohibited item."). Accordingly, federal law did not require air carriers to detect box cutters during the screening process – a fact confirmed by Plaintiffs' own experts. *See* Barry Decl. Ex. D, Johnson Dep. 92:19–93:10 (confirming that the FAA would have permitted a box cutter into the sterile area under normal

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, IN RE SEPTEMBER 11 LITIGATION, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

circumstances); Barry Decl. Ex. G, Winn Dep. 53:16–54:7 ("I must have read 1,000 [FAA Letters of Investigation]. And I don't recall one that mentioned a box cutter . . ."), 39:17-21, 41:16-42:10 (agreeing that the ACSSP did not prohibit carrying box cutters or similar cutting instruments on passenger flights).

Moreover, the COG itself lacked clarity on the "box cutter" issue. Although the COG prohibited box cutters, it explicitly permitted pocket utility knives with blades under four inches long into the sterile area; however, the COG provided no guidance on how to distinguish between permissible "pocket utility knives" and restricted "box cutters." *See* Barry Decl. Ex. Z, Aviation Monograph at 74.[48] Nonetheless, because federal law permitted both box cutters and pocket knives in the sterile area, an air carrier would not face liability for allowing either into the sterile area. *See* Barry Decl. Ex. MM, FAA Position on Box Cutters (TSA 11524) (stating "Prior to September 11, the FAA security program for air carriers did not prohibit carrying box cutters or similar cutting instruments on passenger flights."); *see also* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 247:20–248:5 (testifying to accuracy of FAA Position on Box Cutters), 271:20–25 ("Q. Did the FAA ever impose fines or penalties on air carriers for failure to comply with the provisions of the COG as distinguished from failure to comply with the provisions of their

---

[48] Indeed, the question of what qualifies as a "box cutter" as opposed to a "pocket utility knife" has generated much debate in this litigation. *See, e.g.*, Barry Decl. Ex. G Winn Dep. 38:8–12 ("Q. Is there some general characteristic that you would use to distinguish a box cutter from a pocket utility knife? A. No, because there is all different models and shapes and sizes."); Barry Decl. Ex. NN, Excerpts from Steven J. Murray Dep. 43:19–44:7, Aug. 29, 2013 ("Murray Dep.") ("Q. Do you see that the packaging calls this item a utility knife? A. Yes. Q. Why did you refer to this item as a boxcutter in your report? A. Knives of this type are commonly referred to as boxcutters. Q. What's the basis for that statement? A. My common experience in laboratory and shop, we would call this kind of knife a boxcutter. Q. Would it also be called a utility knife, in common parlance? A. Sure."). Steven J. Murray is Plaintiffs' expert regarding the capabilities of walk-through metal detectors.

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)
SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

ACSSP?  A.  No, sir, the FAA did not.").  Indeed, the FAA's website explicitly stated that, provided that state and local laws did not restrict the carriage of small knives (up to four inches) in a public airport, knives with blades under four inches long were permitted onboard flights. *See* Barry Decl. Ex. M, Archived Web Page, FAA Passenger Information, Travel and Safety Tips (June 2001) ("FAA allows knives with blades up to four inches").

Plaintiffs also argue that knives with blades under four inches should have been seized by screeners during the screening process because the COG also prohibited "menacing" knives. *See* Barry Decl. Ex. V, Winn Report ¶ 69; *see also* Barry Decl. Ex. LL, Helliwell Dep. 56:14–22. However, Plaintiffs' own experts have acknowledged that the ACSSP did not make any reference to "menacing" knives and did not prohibit carrying a Leatherman into the sterile area. *See* Barry Decl. Ex. G, Winn Dep. 39:22–25, 338:20-24.  In addition, James Helliwell, one of the COG's principal drafters, testified that the menacing knife provision of the COG was not meant to include knives with multiple, practical everyday uses.  Barry Decl. Ex. LL, Helliwell Dep. 56:23–57:4.  Contrary to Plaintiffs' argument, the FAA's four-inch knife rule represented a considered policy decision by the FAA based upon a determination that there would be little to no security gain from banning knives under four inches.  *See* Barry Decl. Ex. B, Cammaroto Dep. Vol. I 219:24–220:11, 228:5–228:20.

At most, the COG's references to "box cutters" and "menacing knives" constituted an internal standard voluntarily applied by air carriers that exceeded the standard imposed by federal law.[49]  *See* Barry Decl. Ex. LL, Helliwell Dep. 26:20–25 (explaining that the COG

---

[49] The practical effect of the FAA approval of the COG, including the "box cutters" and "menacing knives" provisions, was that screeners could seize box cutters or other knives with blades under four inches if they chose to do so. The FAA's approval of the COG, however, did not convert the COG into a federal regulation.

SUBJECT TO SSI NATIVE SECURITY INFORMATION PROTECTIVE ORDER. *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

covered elements in the ACSSP "and expanded upon the requirements of the ACSSP"). Of course, federal law controls here, and state law is preempted. But even if state law were applicable here, under New York law, an entity's failure to follow its own internal procedures, when those procedures are more stringent than the legal standard of care, cannot warrant the imposition of tort liability on that entity. *See Gilson v. Metro. Opera*, 5 N.Y.3d 574, 577 (2005). "Internal rules and manuals, to the extent they impose a higher standard of care than is imposed by law, are inadmissible to establish a failure to exercise reasonable care." *Abraham v. Port Auth. of N.Y. & N.J.*, 815 N.Y.S.2d 38, 40–41 (1st Dep't 2006); *see also Asantewaa v. City of N.Y.*, 935 N.Y.S.2d 18, 19 (1st Dep't 2011) ("Moreover, the New York City Fire Department's internal rules requiring that members ensure that passengers in emergency vehicles wear seatbelts imposes a greater standard of care upon defendant than imposed by law, and thus, a violation of said rules cannot serve as basis for plaintiff to impose liability upon defendant"); *Rahimi v. Manhattan & Bronx Surface Transit Operating Auth.*, 843 N.Y.S.2d 557, 559 (1st Dep't 2007) ("The Transit Authority's rules requiring that its drivers anticipate that other drivers will violate the rules of the road impose a standard of care higher than the common law and therefore cannot be the basis for imposing liability on the Transit Authority." (citations omitted)).

This rule is well established under New York law and thus precludes Plaintiffs' introduction of the COG, air carriers' internal guidelines that exceeded the federal standard of care. *See Sherman v. Robinson*, 80 N.Y.2d 483, 489 n.3 (1992) ("We reject plaintiffs' argument that defendant's company manual created a separate duty of care. Violation of a company's internal rules is not negligence in and of itself, and where such rules require a standard that transcends reasonable care, breach cannot be considered evidence of negligence." (citation

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

omitted)); *Rivera v. N.Y.C. Tr. Auth.*, 77 N.Y.2d 322, 329 (1991) ("the trial court should not have admitted into evidence the defendant's entire internal rule book and manual containing irrelevant material which was not relied upon by the parties' experts or which imposed a higher standard of proof on defendant than that imposed by law" (citation omitted)); *Crosland v. N.Y.C. Tr. Auth.*, 68 N.Y.2d 165, 168–69 (1986) (holding that "liability cannot be based upon the alleged breach of Transit Authority rule 85, which, as in the portion quoted above, imposed a duty higher than the Authority actually owes, *i.e.*, to exercise 'ordinary care commensurate with the existing circumstances.' Indeed, as the Appellate Division noted, the rule would be inadmissible at trial for the same reason" (citations omitted)). The New York Court of Appeals has long stressed the importance of this rule, noting that otherwise, "the more cautious an employer is and the more carefully he regulates the conduct of his employees, even though far beyond what the law requires, the more subject he will be to liability because some employee fails to obey the rule." *Longacre v. Yonkers R.R. Co.*, 236 N.Y. 119, 125 (1923).

The COG was a working document that air carriers used as a guide for screeners. Barry Decl. Ex. LL, Helliwell Dep. 25:6–12 ("My marching orders were to try to create a user friendly document that was of a level that could be used by the type of people you generally employed at checkpoints."). Failure to comply with the COG could not give rise to damages under federal law or state tort law, because it was not part of the federal aviation security regulation scheme that preempted state law concerning aviation security.

## V.     American Only Needs to Show Substantial Compliance With The Federal Standard of Care.

This Motion seeks to establish the contours of federal aviation security law on 9/11. Having established the appropriate standard of care, American agrees with the Court's ruling in

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.) SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAYBE DISCLOSED TO PERSONS WITHOUT A NEED TO KNOW, AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

*Bavis*, that an air carrier may demonstrate "due care" by showing substantial compliance with the federal standards. *Bavis*, 811 F. Supp. 2d at 894 ("Defendants then will have to come forward with evidence showing due care at the check-points by complying substantially with applicable regulations and procedures." (citing 14 C.F.R. Part 108)).

In addition to demonstrating that American failed to substantially comply with federal regulatory requirements on 9/11, Cantor must also prove that any such failure was the proximate cause of the terrorists' deliberate crash of Flight 11 into WTC 1. *See In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 150 (S.D.N.Y. 2009) ("If the terrorists would have been able to pass through airport security with their weapons, overcome security procedures aboard the airplanes, overcome resistance of passengers and crew, and fly jumbo jets into buildings even if the Aviation Defendants had acted meticulously, plaintiffs may be unable to prove proximate causation, or at least a jury might so decide.").

## CONCLUSION

Federal law establishes the standard of care applicable to American's conduct on 9/11. The aviation security scheme consisted of the FARs, ACSSP, and Security Directives in force on 9/11; those federal regulations set the standard by which American's actions are to be judged, and preclude Cantor's claims that the federal requirements merely provided a minimum standard that American should have exceeded on pain of liability for damages under state tort law. Accordingly, Cantor should be precluded from advancing any arguments that base liability on any standard other than the requirements and standards set forth in the federal regulatory scheme in effect on 9/11. Once the Court determines the standard of care, American respectfully submits that at the outset of the trial, prior to opening statements, the Court should read a pre-instruction

SUBJECT TO SENSITIVE SECURITY INFORMATION PROTECTIVE ORDER, *IN RE SEPTEMBER 11 LITIGATION*, 21 MC 101 (AKH) (S.D.N.Y.)

SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION

to the jury that states what the appropriate standard of care was as of 9/11.

Dated: New York, New York
        October 25, 2013

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
    Desmond T. Barry, Jr. (DB 8066)
    7 Times Square
    New York, NY 10036
    Telephone: (212) 490-9100
    Fax: (212) 370-4453
    dbarry@condonlaw.com

    -and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000
Fax: (212) 909-6836
repodesta @debevoise.com
mkmonagh@debevoise.com

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

*Of Counsel:*

John T. Pierpont
Johanna N. Skrzypczyk
Erica S. Weisgerber
DEBEVOISE & PLIMPTON LLP

# APPENDIX A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
          :   21 MC 101 (AKH)
          :
IN RE SEPTEMBER 11 LITIGATION    :   This document relates to:
          :   *Bavis v. United Airlines Inc. et al.,*
          :   02 CV 7154
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW OF AMERICAN AIRLINES, INC. AND AMR CORPORATION CONCERNING APPLICABLE STANDARD OF CARE


CONDON & FORSYTH LLP
Times Square Tower
7 Times Square
New York, NY  10036
(212) 490-9100
Desmond T. Barry, Jr. (DB 8806)

-and-

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
(212) 909-6000
Roger E. Podesta (RP 1749)

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

*Of Counsel:*

Maura K. Monaghan
Jacob W. Stahl
Johanna N. Skrzypczyk

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................2

ARGUMENT .............................................................................................2

I.   ATSSSA Determines the Applicable Standard of Care ..........................2

II.  The "Preempted By" Language of ATSSSA Mandates Applying an
     Exclusively Federal Standard of Care ....................................................5

     A. Federal Aviation Act Preemption under *ATA* and *Goodspeed* ..........5

     B. Bavis' Other Authorities Do Not Withstand Analysis .......................9

III. The "Inconsistent With" Language of ATSSSA Mandates Applying an
     Exclusively Federal Standard of Care ...................................................11

IV.  The Federal Aviation Act and Its Implementing Regulations Set Forth
     the Legal Obligations of the Airlines and Security Companies for
     Aviation Security; Defendants May Not Be Subjected to Liability for
     Failing to Exceed Those Obligations ....................................................14

V.   The Security Measures Plaintiffs Suggest Defendants Should Have
     Adopted Would Conflict with FAA Regulations and Policy Judgments
     or Violate Federal Law ........................................................................19

CONCLUSION ........................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abdullah v. Am. Airlines, Inc.,*
    181 F.3d 363 (3d Cir. 1999)..............................................................................8, 10

*Air Transport Ass'n of American, Inc. v. Cuomo,*
    520 F. 3d 218 (2d Cir. 2008)............................................................................. *passim*

*Aldana v. Air E. Airways, Inc.,*
    477 F.Supp. 2d 489 (D. Conn. 2007) ......................................................................10

*Cleveland v. Piper Aircraft Corp.,*
    985 F.2d 1438 (10th Cir. 1993) ...............................................................................11

*Comm'r of Internal Revenue v. Keystone Consol. Indus., Inc.,*
    508 U.S. 152 (1993)..................................................................................................14

*Corcoran v. New York Power Auth.,*
    935 F. Supp. 376 (S.D.N.Y. 1996) ..........................................................................13

*Crosby v. National Foreign Trade Council,*
    530 U.S. 363 (2000).............................................................................................7, 22

*Curtin v. Port Authority,*
    183 F. Supp. 2d 664 (S.D.N.Y. 2002)...................................................................8, 10

*Di Benedetto v. Pan Am World Service, Inc.,*
    359 F.3d 627 (2d Cir. 2004).....................................................................................10

*Drake v. Laboratory Corp.,*
    458 F.3d 48 (2d Cir. 2006)...........................................................................8, 15, 22

*French v. Pan Am Express, Inc.,*
    869 F.2d 1 (1st Cir. 1989) ..........................................................................................8

*Geier v. American Honda Motor Co., Inc.,*
    529 U.S. 861 (2000)..................................................................................................22

*Goodspeed Airport, LLC v. East Haddam Inland Water Courses Comm'n,*
    634 F.3d 206 (2d Cir. 2011)............................................................................. *passim*

*Greene v. B.F. Goodrich Avionics Sys., Inc.,*
    409 F.3d 784 (6th Cir. 2005) ................................................................................7, 8

*In re Air Crash at John F. Kennedy Int'l Airport,*
    635 F.2d 67 (2d Cir. 1980)................................................................................9

*In re Air Disaster at Lockerbie, Scotland,*
    37 F.3d 804 (2d Cir. 1994)............................................................................9, 10

*In re Hanford Nuclear Reservation Litig.,*
    534 F.3d 986 (9th Cir. 2008) ..........................................................................13

*In re Sept. 11 Litig.,*
    594 F. Supp. 2d 374 (S.D.N.Y. 2009)...............................................................12

*In re TMI Litig. Cases Consol. II.*
    940 F.2d 832 (3rd Cir. 1991) ...........................................................................13

*In re Trans World Airlines, Inc.,*
    FAA Order No. 1999-12, 1999 W.L. 1125387 ...................................................17

*Margolis v. United Airlines, Inc.,*
    811 F. Supp. 318 (E.D. Mich. 1993).................................................................8

*McNally v. Port Authority (In re WTC Disaster Site),*
    414 F.3d 352 (2d Cir. 2005)............................................................................10

*Merrill Lynch Pierce Fenner & Smith, Inc. v. Dabit,*
    547 U.S. 71 (2006)...........................................................................................14

*Montalvo v. Spirit Airlines,*
    508 F. 3d 464 (9th Cir. 2007) ...........................................................................7

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005).........................................................................................14

*O'Conner v. Commonwealth Edison Co.,*
    13 F.3d 1090 (7th Cir. 1994) ...........................................................................13

*Platt v. Union Poc. R.R. Co.,*
    99 U.S. 48 (1879)..............................................................................................4

*Pliva, Inc. v. Mensing,*
    No. 09–993, 2011 WL 2472790 (June 23, 2011) ...............................................22

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979)...........................................................................................4

*Rowe v. New Hampshire Motor Transp. Ass'n,*
    552 U.S. 364, 370 (2007)..................................................................................14

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
    2011 U.S. LEXIS 3542 (May 16, 2011) ..................................................12

*Shupert v. Continental Airlines, Inc.,*
    No. 00 Civ. 2743, 2004 WL 784859 (S.D.N.Y. Apr. 12, 1994) ...............10

*Silkwood v. Kerr-McGee Corp.,*
    464 U.S. 238 (1984) ..................................................................................13

*Stanford v. Kuwait Airways Corp.,*
    89 F.3d 117 (2d Cir. 1996) .........................................................................10

*Sunbird Airlines, Inc. v. Beech Aircraft Corp.,*
    789 F. Supp. 360 (D. Kan. 1992) .................................................................8

*U.S. Airways, Inc. v. O'Donnell,*
    627 F.3d 1318 (10th Cir. 2010) ...........................................................6, 8, 11

*United States v. Locke,*
    529 U.S. 89 (2000) ......................................................................................7

*Williams v. Trans World Airlines,*
    509 F. 2d 942 (2d Cir. 1975) ................................................................16, 17

**STATUTES**

49 U.S.C. § 1511 .............................................................................................17

49 U.S.C. § 44701 .....................................................................................15, 16

49 U.S.C. § 40101 ..................................................................................*passim*

49 U.S.C. § 41713(b)(1) ...................................................................................5

49 U.S.C. 40120(c) .................................................................................*passim*

49 U.S.C. § 44903 *et seq.* .......................................................................*passim*

42 U.S.C. § 2014(hh) .............................................................................*passim*

The liability issues in this case should be determined by a federal standard of care based on the Federal Aviation Regulations ("FARs"), the Air Carrier Standard Security Program ("ACSSP") and the Security Directives issued by the Federal Aviation Administration ("FAA"). While Defendants American Airlines, Inc. and AMR Corporation (collectively, "American") are not parties to *Bavis*, they have an important interest in the Court's determination of these issues because of the possible application of that determination to the property damage cases in which American remains a defendant.[1]

The Aviation Defendants thoroughly briefed these issues in the Aviation Defendants' Memorandum of Law in Support of Motion for a Determination of Applicable Law Regarding the Standard of Care (the "2007 Memorandum") and the Aviation Defendants' Reply Memorandum of Law (the "2007 Reply Memorandum") in support of the same motion.[2] American submits this Memorandum of Law together with the accompanying Declaration of Desmond T. Barry, Jr., dated July 8, 2011, and the exhibits attached thereto in order to (i) respond to the Bavis and WTCP Plaintiffs' latest arguments, (ii) call the Court's attention to the Second Circuit's definitive recent rulings in support of federal occupation of the field of aviation safety and security, and (iii) highlight the important intervening deposition testimony of FAA officials Robert Cammaroto and Claudio Manno.  These developments have removed any doubt that a federal standard of care must apply.

---

[1]   American remains a defendant in *World Trade Center Properties LLC. et al v. American Airlines, Inc. et al*, 08-cv-03722 (AKH) and *Cantor Fitzgerald & Co. et al v. American Airlines, Inc. et al*, 04-cv-7318 (AKH).

[2]   Certain Aviation Defendants (Boeing and Massport) filed standard of care briefs addressing issues pertinent to their circumstances.

23461160v5

## PRELIMINARY STATEMENT

Before 9/11, the FAA, exercising the authority delegated to it by Congress, established a detailed set of standards and procedures governing virtually every aspect of aviation security, including passenger pre-screening, checkpoint screening of passengers and their carry-on baggage, and in-flight security.  In developing these standards and procedures, the FAA drew upon classified terrorist threat information that it regularly received from the Federal Bureau of Investigation, the Central Intelligence Agency and other intelligence agencies, and made complex policy judgments balancing competing considerations of security, passenger convenience, maintenance of an efficient air transportation system, and protection of passenger privacy and civil liberties.

Prior to 9/11, American and the other Aviation Defendants were governed by these FAA standards and procedures and applied them on a daily basis in conducting their security operations.  The Bavis and WTCP Plaintiffs' allegations that American and the other Aviation Defendants should be held liable for the 9/11 terrorist attacks should be evaluated by reference to the same federal standards and procedures that governed their conduct on and before that tragic morning.  Applying a *post hoc*, hindsight-influenced standard of care based on generalities of state law having no particular application to aviation security would not only lack legal foundation but also would be manifestly unfair and unjust.

## ARGUMENT

### I.   ATSSSA Determines the Applicable Standard of Care.

Apart from a passing reference on pages one and two, Plaintiff Bavis devotes virtually no attention to the language of the Air Transportation Safety and System Stabilization Act, Section 408, 49 U.S.C. § 40101 *et seq*. ("ATSSSA"), the controlling statute under which she brings her

claims. (Pl. Mem. at 1-2). This disregard of the controlling statutory language leads Plaintiff

into at least three fundamental legal errors:

- To support applying a state law standard of care, Bavis repeatedly relies upon the so-called savings clause in the Federal Aviation Act, 49 U.S.C. 40120(c) (Pl. Mem. at 32, 34 and 35). She fails to recognize, however, that the application of the savings clause to cases arising out of the 9/11 terrorist attacks has been expressly abrogated by the second sentence of Section 408(b)(1) of ATSSSA.

- Bavis' arguments consistently proceed on the assumption that she is asserting causes of action defined by state law. But this argument again ignores the express language of Section 408(b)(1) which creates a new federal cause of action that supersedes state law claims for damages arising out of the hijacking and subsequent crashes of Flights 11 and 175.

- The most important provision of ATSSSA concerning standard of care is Section 408(b)(2) which provides in its entirety as follows:

  > **The substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law.**

  Bavis, however, makes no effort to interpret or give meaning to the crucial qualifying phrase "unless such law is inconsistent with or preempted by Federal law" and instead reads Section 408(b)(2) as if it simply ended with the words "the law, including choice of law principles, of the State in which the crash occurred."

This last error is perhaps the most critical. Congress, having decided to create a new

exclusive federal cause of action to govern 9/11 claims, was faced with two competing

considerations in defining the substance of the new cause of action. First, Congress had no

generally applicable preexisting body of federal tort law upon which to draw and apparently

decided not to create any from scratch in the immediate aftermath of 9/11. Second, Congress

knew that 9/11-related litigation would largely turn on issues of passenger and baggage

screening and, to a lesser extent, in-flight security. Having enacted such statutes as the Federal

Aviation Act and the Aviation Security Improvements Act and having regularly exercised

oversight of the aviation security regulations issued by the FAA, Congress was well aware that aviation security was the subject of detailed and exclusive federal regulations before 9/11. In Section 408(b)(2) of ATSSSA, Congress reconciled these two competing considerations by adopting and federalizing state tort law principles but making them subordinate to preexisting federal law (such as the FARs, ACSSP and FAA Security Directives) either (a) under ordinary principles of preemption or (b) whenever the newly federalized state tort law principles were inconsistent with preexisting federal law.

The "unless such law is inconsistent with or preempted by Federal law" language of Section 408(b)(2) is a uniquely powerful provision. American's research has disclosed no other pre-9/11 federal statute in which the two phrases "inconsistent with" or "preempted by" are used in combination. Under established principles of statutory construction, each of these phrases must be given its own independent meaning. *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."); *Platt v. Union Poe. R.R. Co.*, 99 U.S. 48, 58 (1879) ("Courts are to accord a meaning, if possible, to every word in a statute."). By its express language, Section 408(b)(2) thus provides that preexisting federal law must supplant federalized state tort principles not only whenever ordinary principles of preemption (such as field or conflict preemption) would apply, but whenever that preexisting federal law is substantively inconsistent with federalized state tort law.

As shown below, each of these phrases "inconsistent with" or "preempted by" independently dictates that the federal aviation security regulations in effect on 9/11 (including the FARs, ACSSP and FAA Security Directives) supplant tort law reasonable care standards whenever the two cover the same subject matter and would impose different requirements.

4

II.     **The "Preempted By" Language of ATSSSA Mandates Applying an Exclusively Federal Standard of Care.**

The legal landscape concerning interpretation of the "preempted by" language of Section 408(b)(2) has clarified dramatically since its initial briefing in 2007.  Controlling decisions by the Second Circuit Court of Appeals have now confirmed that the Federal Aviation Act and the FAA regulations promulgated thereunder occupy the field of aviation safety and security and displace differing state tort law standards of care.  *Goodspeed Airport, LLC v. East Haddam Inland Water Courses Comm'n*, 634 F.3d 206, 208 (2d Cir. 2011); *Air Transport Ass'n of American, Inc. v. Cuomo*, 520 F. 3d 218, 225 (2d Cir. 2008) ("ATA").[3]

A.     **Federal Aviation Act Preemption under *ATA* and *Goodspeed*.**

The *ATA* and *Goodspeed* decisions have settled the question of whether the Federal Aviation Act and its implementing regulations occupy the field of aviation security and displace state tort law standards of care (even if, in the absence of ATSSSA, they may allow for the continued existence of state tort remedies).

In *ATA*, the Second Circuit considered a challenge to the New York State Passenger Bill of Rights ("PBR") which sought to regulate treatment of airline passengers exposed to lengthy runway delays.  520 F.3d at 220.  The Court held that the PBR was preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1).  *Id.* at 223.  However, in an extended discussion, the Court also found that the Federal Aviation Act "was enacted to create a 'uniform and exclusive system of federal regulation' in the field of air safety."  520 F.3d at 224.  The

---

[3]     American joins in the arguments of United, Huntleigh and Massport, as set forth in their memorandum on Standard of Care, that the *ATA* decision also establishes that federal aviation security regulations set the standards governing Bavis' claims by virtue of the express preemption provision of the Airline Deregulation Act of 1978.  *See* 520 F.3d at 224-25.  American does not develop this argument further in this Memorandum because Section 408(b)(2) of ATSSSA and Federal Aviation Act preemption are dispositive of the standard of care issue.

Court observed that "[i]nsofar as the PBR is intended to prescribe standards of airline safety, we note, finally, that it may also be impliedly preempted by the FAA and regulations promulgated thereunder." *Id.* The Court then cited with approval numerous decisions from other circuits and a decision from the Southern District holding that "Congress intended to occupy the entire field and thereby preempt state regulation of air safety". *Id.* at 225.[4]

The Second Circuit's subsequent decision in *Goodspeed* erased any remaining doubt regarding the preemptive effect of the Federal Aviation Act on air safety claims in this Circuit. In *Goodspeed*, the Second Circuit converted *ATA*'s extended analysis of federal preemption of the field of air safety into an express holding that Congress had occupied the entire field of air safety and preempted state regulation of that field. The language of the *Goodspeed* opinion is dispositive of this issue:

> In *Air Transport Ass'n of America, Inc. v. Cuomo (ATA)*, 520 F. 3d 218, 225 (2d Cir. 2008), this Court observed that several of our sister circuits, and several district courts within our own circuit, have concluded that Congress intended to occupy the entire field of air safety and thereby preempt state regulation of that field. *ATA* examined evidence of Congressional "intent to centralize air safety authority and the comprehensiveness of [ ] regulations pursuant to that authority," under both the Aviation Act and the ADA. *Id.* However, as the district court was careful to observe, *ATA* stopped short of formally holding that Congress intended to occupy the field of air safety. *See Goodspeed*, 681 F. Supp. 2d at 199. Today we join our sister circuits.[5]

634 F.3d at 210.

Plaintiff Bavis attempts to distinguish *ATA* and *Goodspeed* by arguing that *ATA* recognizes that the Federal Aviation Act does not preempt all state law tort claims (Pl. Mem. at 21) and that *Goodspeed* did not itself involve state tort claims for negligent aviation security.

---

[4]   These pre-*ATA* and pre-*Goodspeed* decisions are discussed in detail in the 2007 Memoranda. *See* Ex. A, 2007 Memo at 22-29; Ex. B, 2007 Reply Memo at 24-34.

[5]   *ATA* collects the relevant circuit cases through 2008. 520 F. 3d at 225. Since then, at least one additional circuit has held that Congress intended to occupy the field of air safety. *U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010).

(Pl. Mem. at 29-31.)  Both observations are true, but neither impacts the conclusion that the Federal Aviation Act and the regulations thereunder occupy the entire field of air safety and displace any contrary state tort law substantive standards.  In non-ATSSSA situations (as noted in *ATA*, 520 F.3d at 225) the savings clause of the Federal Aviation Act, 49 U.S.C. 40120(c), preserves state law remedies.  But state tort substantive standards covering the same subject matter as federal aviation standards are nonetheless displaced.  That latter conclusion flows inevitably from the holding that Congress has occupied the entire field of air safety.[6]  *See, e.g., Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("When Congress intends federal law to 'occupy the field,' state law in that area is preempted."); *United States v. Locke*, 529 U.S. 89, 103 (2000) (there is a "longstanding rule that the enactment of a uniform federal scheme displaces state law").

Moreover, the reasoning of both *ATA* and *Goodspeed* extinguishes any hope that Plaintiff may have that the principles set forth in these decisions are inapplicable to substantive state tort law standards of care.  Both cases cite with express approval decisions from other circuits holding that the Federal Aviation Act and its regulations preempt state tort law standards. *Goodspeed*, 634 F.3d at 210 n. 5, citing *Montalvo v. Spirit Airlines*, 508 F. 3d 464, 468 (9th Cir. 2007) (holding that the "FAA preempts the entire field of aviation safety from state and territorial regulation" and dismissing plaintiffs' failure to warn claim because there were no applicable federal regulations requiring warning); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005) (affirming summary judgment on state law failure to warn claim, holding "federal law establishes the standards of care in the field of aviation safety and

---

[6]   Plaintiff Bavis also rather facetiously dismisses *Goodspeed* as a case involving only a permit for cutting down trees. (Pl. Mem. at 29.) But the pointed breadth of the Court's holding, quoted above, rules out any such narrow reading of the opinion.

7

thus preempts the field from state regulation."); *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367-68 (3d Cir. 1999) (holding in negligence action that it was an error to rely upon territorial standard of care because "federal law establishes the applicable standards of care in the field of air safety generally, thus preempting the entire field from state and territorial regulation"); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 5 (1st Cir. 1989) (holding state drug-testing law preempted because federal "statutory and regulatory mosaic" occupied the field of air safety in regulating pilot qualifications); *ATA*, 520 F.3d at 225, citing the same authorities as well as *Curtin v. Port Authority*, 183 F. Supp. 2d 664, 671 (S.D.N.Y. 2002) (holding that federal law, not state law, standards of care apply to air safety, noting that "limiting the FAA preemption calculus to the ADA unduly circumscribes the examination.").[7]  Furthermore, even before *ATA* and *Goodspeed*, the Second Circuit had held that drug testing regulations under the Federal Aviation Act preempted state law tort claims based on state judge-made rules that sought to impose state requirements more onerous than the federal regulations. *Drake v. Laboratory Corp.*, 458 F.3d 48, 65 (2d Cir. 2006).[8]

Notably, neither Bavis nor WTCP seeks to distinguish *ATA* and *Goodspeed* by drawing a line between aviation safety and aviation security.  Any such distinction would be untenable because Plaintiffs themselves rely on an equation of aviation safety with aviation security for their own "minimum standards" argument (Pl. Mem. at 5-8 & n. 2) and because the role of the

---

[7]  WTCP makes no mention at all of either *ATA* or *Goodspeed*.  Rather, unhelpfully, it cites two district court decisions, *Sunbird Airlines, Inc. v. Beech Aircraft Corp.*, 789 F. Supp. 360 (D. Kan. 1992), and *Margolis v. United Airlines, Inc.*, 811 F. Supp. 318 (E.D. Mich. 1993), holding that the Federal Aviation Act does not preempt state tort law standards, without noting that these decisions have been superseded by subsequent contrary holdings of the Courts of Appeals for their respective circuits. *See O'Donnell*, 627 F. 3d at 1326 (10th Cir. 2010) and *Greene*, 409 F. 3d at 795 (6th Cir. 2005).

[8]  Curiously, Bavis relies primarily on the district court decision in *Drake*, 290 F. Supp. 2d 352 (E.D.N.Y. 2003), not the Second Circuit's ruling that remanded it for further consideration.  (Pl. Mem. at 33, 35.)

federal government in aviation security has been at least as comprehensive and exclusive as its role in aviation safety. Since its inception in 1973, checkpoint screening of passengers and baggage has been exclusively the subject of federal regulation without any state involvement at all. Nor have the states even attempted to play any role in establishing requirements for in-flight security.

Finally, the differences between an analysis of preemption under ATSSSA as compared to preemption under the Federal Aviation Act in non-ATSSSA situations all weigh in favor of displacement of state law under ATSSSA. As noted above, Section 408(b)(1) declares the savings clause in the Federal Aviation Act inapplicable to claims asserted under ATSSSA. Moreover, Section 408(b)(2) of ATSSSA contains an express "preempted by" clause as well as an even broader "inconsistent with" displacement provision. The conclusion that the FARs, ACSSP, and FAA Security Directives displace state substantive standards of care is inescapable under Section 408(b)(2) in light of *ATA* and *Goodspeed*.

**B.     Bavis' Other Authorities Do Not Withstand Analysis.**

Plaintiff Bavis cites several other Second Circuit decisions in an effort to avoid application of a federal standard of care. Each of these decisions is plainly inapposite.

Amazingly, Plaintiff continues to assert that *In re Air Crash at John F. Kennedy Int'l Airport*, 635 F.2d 67 (2d Cir. 1980), and *In re Air Disaster at Lockerbie, Scotland*, 37 F.3d 804 (2d Cir. 1994), require the application of state reasonable care liability standards to the 9/11 terrorist attacks. (Pl. Mem. at 6, 26, 29, 31, 34.) However, this position is indefensible in view of the wording of Section 408(b)(2) of ATSSSA, the Second Circuit's subsequent decisions in *ATA* and *Goodspeed*, and the utter absence of any preemption analysis in either *JFK* or *Lockerbie*. Moreover, even prior to *ATA*, several district courts in this Circuit held that *JFK* and

*Lockerbie* were not binding authority on preemption issues.  *See Aldana v. Air E. Airways, Inc.*, 477 F.Supp. 2d 489, 493 (D. Conn. 2007) (endorsing *Abdullah* and noting that "the Second Circuit has not meaningfully addressed the issue of tort preemption"); *Curtin,* 183 F. Supp. 2d at 669-70 (following *Abdullah* and noting that because the parties in *JFK* stipulated to the application of New York law, "the Court of Appeals did not address whether the FAA preempts state law tort claims"); *Shupert v. Continental Airlines, Inc.*, No. 00 Civ. 2743, 2004 WL 784859, at *5-6 (S.D.N.Y. Apr. 12, 1994) (following *Abdullah* and noting that the court in *JFK* merely accepted the parties' stipulation to the application of New York law).

Nor do *Di Benedetto v. Pan Am World Service, Inc.*, 359 F.3d 627 (2d Cir. 2004), or *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996), support the application of a state law standard of care in our situation.  (Pl. Mem. at 7, 26-28.)  *Di Benedetto* did not reject defendants' preemption arguments; it merely found it unnecessary to reach them because that plaintiff had so clearly failed to establish a breach of any state law duty.  359 F.3d at 631. *Stanford* involved the transportation of passengers by a foreign flag carrier from Lebanon to Dubai; neither the Federal Aviation Act nor any FAA regulation was even remotely at issue.  89 F.3d at 122.

Plaintiff's reliance on *McNally v. Port Authority (In re WTC Disaster Site)*, 414 F.3d 352, 379-380 (2d Cir. 2005), for the proposition that "what ATSSSA displaces is not the substantive standards governing liability, but the state-law damages remedies" is also misplaced.  (Pl. Mem. in Opposition to Massport Motion for Summary Judgment at 4.)  That observation was entirely correct in the context in which it was made – lawsuits by rescue and clean-up workers as to which no claim or defense based on any federal standard of care was asserted – but has no application here.  *McNally* involved construction only of Section 408(b)(1) and the first clause of

Section 408(b)(2) of ATSSSA and did not address the meaning of the "inconsistent with or preempted by Federal law" clause of Section 408(b)(2).

Finally, the authority of one of Plaintiff's favorite out-of-circuit decisions, *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438 (10th Cir. 1993) (Pl. Mem. at 24, 29, 36), has been fatally undermined by the Tenth Circuit's subsequent decision in *O'Donnell*, 628 F.3d 1318 (cited with approval in *Goodspeed*, 634 F.3d at 210, n. 5). *Cleveland* concluded that the Federal Aviation Act did not preempt state tort law standards. *O'Donnell*, however, overturned that ruling, concluding instead that Congress had occupied the entire field of aviation safety and displaced all state law substantive standards in that field. 627 F.3d at 1326.[9]

## III. The "Inconsistent With" Language of ATSSSA Mandates Applying an Exclusively Federal Standard of Care.

As explained in Parts I and II of this Memorandum, Congress, in enacting Section 408(b)(2) of ATSSSA, subordinated general principles of tort law derived from the law of the State of the crash to preexisting federal law under ordinary principles of field and conflict preemption. But Congress went even further. The "inconsistent with" language of Section 408(b)(2) mandates that the federal aviation security regulations in effect on 9/11 (as set forth in the FARs, ACSSP and FAA Security Directives) supersede tort law reasonable care standards whenever the two are inconsistent (*i.e.*, whenever the two standards cover the same subject matter and one would require a different course of conduct than the other).[10]

---

[9]   *O'Donnell*, 627 F.3d at 1326, did agree with *Cleveland*, 985 F.2d at 1442-43, and *ATA*, 520 F.3d at 225, that the savings clause of the Federal Aviation Act may preserve certain state tort law remedies. But the savings clause has no application to ATSSSA claims.

[10]   The issues addressed in this Part III are discussed in greater detail in the 2007 Memoranda. *See* Ex. A, 2007 Memo at 10-11 and 30-43; Ex. B, 2007 Reply Memo at 11-23.

Under standard canons of statutory construction, when a phrase such as "inconsistent with" is not defined in the statute itself, the phrase is to be given its ordinary English meaning. *See, e.g. Schindler Elevator Corp. v. United States ex rel. Kirk*, 2011 U.S. LEXIS 3542 at *11 (May 16, 2011) ("Because the statute does not define 'report,' we look first to the word's ordinary meaning."). The Oxford English Dictionary (2nd Ed. 1989) defines "inconsistent" as "not agreeing in substance, spirit, or form . . . not consonant or in accordance; at variance, discordant, incompatible, incongruous." Under this definition, the "inconsistent with" language of Section 408(b)(2) would preclude applying a generalized reasonable care standard where that application would vary the Aviation Defendants' obligations under the applicable provisions of an FAR, the ACSSP or a Security Directive.

Because the Court has exclusive jurisdiction of property damage and wrongful death claims under ATSSSA and has not yet ruled on the governing standard of care,[11] there is no precedent directly construing the "inconsistent with" language of Section 408(b)(2). However, Section 408(b)(2) has its closest federal analog in the Price-Anderson Amendments Act of 1988, 42 U.S.C. § 2014(hh) ("Price-Anderson Act") (creating exclusive federal cause of action governed by law "derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions" of federal law). Like ATSSSA, the Price-Anderson Act created a new exclusive cause of action that superseded any previously existing state law rights of action.

---

[11] The suggestion by Bavis and WTCP that the Court already has ruled on the standard of care issue in granting the motion by American and Globe for summary judgment as to the Flight 175 property damage claims is specious. (Pl. Mem. at 1; WTCP Mem. at 1.) American and Globe successfully moved for summary judgment on state law duty and proximate cause grounds; they asserted no preemption or standard of care defense and no issues concerning the proper interpretation of Section 408(b)(2) of ATSSSA were presented. *In re Sept. 11 Litig.*, 594 F. Supp. 2d 374 (S.D.N.Y. 2009).

The federal courts consistently have concluded that the analogous language in the Price-Anderson Act means that an exclusively federal standard of care applies to any claims brought pursuant to the newly created federal cause of action. *See, e.g., In re TMI Litig. Cases Consol. II.* 940 F.2d 832, 854 (3rd Cir. 1991) (holding that phrase "unless inconsistent with" federal law means "[a] claim arising out of any nuclear incident is compensable under the terms of the Amendments Act *or it is not compensable at all*") (emphasis in original); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1003 (9th Cir. 2008) (holding "federal law preempts states from imposing a more stringent standard of care than federal safety standards"); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994) (holding, under same statute, that "[i]mposing a standard of care other than the federal regulations would disturb the carefully crafted balance between private involvement and safety that Congress has achieved"); *Corcoran v. New York Power Auth.*, 935 F. Supp. 376, 386 (S.D.N.Y. 1996) (holding that "imposing any other standard of care would contravene the federal interest in occupying the field of nuclear safety"); *see also* Ex. A, 2007 Memo at 32 n. 7 (citing numerous additional authorities to the same effect).

As the *O'Conner* court further observed, the Price-Anderson Act legislatively overruled *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) (cited in Pl. Mem. at 24, 32, 33), and "makes pointedly clear that any tension between federal standards and state liability standards is to be resolved so as to avoid inconsistency with the Price-Anderson Act." 13 F.3d at 1105 n. 13

Congress opted to include the phrase "inconsistent with" in ATSSSA against the backdrop of an existing body of precedent interpreting a virtually identical provision in the Price-Anderson Act. In choosing to so closely model Section 408(b)(2) on the Price-Anderson Act, Congress must be presumed to have intended courts to construe Section 408(b)(2) in the same

way. As the Supreme Court has explained on multiple occasions, there is a "presumption that Congress is aware of 'settled judicial and administrative interpretation[s]' of terms when it enacts a statute." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 993 (2005) (citing *Comm'r of Internal Revenue v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993); *see also* Ex. A, 2007 Memo at 33-34 (citing additional authorities). Or, as the Court put it in *Rowe v. New Hampshire Motor Transp. Ass'n*, "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretation as well." 552 U.S. 364, 370 (2007) (citing *Merrill Lynch Pierce Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006). In sum, the "inconsistent with" language in ATSSSA should be given the same meaning as its counterpart language in the Price-Anderson Act.

## IV. The Federal Aviation Act and Its Implementing Regulations Set Forth the Legal Obligations of the Airlines and Security Companies for Aviation Security; Defendants May Not Be Subjected to Liability for Failing to Exceed Those Obligations

In their standard of care briefs (Pl. Mem. at 5-8; WTCP Mem. at 2-3) and in their opposition to Massport's motion for summary judgment (Pl. Massport Mem. at 3-6; WTCP Massport Mem. at 1-3), Bavis and WTCP contend that the Federal Aviation Act and implementing regulations set forth only "minimum standards" that the Aviation Defendants may be required to exceed, on pain of tort liability, either under a state reasonable care standard or a federal duty to provide service with the highest possible degree of safety in the public interest. This argument fails for multiple reasons.

First, as to state tort law standards, Plaintiffs' "minimum standards" argument represents an attempted end run around the language of ATSSSA and controlling judicial decisions on conflict and "occupation of the field" preemption. It is foreclosed by the "inconsistent with or

preempted by" clause of Section 408(b)(2) of ATSSSA and by the Second Circuit's decisions in *ATA*, *Goodspeed* and *Drake*. State tort law cannot impose liability for failing to exceed federal standards where, as here, federal law has occupied the entire field and the governing statute expressly displaces inconsistent state law.[12]

Second, the FARs, ACSSP and FAA Security Directives are mandatory, binding requirements that have the force and effect of law; these regulations tell the airlines and their security companies what they are legally required to do and provide for fines and other penalties if they are violated.[13] It makes scant sense to impose tort liability on the Aviation Defendants for failing voluntarily to exceed what the law governing their conduct specifically requires them to do.

Third, the "minimum standards" argument confuses the statutory provisions governing aviation safety with those governing aviation security. 49 U.S.C. § 44701, upon which the "minimum standards" argument is based, pertains to issues of aviation safety, not aviation security. Ex. B, 2007 Reply Memo at 4-7. This fact is confirmed by the multiple references to "safety" in the text of Section 44701 itself. The FAA's authority over aviation security was conferred by the Air Transportation Security Act of 1974 and later reconfirmed by the Aviation Security Improvements Act of 1990. Those statutes, now codified in a separate chapter of the

---

[12]  Minimum standards arguments have been consistently rejected under the Price-Anderson Act. *See* Part III, *supra*.

[13]  Ex. C, Deposition Transcript of Robert J. Cammaroto ("Cammaroto Dep.") Volume I at 17:8-15, 35:3-36:11; Volume II at 232:14-19; Ex. D, Deposition Transcript of Claudio Manno ("Manno Dep.") at 277:14-278:3. On 9/11, Mr. Cammaroto was serving as the chief of the FAA's Security Directives Working Group and testified as the FAA's Rule 30(b)(6) representative on pre-9/11 aviation security standards and procedures. Ex. C, Cammaroto Dep. Volume I at 16:21-25. On 9/11, Mr. Manno was director of the FAA's Office of Civil Aviation Intelligence and testified as a fact witness concerning the FAA's assessment of the pre-9/11 terrorist threat. Ex. D, Manno Dep. at 9:2-7. The 2007 Memorandum identifies additional authority concerning the legally binding and mandatory nature of the ACSSP and FAA Security Directives. *See* Ex. A, 2007 Memo at 6-7 and 13-18.

Federal Aviation Act at 49 U.S.C. § 44903 *et seq.*, make no reference to "minimum standards" but instead stress the need for implementation of uniform security procedures.

Fourth, even assuming that 49 U.S.C. § 44701 applies to aviation security procedures, the standards the FAA adopts under that section already incorporate the objective of providing service with "the highest possible degree of safety in the public interest." They are by no means "minimum standards" in the sense of being minimally adequate. To the contrary, in promulgating its safety standards, the FAA is statutorily required to take into account "the duty of an air carrier to provide service with the highest possible degree of safety in the public interest." 49 U.S.C. § 44701(d); *Williams v. Trans World Airlines*, 509 F. 2d 942, 946 n. 8 (2d Cir. 1975). The FAA's aviation security regulations are similarly not designed to meet minimal standards of adequacy. Appendix III to the ACSSP expressly states that ACSSP standards and procedures for screening persons and carry-on baggage "are designed to effect uniform application, *optimum safety*, and the courteous and efficient treatment of all persons subject to preboard screening." Ex. E, American ACSSP at Appendix III (emphasis added). A standard designed to promote "optimum safety" is not in any meaningful sense a "minimum standard." FAA Rule 30(b)(6) designee Robert Cammaroto confirmed this fact at his deposition, testifying that in promulgating the ACSSP and issuing Security Directives, the FAA sought to adopt security measures that were as effective as possible in meeting the perceived threat. Ex. C, Cammaroto Dep. Volume I at 195:5-196:10.

If, as 49 U.S.C. § 44701(d) mandates, the FAA's so-called "minimum standards" are themselves designed to effectuate the duty of an air carrier "to provide service with the highest possible degree of safety in the public interest," an air carrier cannot be found in breach of that duty if it complies with the federal standard. Even in the safety arena, when the federal standard

16

is viewed as preemptive, an air carrier which complies with an FAA safety standard cannot be found liable in tort for failure to "provide service with the highest possible degree of safety" as to the conduct covered by the federal safety standard.[14]  Similarly, in the aviation security arena, an air carrier or security company fulfills any federal duty it may owe when it complies with applicable FARs, Security Directives or ACSSP provisions.

Fifth, even assuming *arguendo* that state tort standards are not preempted or displaced by ATSSSA and the Federal Aviation Act, nothing in New York tort law suggests that it would impose aviation security procedures more stringent than those adopted pre-9/11 by the FAA. Plaintiffs talk blithely about the Aviation Defendants' ability to do more than the federal security procedures require.  But the real question is not whether the Aviation Defendants could have voluntarily exceeded the federal requirements but rather whether a legal basis exists for holding them liable in tort if they chose not to do so.  Plainly, if the Aviation Defendants complied with their screening obligations under the FARs, ACSSP and any applicable Security Directives, no basis exists in federal law for holding them liable in tort.  And as the Bavis Defendants effectively demonstrate in their April 29, 2011 Memorandum of Law in Support of Draft Jury Instructions, New York law imposes only a duty of ordinary care on air carriers (*id.* at 19), and requires the adoption of only "minimal security measures" to prevent the commission of intentional criminal acts by third parties.  *Id.* at 5-6 & n. 12, 20-21 & n. 40.  Even Bavis characterizes New York's reasonable care standard as imposing only a duty to take "minimal

---

[14]  Neither *In re Trans World Airlines, Inc.*, FAA Order No. 1999-12, 1999 W.L. 1125387, at *3 (WTCP Mem. at 1), nor *Williams v. Trans World Airlines*, 509 F.2d 942 (2d Cir. 1975) (Pl. Mem. at 1, 8), support Plaintiffs' position.  *Trans World* was a civil penalty case in which the fine was based on violations of two FARs requiring TWA to comply with FAA Security Directives.  TWA's responsibility for providing service with the highest degree of safety was cited only to justify imposing vicarious liability on TWA for the inattention of its employees.  *Williams* is even more off-point.  It upheld an air carrier's refusal under 49 U.S.C. § 1511 and its implementing regulations to transport a potentially dangerous passenger.  509 F.2d at 949.

security precautions against reasonably foreseeable criminal acts by third parties." (Pl. Massport Mem. at 11.)  Compliance with the federal security procedures for passenger and carry-on baggage screening would far exceed any security procedures that might have been required before 9/11 under New York common law.

Bavis also suggests that state reasonable care standards have been interjected through the back door because some provisions of the ACSSP or the Checkpoint Operations Guide ("COG")[15] require aviation security personnel to exercise elements of judgment or common sense. (Pl. Mem. at 4, 16-18.)  This argument misunderstands the effect of federal preemption. Any judgment or common sense that aviation security personnel exercise under the ACSSP or the COG must be evaluated exclusively in the context of the federal regulatory requirements themselves, not in the context of an ill-defined and perhaps hindsight-influenced state common law standard.

Finally, Bavis and WTCP vastly oversimplify what it means to exceed federal security standards or to do more than the ACSSP or FAA Security Directives require.  The FAA's pre-9/11 security procedures represented the end product of a series of policy judgments and trade-offs between competing systemic objectives including security, passenger convenience, the maintenance of an efficient and on-time air transportation system, and the protection of passenger privacy and civil liberties.  *See* Ex. E, American ACSSP at Appendix III; Ex. C, Cammaroto Dep. Volume I at 100:14-20, 141:11-142:4, 143:14-25; Ex. F, FAA Information

---

[15]   Unlike the ACSSP, the COG was not issued by the FAA and did not have the binding force of a federal regulation. Ex. C, Cammaroto Dep. Volume I at 271:13-19.  Before 9/11, the FAA did not consider the COG to be a document with which the airlines were required to comply as a matter of federal law and would not impose fines or penalties for failure of an air carrier to comply with provisions of the COG. Ex. C, Cammaroto Dep. Volume II at 231:15-232:9; Volume I at 271:20-25. Rather, the COG was a practical working guide to the operation of the ACSSP that was developed by the Air Transport Association and the Regional Airways Association and that the FAA reviewed to ensure that it did not contain any provisions inconsistent with the requirements of the ACSSP or other FAA regulations. Ex. C, Cammaroto Dep. Volume I at 272:2-273:23.

Circular 99-13. A policy unilaterally adopted by an air carrier to single mindedly advance one of these objectives may very well disserve others. Moreover, even the selection of security measures requires an assessment (often based on classified information) of the most serious and realistic threats and a prioritization of the available security resources among those threats (*e.g.*, should checkpoint screeners be directed to focus their attention toward detection of improvised explosive devices or toward seizure of small knives?). Ex. C, Cammaroto Dep. Volume I at 228:5-231:5; Ex. D, Manno Dep. at 128:8-19. These complexities undoubtedly influenced Congress to delegate the authority to prescribe aviation security measures to an expert administrative agency (the FAA, with the assistance of the FBI as to threat assessment) and to mandate the development, to the maximum extent possible, of uniform nationwide security procedures. *See* 49 U.S.C. § 49904(a) (amended 2001); 49 U.S.C. § 49903(b) (amended 2001).

In sum, nothing in Plaintiffs' "minimum standards"/"doing more" argument warrants a departure from the federal standard of care mandated by the "inconsistent with or preempted by Federal law" clause of Section 408(b)(2) of ATSSSA and the Second Circuit's "occupation of the field of air safety" decisions in *ATA* and *Goodspeed*.

## V. The Security Measures Plaintiffs Suggest Defendants Should Have Adopted Would Conflict with FAA Regulations and Policy Judgments or Violate Federal Law.

While repeatedly proclaiming that the Aviation Defendants should have done more than FAA required, Plaintiffs have been singularly recondite in revealing their theories as to what more the Aviation Defendants actually should have done. However, based on their deposition questions, what Plaintiffs most likely regard as "doing more" frequently would conflict with specific provisions of FAA screening regulations or violate other provisions of federal law.

For example, Plaintiffs' questions suggest that they believe that the Aviation Defendants, apprised of the threat posed by Islamic terrorists, should have subjected passengers, especially young males, appearing to be of Arabic or Middle Eastern extraction to greater security scrutiny than other passengers.   However, an Aviation Defendant that adopted such an approach would find quickly that it had violated FAA policy and federal law.   Before 9/11, the FAA did not permit airlines or checkpoint screening companies to select passengers for more intensive screening procedures based on their race, religion or national or ethnic origin.   Ex. C, Cammaroto Dep. Volume I at 102:15-22.   FAA policy prohibited security personnel from singling out passengers of Arabic or Middle Eastern origin for more intensive security searches than other passengers, such as special physical hand searches of their carry-on bags or hand-held metal detector or pat-down searches of their persons if they failed to alarm the walk-through metal detector.   *Id.* at 102:23-103:10.   Before 9/11, the Aviation Defendants used the computer-assisted passenger pre-screening program ("CAPPS"), developed by the FAA, to identify passengers warranting additional security scrutiny.   Because of civil liberties concerns expressed by the Gore Commission, the Department of Justice and the American Civil Liberties Union, CAPPS deliberately did not take into consideration factors such as race, religion or ethnic origin. *Id.* at 83:9-89:20.   It would have been impermissible for an airline unilaterally to modify the CAPPS algorithm to give special scrutiny to Arabs or Moslems or persons of Middle Eastern appearance. *Id.* at 89:21-96:11.[16]

---

[16]   In an attempt to provide some legal basis for their "doing more" arguments, Plaintiffs grossly overread the powers of airline ground security coordinators ("GSCs") under Section 6.1 of the COG (Pl. Mem. at 17).   GSCs are not policymakers; they are service personnel typically assigned responsibility for ensuring that FAA security procedures are followed as to particular flights. Section 6.1 (entitled "Exceptional Screening") permits a GSC to direct the use of intensified security procedures to address emergency situations such as the receipt of a bomb threat directed toward a specific flight.   As explained in note 15, *supra*, the COG is not a federal regulation and has no legal

As a second example of "doing more," Plaintiffs appear to suggest that checkpoint screeners should have seized all short-bladed knives or at least those that appeared capable of causing physical harm. But the FAA's rule, set forth in Appendix I to the ACSSP (Ex. G) that prohibited only knives with blades four inches long or longer (or illegal under local law) from entering the sterile area represented a considered policy judgment.[17]  Ex. C, Cammaroto Dep., Volume I at 204:15-213:8, 246:4-19.  Before 9/11, the FAA regarded bombs and explosives (especially improvised explosive devices) as the principal threat to domestic aviation security (Ex. D, Manno Dep. at 34:12-55:11), and did not regard knives with blades under four inches long as high-priority threat items.  *Id.* at 589:18-599:12; Ex. C, Cammaroto Dep., Volume I at 229:8-230:3, Volume II at 235:2-12.  Indeed, in 1993, the FAA considered whether to modify the four-inch knife rule and decided not to do so.  Ex. C, Cammaroto Dep., Volume I at 218:15-231:5.  Among the many factors influencing the FAA's decision to reaffirm the four-inch knife rule were that (1) many passengers carried these items for legitimate reasons; (2) relatively few hijackings had occurred in which the hijacker's principal weapon had been a short-bladed knife and those few hijackings generally had benign outcomes; (3) would-be hijackers could obtain or improvise equally dangerous items once inside the sterile area; (4) the difficulty of detecting short-bladed knives at the checkpoint; and (5) the desire to focus screener attention and resources on higher-priority threat items such as explosive devices and firearms.  *Id.* at 218:15-239:13, 247:2-250:12; Ex. D, Manno Dep. at 589:18-599:12.  Before 9/11, the FAA did not conceive of a

---

force.  Nothing in Section 6.1 authorizes GSCs to order regular and systematic departures from the screening procedures set forth in the ACSSP or as required by Security Directives.

[17]  The FAA was, of course, aware before 9/11 that even short-bladed knives could be used to kill or injure.  Ex. C, Cammaroto Dep., Volume I at 218:3-14.

hijacking by multiple suicidal hijackers armed only with short-bladed knives.  Ex. D, Manno Dep. at 145:3-146:9, 183:17-185:13, 589:18-590:13.[18]

Section 408(b)(2) of ATSSSA does not permit Plaintiffs to overturn considered policy judgments such as the four-inch knife rule through invocation of state tort law to impose hindsight-oriented security measures specifically tailored to prevent what happened on 9/11.

Moreover, many of Plaintiffs' "doing more" theories would fail to pass muster under well-established principles of conflict preemption.  *See, e.g., Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) (finding implied preemption where state-law airbag standards imposed requirements beyond those mandated by federal airbag regulations); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (finding conflict preemption where it is impossible for a private party to comply with both state and federal law).  Conflict preemption principles definitely would apply if the Aviation Defendants could not have independently implemented the proposed "improvements" on the federal standards without first obtaining FAA approval.  As the Supreme Court recently held in *Pliva, Inc. v. Mensing*, No. 09–993, 2011 WL 2472790, at *12 (June 23, 2011):

> [W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for preemption purposes.

Even more fundamentally, Plaintiffs' "doing more"/"minimum standards" arguments falter under the "inconsistent with or preempted by Federal law" clause of Section 408(b)(2) of ATSSSA and the Second Circuit's decisions in *ATA*, *Goodspeed* and *Drake*.  The conduct of the

---

[18] Several more examples of inconsistencies or conflicts between Plaintiffs' "doing more" liability theories and the actual provisions of, and policy judgments underlying, the ACSSP, FAA Security Directives and other provisions of federal law are set forth in the 2007 Reply Memorandum.  *See* Ex. B, Reply Memo at 20-23.

air carriers and security companies on 9/11 must be evaluated according to the federal standards set forth in the FARs, ACSSP and FAA Security Directives. Any state common law that would impose a different standard of care is either preempted or displaced by federal law. Furthermore, Plaintiffs have provided no basis for concluding that New York tort law, even if it applied, would have required aviation security procedures any more stringent than those imposed by the FAA.

## CONCLUSION

For the foregoing reasons, American respectfully requests that the Court enter an order (a) that the standard of care for evaluating the conduct of the airlines and security companies in connection with the 9/11 terrorist attacks is set forth in the FARs, ACSSP and FAA Security Directives (the "Federal Regulations") and (b) that New York tort law standards are preempted or displaced whenever they cover the same subject matter as the Federal Regulations and would require defendants to engage in different conduct than that required under those regulations.

Dated: New York, New York
     July 8, 2011

                          Respectfully submitted,

                          CONDON & FORSYTH LLP

                          By: _____
                              Desmond T. Barry, Jr. (DB 8066)
                          Times Square Tower
                          7 Times Square
                          New York, New York  10036
                          Tel: (212) 490-9100
                          Fax: (212) 370-4453

                               -and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta (RP 1749)
919 Third Avenue
New York, New York  10022
Tel:  (212) 909-6000
Fax:  (212) 909-6836

*Attorneys for Defendants*
AMERICAN AIRLINES, INC. and
AMR CORPORATION

*Of Counsel:*

Maura K. Monaghan
Jacob W. Stahl
Johanna N. Skrzypczyk

24